**THOMAS F. X. DUNN**
**ATTORNEY AT LAW**
**225 BROADWAY**
**SUITE 1515**
**NEW YORK, NEW YORK 10007**
TEL: 212-941-9940
FAX: 212-693-0090

**By ECF & email**                                                                                                    April 1, 2020

Honorable Paul G. Gardephe       The Government is directed to respond by April
United States District Judge          6, 2020.
United States District Court
Southern District of New York      SO ORDERED.
40 Foley Square
New York, N.Y. 10007                   */s/ Paul G. Gardephe*

      Re: United States v. Jibril Adamu,     Paul G. Gardephe
           18 Cr. 601 (PGG)                        United States District Judge
                                                                   April 2, 2020

Dear Judge Gardephe:

      I represent Jibril Adamu. I write to request that your Honor grant his release, because such release is necessary due to Mr. Adamu's pre-existing medical conditions. Mr. Adamu advised that he has breathing issues and that these issues increased over the last few days. Although he received no medical treatment to date he believes he may have some infection on his lungs. The compelling reason is that Mr. Adamu, like all other inmates at the Metropolitan Correction Center (MCC) is at heightened risk for contracting and spreading the COVID-19 virus. The MCC placed Mr. Adamu on a list of inmates that are considered at "high risk" of being infected with the coronavirus.

      **Charges, Arrest and Arraignment**

      Mr. Adamu is charged with one count of Narcotics Conspiracy on board a U.S. Aircraft, in violation of 21 U.S.C. § 959(c), (d) and § 963, and one count of Narcotics Distribution on Board a U.S. Aircraft, in violation of 21 U.S.C. § 959(c), (d), § 960(a)(3) and (b)(1)(c). Mr. Adamuwas arrested on or about October 17, 2019, and arraigned that same day before Magistrate Judge Stewart D. Aaron. At the arraignment, Mr. Adamu consented to detention without prejudice to move for release on bail at a future date. *See* ECF. No. 151 (Oct. 17, 2019). Prior to his arraignment in the Southern District of New York, Mr. Adamu had been detained in a Croatian jail for over one year.

Honorable Paul G. Gardephe
April 1, 2020

    Mr. Adamu seeks his release subject to conditions of home incarceration and electronic monitoring that would prevent any risk of flight or danger to the community during the COVID-19 crisis.  The government extradited Mr. Adamu from Croatia. He is a citizen from Africa. I have no co-signers to offer to your Honor to sign a bond. I have no place of residence to offer where Mr. Adamu could live. I can only offer that he initially live in a halfway house or shelter. I am attempting to contact his family to determine if they can provide financial support in which he could pay for a room.

    In recent weeks, COVID-19 has spread throughout the United States, infecting thousands of Americans and inflicting many with severe respiratory illness; many Americans have perished.

    On March 11, 2020, the World Health Organization described the COVID-19 outbreak as a global pandemic.

    According to the Centers for Disease Control (CDC), people who suffer from asthma and it is submitted other breathing issues "are at higher risk of getting very sick from this illness." The CDC sets forth that "[b]ased on currently available information and clinical expertise, older adults and people of any age, who have been seriously underlying medical conditions might be at a higher risk for severe illness from COVID-19." Those at high risk include "people who suffer from asthma and breathing issues. *See* CDC: COVID-19: What if You are High Risk, *available at* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html

    Mr. Adamu is in the high-risk category of individuals, who face grave health consequences or death from exposure to COVID-19. Mr. Adamu is likely at the very highest risk in light of the fact that he suffers from a high-risk condition.

    With regard to his breathing issues, it is not unreasonable to make a sound assumption that Mr. Adamu also faces serious risk of premature death.

    Mr. Adamu advised that his sleeping arrangements at the MCC as with all prison environments, has inmates held in close quarters. As a result, it is simply impossible for inmates to effectively follow the CDC's published advice that individuals socially distance themselves from other individuals. The closely quartered prison environment does not permit inmates from separating from other inmates by at least six feet. Nor are other CDC recommendations possible, such as avoiding crowded areas, limiting close contact, frequent hand washing, and staying indoors at home.

    As of yesterday MCC quarantined all units except 9N and the women's unit.

    Although the Bureau of Prisons (BOP) announced a plan to address the

COVID- 19 pandemic, no action plan will be able to mitigate the effects of the virus once it infiltrates prison facilities. It has infiltrated the MCC. Media reports indicate that even jail officials and prosecutors are beginning to recognize that the country's prison population is at significant risk.

Courts are beginning to recognize the risk as well. On March 18, 2020, in *United States v. Stephens*, 15-cr-95 (AJN) (S.D.N.Y. Mar. 18, 2020), Judge Alison J. Nathan granted the defendant's emergency motion for reconsideration of denial of bail and ordered the defendant released with conditions. *See id.*, Doc. 2798. Judge Nathan noted that, since the initial bail hearing, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent" and that while "there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop." *Id.* at 2 (citing Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007)). Judge Nathan further noted that "[t]he magnitude of this risk has grown exponentially since the [prior hearing] before this Court; at the end of the day on March 6, New York State had 44 confirmed cases of COVID-19, but that by the end of the day on March 18, that number had climbed to 2,382." *Id.* at 2-3 (citations omitted). In her order, Judge Nathan also cited a recent bail determination in the Eastern District of New York, *United States v. Raihan*, 20-cr-68 (BMC) (E.D.N.Y Mar. 12, 2020), where Judge Brian M. Cogan ordered a defendant released on bail in part because "[t]he more people we crowd into [the MCC], the more we're increasing the risk to the community." *Id.*, Doc. 20 at 10.

The Magistrate Judges in the Eastern District have begun to consider the risks of COVID-19 in every bail hearing and released a previously-detained defendant, even in quite serious cases, based largely upon the risk to them posed by detaining them at MDC. *See, e.g., United States v. Eli*, 20 Cr. 50 (RJD) (RER) (releasing, over government's objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk) (March 24, 2020).

In *United States v. Joanna DeAlba*, 19 CR 563(DLI) the bail determination was referred to Magistrate Judge Bulsara. The judge released the defendant because of a combination of medical conditions, none on the CDC list, but the argument was the stress of all of these conditions left her vulnerable to infection and if infected, to a higher risk of a severe case of COVID-19. She was released to a homeless shelter on the following conditions: electronic monitoring with a curfew, travel restricted to NYC, surrender all travel documents and have an evaluation for substance abuse and mental health treatment. The government grudgingly consented. *See, United States v. Juan Plasencia*, 20 mj 205 (SJB) (releasing the defendant, through a joint stipulation of the parties, defendant charged with illegal possession of a firearm after having been previously convicted of a felony attempted armed robbery, and whose initial application

3

Honorable Paul G. Gardephe
April 1, 2020

For bail was denied for failing to present credible sureties to assure his appearance, because of the COVID pandemic) (March 23, 2020).

*See, United States v. Barrett*, 19 Cr. 436 (KAM) (releasing defendant, through joint agreement of the parties, defendant charged with Medicare and Medicaid fraud and conspiracy to defraud the United States, because of the COVID pandemic. Defendant was previously convicted of the same offense in 2016 and at his bail hearing had presented no credible sureties to ensure his appearance.) (March 13, 2020).

*See also* USA v Estime 19 CR 711 NSR (SDNY) (March 27, 2020) The defendant was a 33 year old with no medical issues. The defendant had been remanded for several months on a (b)(1)(B)cocaine conspiracy charge for alleged importing kilogram of cocaine. The defendant was caught picking up package. He had one prior state felony drug conviction from 12 years ago. – The defendant filed a bail review motion based on Covid-19 danger at Valhalla. The government consented and Magistrate Judge signed an order the defendant on a personal recognizance bond.

In *United States v. Hugho Witter*, 19 Cr. 568-02 (SHS) the Court released the defendant in ten-year mandatory minimum drug case post-plea over government objection. The Court found that "COVID-19 presents an unprecedented public health crisis," that because "the virus has infiltrated the Metropolitan Correctional Center…both Witter's age and medical condition elevate his risk of complications from the virus," and "the fact that defendant takes Lisinopril, an ACE inhibitor, to treat his hypertension likely places him 'at higher risk for severe COVID-19 infection.'") (March 26, 2020).

In *United States v. Lopez,* 19 Cr. 323(JSR) the Court denied the government's request for revocation and detention of defendant who pleaded guilty to conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime, finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," where "the number of [coronavirus cases] has been increasing by a substantial percentage each day," the pandemic "creates a danger if the defendant is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want").

The courts in the following cases resulted in the release of a defendant. *United States v. Baker*, 20 Cr. 125 (KMK) (releasing, after defendant was previously detained on consent without prejudice, defendant charged with conspiracy and possession with intent to distribute controlled narcotics substances) (March 24, 2020). *United States v. Almaleh*, 17 Cr. 25 (NSR) (releasing, with government consent, two elderly defendants charged with conspiracy to commit bank fraud, bank fraud, wire fraud, and false statements to the FDIC, because of high COVID risk of defendants. Defendants had

Honorable Paul G. Gardephe
April 1, 2020

previously been released on bail, but were remanded to detention for continuing criminal conduct and violations of the terms of their release.) (March 22, 2020). *United States v. Vizzari*, 19 Cr. 767 (VSB) (releasing defendant awaiting sentencing after pleading guilty to possession with intent to distribute heroin and violation of parole in a prior conviction for possession with intent to distribute heroin, because his age and health conditions presented exceptional COVID risk) (March 20, 2020).

Defendants gained release in these following cases: *United States v. Perez*, 19 Cr. 297 (PAE) (over government's objection that defendant (1) posed a substantial risk to the community as demonstrated by his four prior felony convictions and multiple instances where defendant committed crimes while on pre-trial release and parole and (2) posed a severe flight risk as demonstrated by his flight and detention for bail jumping in the instant matter as well as eight prior arrests for failure to appear, releasing defendant charged with attempted inducement of a minor to engage in illegal sexual conduct, because his lung condition and age placed him at severe COVID risk) (March 19, 2020). *United States v. Calvin Hudson*, 19 Cr. 496 (CM) (releasing, over government objection, defendant charged with narcotics conspiracy, loansharking, and extortion, whose bail application was twice denied due to the danger he posed to the community based on the violent nature of the charges, due to the COVID crisis and the ensuing difficulty of his attorneys in meeting defendant in preparation for his approaching trial) (March 19, 2020).

Also favorable to defendants were *United States v. Brandon*, 19 Cr. 644 (GBD) (releasing on his own recognizance, over government's objection that defendant was a serial and continuous violator of the law, defendant awaiting sentencing on a guilty plea to escape from federal custody in failing to report to a halfway house, based on an underlying 24-month sentence for violation of his supervised release from a 2009 Honorable Sidney H. Stein

conviction for access device fraud and identity theft, because of COVID risk) (March 19, 2020). *United States v. Estrada*, 18 Cr. 18 (ALC) (with government consent, allowed defendant charged with narcotics conspiracy and possession with intent to distribute narcotics to withdraw his previously entered guilty plea and reinstate his bail in part because of the COVID crisis) (March 16, 2020). *United States v. Juan Plasencia*, 20 mj 205 (SJB) (releasing, through a joint stipulation of the parties, defendant charged with illegal possession of a firearm after having been previously convicted of a felony attempted armed robbery, and whose initial application for bail was denied for failing to present credible sureties to assure his appearance, because of the COVID pandemic) (March 23, 2020). *United States v. Barrett*, 19 Cr. 436 (KAM) (releasing, through joint agreement of the parties, defendant charged with Medicare and Medicaid fraud and conspiracy to defraud the United States, because of the COVID pandemic. Defendant was previously convicted of the same offense in 2016 and at his bail hearing had presented no credible sureties to ensure his appearance.) (March 13, 2020)

Honorable Paul G. Gardephe
April 1, 2020

On March 13, 2020 the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities all but eliminating defense counsel's ability to meet with Adamu.  In all likelihood, the present lockdown and quarantine will extend well beyond 30-days. The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. "The right to consult with legal counsel about . . . going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d. Cir. Mar. 20, 2020).

With trial currently set to begin on June 15, 2020, there is no reason to believe that defense counsel will have had any meaningful opportunity to meet with Mr. Adamu and prepare for trial before then. To be clear, the defense is *not* asking the Court to adjourn the trial date yet again; the remedy for a Sixth Amendment violation is not to substitute it for a speedy trial one. Rather, the more straightforward and legally tenable solution is to simply release Mr. Adamu from custody so that he can meaningfully prepare for trial in the event that trial is able to proceed as scheduled.

Our legislators also now recognize the significant health risks that inmates face as a result of COVID-19. On March 19, 2020, U.S. Senator Kamala D. Harris wrote to the director of the BOP to note that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems."  (*See* Exhibit 1: Letter from Kamala D. Harris to BOP Director Michael Carvajal dated Mar. 19, 2020.) In her letter, Senator Harris observes that, rather than releasing high-risk inmates, BOP is doubling down on penal measures despite the high stakes, "responding to the threat of coronavirus with extreme measures that both maintain current levels of incarceration and penalize the incarcerated community—including by suspending social and legal visitation, suspending inmate facility transfers, and potentially locking down institutions." (*Id.* at 2.) (citing BOP COVID-19 protocols). Congresspersons Jerold Nadler separately wrote to Attorney General William P. Barr to note that "it is incontrovertible that, if [DOJ] does not act aggressively to address the COVID-19 threat, federal jails and prisons could quickly become epicenters of the COVID-19 pandemic." (*See* Exhibit 2 Letter from Rep. Jerold Nadler and Rep. Karen Bass to Attorney General Barr dated Mar. 19, 2020 (the "Nadler Letter")

In light of his pre-existing health problems, Mr. Adamu is at immediate critical health risk from COVID-19. Mr. Adamu's health problems cannot be treated easily inside a prison environment with the challenge of COVID-19, and that if Mr. Adamu becomes infected with COVID-19 he will rapidly become critically ill and

Honorable Paul G. Gardephe
April 1, 2020

will be at high risk of expiring from the disease.

Mr. Adamu's existing breathing difficulties when combined with the unprecedented public health crisis posed by the COVID-19 pandemic, provide extraordinary and compelling reasons to release him to home confinement.

Now, there is a grave risk that the virus may amount to a swift death sentence for Mr. Adamu in light of his compromised health. Prison is the very last place Mr. Adamu should be at this time and he should be released as soon as possible so that he can isolate himself away from the prison population."

As Representative Jerold Nadler publicly stated on March 19, 2020: "DOJ and BOP must do all they can to release as many people as possible, who are currently behind bars and at risk of getting sick." Ex 2 (Nadler Letter at 2.) I request that your Honor should swiftly step in and protect Mr. Adamu's health.

The government opposes this application.

**Proposed Bail Conditions**

It is respectfully requested that Mr. Adamu be released on a $100,000 bond with the condition of confinement at a shelter or halfway house, where he will be in a position to protect himself from exposure to COVID-19.

Thank you for your consideration of this request.

Respectfully yours,
/s/
Thomas F. X. Dunn

Cc: Elinor L. Tarlow, Esq.
　　Assistant U. S. Attorney

　　Matthew C. Helllman , Esq.
　　Assistant U.S. Attorney
　　(by ECF & email)

KAMALA D. HARRIS
CALIFORNIA

WWW.HARRIS.SENATE.GOV

United States Senate

COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS

COMMITTEE ON THE JUDICIARY

SELECT COMMITTEE ON INTELLIGENCE

COMMITTEE ON THE BUDGET

March 5, 2020

Mr. Michael Carvajal
Director
Federal Bureau of Prisons
320 First Street NW
Washington, DC 20534

Dear Mr. Carvajal:

I write to request information about the Bureau of Prisons' (BOP) preparation for coronavirus in BOP facilities and private prisons.

On January 20, the Centers for Disease Control and Prevention (CDC) announced the first confirmed case of coronavirus in Washington State. Based on an analysis of the virus's genetic sequence, another case that surfaced in the state and was announced in late February appears to have descended from the first case. The two affected individuals live in the same county, but are not known to have had contact with one another. According to researchers, these findings suggest that the virus may have been spreading through the community for close to six weeks.[1]

On February 27, California announced its first case of community spread in the city of Vacaville. Reports indicate that a local woman had contracted the virus, but had not traveled abroad recently and had no known exposure to an infected person.[2] The woman began to show symptoms of the disease and was admitted to the NorthBay VacaValley Hospital. It was later confirmed that two healthcare providers who treated the woman had tested positive for coronavirus and are under self-quarantine. Additionally, 124 healthcare workers were ordered to undergo quarantine due to possible exposure.[3]

The risk of community spread poses a critical and unique threat to vulnerable populations, including those in our prisons and jails. As of February 2020, there were over 175,000 incarcerated men and women in federal prisons.[4] Our incarcerated population faces severe threats to their health and safety every day, and BOP must prioritize and work diligently to improve prison conditions nationwide. As the country prepares for coronavirus, it is also incumbent upon BOP—in coordination with HHS—to prevent outbreaks and to safely and humanely treat all affected individuals.

---

[1] Sheri Fink and Mike Baker, *Coronavirus May Have Spread in U.S. for Weeks, Gene Sequencing Suggests*, N.Y. TIMES (March 1, 2020), https://www.nytimes.com/2020/03/01/health/coronavirus-washington-spread.html.
[2] *U.S. Confirms Two New Coronavirus Cases Without Links to Travel*, THE GUARDIAN (Feb. 28, 2020), https://www.theguardian.com/us-news/2020/feb/28/third-coronavirus-case-confirmed-in-silicon-valley-amid-fears-of-local-spread.
[3] *2 North Bay VacaValley Hospital Health Care Workers Test Positive for Coronavirus*, CBS SAN FRANCISCO BAY AREA (March 1, 2020), https://sanfrancisco.cbslocal.com/2020/03/01/coronavirus-covid19-health-care-workers-test-positive-vacavalley-hospital-solano-alameda-county/.
[4] Federal Bureau of Prisons, Statistics, https://www.bop.gov/mobile/about/population_statistics.jsp.

1

On March 4, the Justice Department informed my office that there are no known cases of coronavirus among BOP inmates, and that BOP is providing guidance to health care professionals and has a screening tool in the event that an inmate or staff member is exposed or symptomatic. The Justice Department also reported that BOP is providing information to staff members and inmates regarding prevention. While helpful, this information does not provide sufficient clarity around BOP's plan to prepare for and respond to an outbreak of coronavirus.

Therefore, in order to assess BOP's preparation, I request a response to the following questions by Monday, March 9, 2020:

1. How many BOP officials are currently working on the agency's response to coronavirus? Has BOP received any direction or guidance from Attorney General Barr on this matter?

2. How is BOP coordinating with federal public health officials on issues related to coronavirus that may impact our incarcerated population?

    a. Which agencies are providing guidance to BOP about the steps necessary to prevent, detect, and respond to a coronavirus outbreak among our incarcerated population?

    b. Does BOP have a plan to provide treatment to incarcerated individuals that entails more than isolation?

3. How is BOP coordinating with federal public health officials on issues related to coronavirus that may impact correctional staff?

    a. Which agencies are providing guidance to BOP about the steps necessary to prevent, detect, and respond to a coronavirus outbreak among correctional staff?

    b. Does BOP have a plan to offer paid leave or other support to impacted correctional staff?

4. Does the CDC plan to test or screen for coronavirus in BOP facilities and private prisons? If yes, please explain the timing and protocols that will be followed.

I look forward to your prompt response to this matter.

Sincerely,

*[signature]*

KAMALA D. HARRIS
United States Senator

JERROLD NADLER, New York
CHAIRMAN

JIM JORDAN, Ohio
RANKING MINORITY MEMBER

# U.S. House of Representatives
## Committee on the Judiciary
### Washington, DC 20515-6216
#### One Hundred Sixteenth Congress

March 12, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Barr:

  This week, the World Health Organization declared the novel coronavirus (or COVID-19) a global pandemic. Reports indicate that the virus has infected at least 125,000 people worldwide and has led to over 4,300 deaths to date. I write to inquire about the measures taken by the Department of Justice to ensure the health and welfare of prisoners in the custody of the Bureau of Prisons (BOP) and the U.S. Marshals Service (USMS) during this crisis. I write also to inquire about measures taken to ensure the health and welfare of staff and correctional officers who assist in housing and transporting prisoners in the custody of the BOP and the USMS.

  I am especially concerned because the incarcerated and justice-involved populations contain a number of groups that may be particularly vulnerable to COVID-19. In particular, health conditions that make respiratory diseases more dangerous are far more common in the incarcerated population than in the general U.S. population.

  I also believe it would be important, at this time, for DOJ to consider measures that can be taken to reduce the number of prisoners in government custody. Specifically, I believe DOJ should consider directing U.S. Attorney's Offices, wherever possible, to not seek the detention of individuals at their initial appearance in court, decline prosecuting minor, non-violent offenses, and decline pursuing supervised release and probation revocations that involve technical and minor violations.

Because of my concerns about these serious issues, I ask the following:

1. Has the Justice Department given any direction or guidance to the BOP and the USMS for dealing with COVID-19? If so, please provide the specific text of the guidance provided.

2. Whether in response to direction or guidance from DOJ or not, have the BOP and the USMS developed their own policies and procedures regarding COVID-19? Please provide copies of any and all such policies and procedures.

  a. If so, have these policies and procedures been distributed to each facility, including contract facilities?

      b. What specific measures have been taken to ensure that these policies and procedures are being implemented in contract facilities that are not BOP-run?

           i. If these policies and procedures are not being implemented in contract facilities, please explain why not and what, if any, alternative measures are being taken to ensure the health and welfare of inmates who are incarcerated in those contract facilities.

3. Have the BOP and the USMS, respectively, designated point persons within their agencies to address COVID-19? Please provide the name and title of each person so designated and their qualifications for the position.

4. Have additional precautionary measures been taken with respect to sanitation and hygiene, including frequent cleaning and ready availability of soap and tissues?

5. Is there a comprehensive testing protocol being implemented across the board in BOP facilities and contract facilities? If not, why not?

6. Are inmates entering BOP and contract facilities being tested at the time of intake? If not, why not? Conversely, are inmates being tested at the time of their release from BOP or contract facilities?

7. At this time, are any prisoners in the custody of BOP and the USMS being monitored for signs of infection?

8. Are testing kits being made available to the BOP and contract facilities? If so, how quickly are test results being released?

9. What measures have been taken to ensure that any prisoners testing positive for COVID-19 are isolated and treated? What about those who have exposed to those who test positive?

10. What protocols exist, once a positive case is discovered, to ensure that the rest of the prisoners in the facility are not exposed? Are any special measures being taken to ensure high-risk prisoners are not exposed?

11. What is the protocol for deciding when to transport a prisoner with COVID-19 for care at a hospital?

12. What protocols exist with regards to attorney and family visits? How are attorneys and family members being notified if a client or family member, respectively, tests positive for COVID-19?

13. What is the protocol for transporting inmates to court for hearings?

14. Are specific measures being taken to ensure staff at the facilities (whether BOP-run or contract facilities) have leave available if they develop symptoms of COVID-19? Are special measures being taken to ensure staffing levels are adequate at all times?

Because of the urgency of this matter, I ask that you respond in writing as soon as possible,

Sincerely,

*Jerrold Nadler*

Jerrold Nadler
Chairman

cc:   Jim Jordan
      Ranking Member