*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 6, 2020

**BY ECF and EMAIL**

The Honorable Paul G. Gardephe
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, New York 10007

    Re:    *United States v. Jibril Adamu*, S1 18 Cr. 601 (PGG)

Dear Judge Gardephe:

    The Government writes in opposition to the request of Jibril Adamu, the defendant, to be released on bail from the Metropolitan Correctional Center ("MCC"). The Government respectfully submits that the defendant's request should be denied because he has failed to rebut the statutory presumption that he poses a danger to the community and is a risk of flight. This Court has already denied co-defendant Jean-Claude Okongo Landji's ("Landji") application for bail, noting that Landji poses an enormous risk of flight as well as a danger to the community. *See* dkt. 286 ("Landji Bail Decision"). Adamu is an even weaker candidate for bail. The evidence against Adamu, who was Landji's co-pilot, is equally strong, and includes Adamu's post-arrest admissions regarding his involvement in schemes to fly massive quantities of cocaine on aircraft he has piloted. Adamu further is a Nigerian citizen, has absolutely no ties to the United States, and offers only that he would live in a shelter or other similar housing if released. There is nothing in Adamu's application to show that releasing him would offer any meaningful improvement from his current conditions of confinement in terms of risk mitigation or treatment, or that such release would actually safeguard him or the community. The Court should deny Adamu's bail application in light of the significant flight risk and danger that he poses, the insufficiency of his bail application, and the potential health risks to the defendant and the community if he were released.

    **I.**    **Background**

    The defendant participated in a conspiracy to traffic significant quantities of cocaine with his co-defendants, including Landji and David Cardona-Cardona ("Cardona"). Beginning in or about October 2017, Cardona met with several confidential sources (the "CSes"), who were working at law enforcement's direction. The CSes recorded conversations with Cardona during which he described, among other things, a five-ton cocaine shipment to Mali in which Cardona and the defendant were involved. Cardona further agreed, during these conversations, to provide

the CSes cocaine in exchange for weapons that he would then sell to foreign terrorist organizations ("FTOs") in Africa and elsewhere. The CSes represented to Cardona, among other things, that they would be able to provide man portable surface-to-air missiles and other military-grade equipment, including machineguns, sniper rifles, and explosive ammunition.

In or about 2018, while in Togo, Landji and Cardona participated in recorded meetings with the CSes, during which they discussed their prior cocaine operations, Landji's access to airplanes, and future plans to transport significant quantities of cocaine by plane to Croatia. In particular, the CSes, Cardona, and Landji discussed that Landji owned a Gulfstream IIB airplane (the "G2"), which was registered in the United States, and that the defendant and Landji would fly the G2 to Croatia with an initial shipment of cocaine as a test run for future transactions that would involve hundreds of kilograms of cocaine. Landji further described that he could engage in a "black flight," a flight during which flight plans are either misfiled or not filed at all, and communications and safety equipment are deactivated, to evade detection by law enforcement.

In or about September 2018, the CSes showed Cardona an aviation hangar at the airport in Zagreb, Croatia that they purported to control.  The CSes described that they would arrange for the cocaine to be offloaded in the hangar and for the weapons to be loaded on a pallet in the cargo hold of the aircraft for return to Africa.  Also in September 2018, the CSes, working with other Croatian undercover officers (the "UCs"), arranged to show weapons to Cardona to demonstrate their bona fides in supplying weapons.  At a meeting on or about September 15, 2018, two of the UCs met with Cardona at an undercover warehouse in Zagreb and showed him a missile, a box of AK-47s, and night vision goggles, which Cardona agreed to purchase with the cocaine that the defendant and Landji would be transporting to Croatia.

Cardona traveled to Croatia on or about October 18, 2018.  While there, he engaged in several meetings with the CSes in order to finalize logistics for the G2's arrival with the cocaine and demanded payment towards expenses for the G2 (in particular, fuel). Before the flight, the defendant and Cardona discussed the plan to acquire the sample kilogram of cocaine over the phone. On October 30, 2018, the defendant and Landji, along with a third U.S. citizen ("Male-1"), flew the G2 into Zagreb, Croatia carrying just over one kilogram of cocaine in the G2's baggage compartment. The defendant and Landji were taken into custody when they landed and Croatian law enforcement recovered the cocaine after searching the G2.

In November 2018, the defendant was charged by indictment with one count of distributing and possessing with the intent to distribute five kilograms or more of cocaine on board a United States aircraft, in violation of Title 21, United States Code, Sections 812, 959(c), 959(d), 960(a)(3), and 960(b)(1)(B), and one count of conspiring to do the same, in violation of Title 21, United States Code, Sections 959(c), 959(d), and 963.  Croatia extradited the defendant to the United States in or about October 2019.  On or about October 17, 2019, the defendant was presented in the Southern District of New York and detained on consent.

On April 1, 2020, the defendant filed a letter requesting that he be released pending trial, which is currently scheduled to proceed on June 15, 2020, and that the following conditions be set: (1) an unsecured personal recognizance bond in the amount of $100,000; and (2) confinement at a shelter or a halfway house secured by electronic monitoring.  *See* dkt. 281 ("Def. Letter").

The defendant argues in his bail application that he should be released on such conditions on the grounds that: (1) his breathing issues render him particularly vulnerable to contracting and suffering the effects of COVID-19; (2) bail conditions could be set that would prevent any risk of flight or danger to the community; and (3) he does not have sufficient access to legal counsel in light of the spread of COVID-19 and the BOP's restriction of legal visitation for the next several weeks.

## II.     Discussion

### a.   The Defendant is a Danger to the Community and Poses a Serious Risk of Flight

While "[t]he Government bears the ultimate burden of showing by clear and convincing evidence that the defendant presents a danger to the community," *United States v. Minnici*, 128 F. App'x 827, 828 (2d Cir. 2005), when a defendant is charged with certain offenses, including the one at issue here, "it shall be presumed that no condition or combination of conditions will reasonably assure . . . the safety of the community." 18 U.S.C. § 3142(e)(3)(E). The defendant has not met his burden of overcoming the statutory presumption in favor of detention.

*First*, the defendant has provided no evidence to rebut the presumption that he poses a danger to the community, *see* 18 U.S.C. § 3142(e)(3)(A), and instead counsel summarily argues that the conditions proposed will sufficiently "prevent any risk of flight or danger to the community." (Def. Letter at 2.) The defendant's conduct in this case demonstrates otherwise.

The defendant conspired to transport ton quantities of cocaine throughout the world, and flew airplanes, including the G2, loaded with cocaine. That conduct alone presents a significant danger. The conspiracy in which the defendant participated also contemplated sales of missiles, firearms, explosives, and other dangerous weapons. As described above, the conspiracy involved a drugs-for-guns exchange in which the defendant would transport cocaine from Africa to Croatia, and then military-grade weapons would be flown back to Africa so that they could be sold to FTOs. The weapons distribution and sales never occurred only because the defendant was arrested before they could be carried out. The defendant's involvement in such a conspiracy establishes the significant and unrebutted risk he presents to public safety.

The DEA and the CSes did not catch the defendant in his first large-scale drug transaction. In 2009, for example, the defendant participated in a conspiracy that trafficked tons of cocaine from South America to west-Africa, an earlier effort that was identical in many respects to the now-charged conduct. The defendant flew a Boeing 727 airplane to South America, knowing that the airplane that he was transporting would later be used to ship narcotics. That plane, loaded with approximately five tons of cocaine, was later flown to Africa where it crash-landed in the deserts of Mali (the "727 Cocaine Flight"). There, the cocaine was recovered by the traffickers, and the plane blown up.[1]

---

[1]     https://www.theguardian.com/world/2010/nov/15/south-american-gangs-flying-cocaine-to-europe

Like Landji, the defendant used his training as a commercial pilot to transport illegal and dangerous goods on aircraft in illegal flights. Rather than using these skills to maintain legitimate employment, the defendant chose to channel them into dangerous and illegal activity. Although, after his arrest in this case, the defendant claimed he was only on the G2 flight to Croatia for training purposes, as described further below, the defendant admitted to knowing Cardona as a drug trafficker; to having worked previously to fly aircraft for Cardona's drug business; and to his role in the 727 Cocaine Flight. In fact, the defendant told authorities that he believed Cardona killed one of the other co-conspirators involved in the 727 Cocaine Flight in 2009 or 2010 after a dispute, but admitted that he continued to work with Cardona after that in attempt to support his drug trafficking schemes by air. Thus, the defendant used his position of trust as a pilot to work with others in an attempt to surreptitiously fly tons of cocaine around the world, fully aware and dismissive of the attendant dangers of such large-scale drug trafficking.

*Second*, the defendant also presents a serious risk of flight and should be detained on that independent basis. *See* 18 U.S.C. § 3142(e)(3). Among other things, and as is described below, there are no conditions that could reasonably assure the defendant's appearance in light of the weight of the evidence in this case, the defendant's training as a pilot and potential access to airplanes, his willingness to engage in drug trafficking with violent co-conspirators, and his minimal ties to the Southern District of New York.

The weight of the evidence in this case against the defendant is overwhelming. In a call recorded before the defendant and Landji flew cocaine to Croatia, Cardona and the defendant discussed the efforts to secure the cocaine sample that they would be transporting. On or about October 21, 2018, Cardona, a CS, and co-conspirator Youssef Fofana, who is also charged in the instant case but not yet apprehended, engaged in a series of conversations regarding the planned test sample of cocaine to bring to the Croatian meeting with arms traffickers. In one call, Fofana described to the CS his efforts to bring the sample kilogram ("one stone") to the pilots, but explained the logistical problems involved (Fofana: "*…this is the important stone, the flight is not in question, only the acquiring of the stone . . . it is difficult to find a person to collect just one stone, it would be easier to find a courier with a greater amount of stones…*").[2] From the conversation, it is clear that this group of defendants was experienced delivering a "greater amount" of cocaine than the kilogram sample requested by the CSes. The October 23, 2018 conversation ended with Fofana and Cardona discussing the paperwork the pilots—Adamu and Landji—would need to arrive without problems in Croatia.

The next day, on or about October 22, 2018, Cardona explained the delays to the defendant, and the defendant admitted on tape that he maintained his own local drug-trafficking contacts in Africa. First, Cardona explained to Fofana that he was unable to reach the defendant after dialing a particular number (the "Adamu Phone") and getting through to an answering machine (Cardona: "*Trying to call J, but no answer*"), and Fofana agreed to contact the defendant. Minutes later, Cardona called the Adamu Phone again, and the defendant and Cardona discussed the same cocaine shipment as discussed the day before with Fofana. Cardona told the defendant they were

---

[2] The portions of transcripts from recorded meetings with the CSes that are cited in this letter have been provided to defense counsel pursuant to a stipulation that such transcripts and the translations reflected in those transcripts are drafts.

looking for a kilogram of cocaine (Cardona: "…*looking for a photocopy somewhere close by there, is just one test*"). Cardona then suggested that the defendant ask one of his local contacts how much it would cost, and the defendant responded that in Benin or Nigeria, it would cost "equally 20,000." The defendant then told Cardona they needed visas for the trip to Croatia, but that he and Landji were otherwise ready to transport the cocaine (Adamu: "*Landji and I are ready and all is in order.*"). Approximately eight days later, the defendant and Landji flew the cocaine to Zagreb airport, where it was discovered by Croatian law enforcement.

After his arrest, the defendant met with members of the Drug Enforcement Administration. The defendant waived his *Miranda* rights in writing and agreed to answer questions. Initially, the defendant denied knowing the G2 had cocaine on board, and claimed it was only a training flight. However, later in the interview, the defendant admitted knowing Cardona and Fofana, and that he had previously planned to travel from Sierra Leone to Europe to meet with Cardona. After explaining that he has worked with Cardona on prior occasions to find airplanes to purchase or use for Cardona's business, the defendant admitted that he knew Cardona's business was "obviously drugs." The defendant also discussed his involvement in the 727 Cocaine Flight, acknowledging he knew the flight engineer and co-pilot to have also been hired by Cardona, and that they together flew the plane from Guinea Bissau to Panama with a stop in Caracas, Venezuela to refuel. Moreover, the defendant indicated he was paid $3,000 to ferry the plane, but that others flew the plane while it carried cocaine to Mali and crash-landed. The defendant claimed he was given this money by a worker for Cardona who was on the plane when it crashed, and the defendant said he believed Cardona killed this person in 2009 or 2010 after a dispute related to the 727 Cocaine Flight. The defendant also claimed to know that Landji and Cardona would be meeting in Zagreb after they arrived to discuss the drug business, though he claimed he would not have joined the meetings.

The defendant also told the DEA that he had recently joined Landji's business and intended to work as a pilot for Landji. Landji's business, particularly with regard to the G2 which the defendant was hired to help pilot, was distributing ton-quantities of cocaine. In recorded meetings between Landji and Cardona, the parties made as much clear. On May 28, 2018, for example, while again meeting with the confidential source and Cardona, Landji discussed the various types of planes to which he had access and had the following conversation, in substance and in part:

| | | |
|---|---|---|
| **CS**: | | Once it's loaded . . . once the planes is with the tanks, everything. |
| **CARDONA**: | | Uh-hum. |
| **CS:** | | It creates weight. It creates weight. So how much weight more from the dope? |
| **LANDJI:** | | One ton. |
| **CS:** | | How much can we put in? |
| **CARDONA**: | | One ton. |
| **CS:** | | So one ton plus the gas. |

    **CARDONA**:  One ton plus, plus the . . . fuel. One ton.

    **CS**:    It's strong plane.

   In this conversation, Landji discussed with a confidential source and Cardona how much of the cocaine could be transported in each future flight on the plane that the defendant would be supplying. In other conversations, Landji acknowledged knowing the plane's United States registration would need to be changed to avoid American law enforcement scrutiny – though that change never happened, it is clear the plane was intended from the beginning for drug trafficking. The defendant's joint venture with Landji, prior involvement with Cardona in large-scale drug trafficking, including his belief that Cardona had killed somebody in a drug-related dispute, and his familiarity with key players including Fofana, are all strong indicators of his culpability in the instant case.

   For this alleged conduct, the defendant now faces a mandatory minimum of ten years' imprisonment and a guidelines range that exceeds more than 25 years' imprisonment. In light of these potential penalties and the strength of the evidence in this case, which includes but is not limited to recorded conversations and the defendant's admissions reflecting his participation in the crime, he has a strong motive to flee and, as is evidenced by the allegations in this case relating to the defendant's access to and use of aircraft, may still have the means to do so.

   Finally, the defendant also presents a serious risk of flight because he has no family ties, no community ties, and no period of employment or residence in the Southern or Eastern Districts of New York. The defendant does not argue otherwise, stating there no co-signers to sign a bond, and "no place of residence to offer where Mr. Adamu could live." (Def. Letter at 2). Courts uniformly look to whether the community ties are within the district to ensure that the defendant appears in court. *See, e.g.*, *United States v. Lewis*, No. 16 Cr. 786 (NSR), 2017 WL 6547742, at \*3 (S.D.N.Y. Dec. 20, 2017) (defendant lacked community ties where he had "no contacts with the community of New York," among other factors); *Hollender*, 162 F. Supp. 2d at 267 (evaluating defendant's family and community ties "in this District"); *United States v. Ambrosio*, No. 94 Cr. 674 (DC), 1995 WL 138605, at \*4 (S.D.N.Y. Mar. 30, 1995) (finding insufficient ties to community even for defendant who "has many familial ties in New York" and lived in New York since 1972). The defendant has provided no evidence that he has any connection with this district, or indeed this country, to suggest a reason to return to the court. Indeed, the defendant, who is a citizen of Nigeria and does not have lawful legal status in the United States, has little incentive to honor the proposed unsecured bond, with neither a financial suretor or a co-signer with moral suasion to motivate the defendant's return to face justice in this case. In fact, as discussed below, the defendant's proposed conditions of release would bear no meaningful monitoring or consequence for a failure to return at all.

   The defendant does not provide any information about where he might reside or specifics on how he would sustain himself. Defense counsel proposes no option for the defendant upon release other the nonspecific suggestion of a "halfway house or shelter." (*Id.*). From the undersigned's conversations with Pretrial Services, electronic monitoring is unavailable to defendants in shelter housing, making location monitoring in such a location impossible. Thus, the defendant's request is, in effect, to be allowed to leave on his own signature, with no secured penalty for non-return, without any form of location monitoring, to join the public shelter system.

It is unclear from the defendant's application why shelter housing is a superior option to the MCC. For example, there is no explanation as to what separation from other shelter inhabitants the defendant would have (in order to protect both the defendant and the other inhabitants), to what medical care the defendant would have access at a shelter or halfway house, or whether the defendant would receive medication for his general breathing ailment at the unspecified facility in question. In short, there is nothing about the proposed housing situation that suggests conditions that can reasonably assure his appearance in court, and there is nothing about the proposed conditions that suggest in any way they would be an appropriate response to whatever circumstances are presented by COVID-19.

In addition to the danger the defendant poses to the community, given the weight of evidence, the applicable 10-year statutory minimum sentence, the even higher applicable Guidelines range, the defendant's prior access to and ability to operate planes, his failure to provide meaningful bail conditions, and his limited connection to the United States, the defendant presents too great a risk of flight to release on bail conditions. The defendant's request for pre-trial release should be denied.

      b.   The Conditions at MCC Do Not Warrant The Defendant's Release

The defendant's arguments concerning COVID-19 also do not warrant his release. The possibility that the defendant might contract COVID-19 at the MCC is not a permissible basis for release from custody under the Bail Reform Act. That is because the Bail Reform Act "addresses conditions of release, not conditions of *detention*," *United States v. Valerio*, 9 F. Supp. 3d 283, 293-94 (E.D.N.Y. 2014), and such a factor does not have "a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community," 18 U.S.C. § 3142(f)(2).

The defendant does not cite any particular statutory authority for his release, but presumably argues under the Bail Reform Act that there is a "compelling reason" due to his "pre-existing medical conditions." (Def. Letter at 1). The defendant then cites numerous cases for the proposition that the risks posed by COVID-19 can, at least in some particular cases, be incorporated by the court in considering a bail application. Because the defendant's application appears to be grounded solely with respect to the threats posed by COVID-19 and contemplates conditions of release entirely designed to respond to the virus, the Government construes his application as one pursuant to 18 U.S.C. § 3142(i). Though the defendant's release is not merited in any event, his temporary release in light of COVID-19 is unwarranted.

Pursuant to Title 18, United States Code, Section 3142(i), after a defendant has been ordered detained pretrial, a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The defendant's release is not appropriate under this provision for several reasons.

As an initial matter, based on the bail conditions proposed by the defendant, he would not be released "in the custody of the United States marshal" and he has not identified any other

"appropriate person" in whose custody he would be placed. (Landji Bail Decision at 12). In fact, as discussed above, he has not identified any suitable custodial alternative to his current detention. Additionally, Section 3142(i) does not permit a court to abrogate its analysis of whether a defendant is a danger to community or risk of flight. For the reasons described above, the defendant has failed to rebut that presumption. But even if the defendant had identified an appropriate person into whose custody he could be released, was not a danger to community, and did not pose a risk of flight, denial of his request would still be warranted, as described below, because he has not offered a "compelling reason" for temporary release and his release is not "necessary for preparation" of his defense. *See* 18 U.S.C. § 3142(i).

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where otherwise detention would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008); *see also United States v. Hunter*, No. 13 Cr. 521 (LTS), 2014 WL 6632965, at *2 (S.D.N.Y. Nov. 24, 2014) (noting that appropriate bail considerations must "implicate the core issues of flight risk and danger to the community"); *United States v. Nelson*, No. 18 Cr. 044 (RJA) (HKS), 2018 WL 2928034, at *4 (W.D.N.Y. June 12, 2018) (reasoning that while "[t]he Court is sympathetic" to the defendant's poor health and "understands that it is more difficult for the Defendant to obtain appropriate medical treatment in prison," "[t]he Court is not persuaded that the Defendant's poor health has any significant bearing on the potential danger his release would pose").

Here, the defendant does not allege that his medical needs are not being met. And the defendant has provided no medical records to demonstrate that he has any health conditions which pose an increased risk to COVID-19. The defendant generally states that he has "breathing issues" and "believes he may have some infection on his lungs." While the Government does nothing to diminish the seriousness of a breathing condition in light of COVID-19, the defendant's nonspecific and uncorroborated allegations are insufficient to trigger the "exceptional reason" standards for release. At most, the defendant offers speculation both that he is more likely to suffer adverse health consequences if he remains in the MCC *and* the Bureau of Prisons would be unable to attend to such adverse health consequences if they arose. He does nothing, however, to explain why such risks would be mitigated by releasing the defendant to a halfway house or a homeless shelter. Indeed, the defendant's application fails to identify any "appropriate person" into whose custody he could be released pursuant to 18 U.S.C. § 3142(i), and an unspecified shelter does not meet this requirement.

These speculations are insufficient to support the defendant's extraordinary request for release pending his upcoming sentence. Updates regarding the number of positive inmates and staff at the MCC and other local detention facilities are now publicly available online. *See* https://www.nyed.uscourts.gov/coronavirus. As of April 3, 2020, four inmates at the MCC have tested positive for COVID-19. Currently, MCC inmates are remaining in their assigned cells for a 14-day period as part of a coordinated BOP action plan to contain the virus in federal facilities nationwide. However, three days per week, inmates will be released from their cells to shower, use the telephones, and use the BOP e-mail system, while adhering to BOP-encouraged policies for social distancing. (*See* attached Exhibit A, April 3, 2020 Update Letter from Wardens of MCC and MDC, at 2). The April 3, 2020 report further details the steps taken by BOP staff to safeguard

inmates and to mitigate the virus's spread, including temperature checks, quarantine measures, and cleaning protocols.  *See id*.

This report confirms the information that the Government has received from BOP to date that the MCC—and all BOP institutions—have implemented a coordinated response to address the COVID-19 pandemic.  *See* Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  Since at least October 2012, BOP has had a Pandemic Influenza Plan in place.  *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp.[3]  Moreover, beginning approximately two months ago, in January 2020, BOP began to plan specifically for coronavirus/COVID-19 to ensure the health and safety of inmates and BOP personnel.  *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response to coronavirus/COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission."  *Id*.  In addition, BOP stood up "an agency task force" to study and coordinate its response to coronavirus/COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP, in coordination with the Department of Justice ("DOJ") and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff."  *Id*.  BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.*  For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id*.  On April 1, 2020, BOP implemented Phase Five of its COVID-19 action plan, which will keep all inmates secure in their cells and quarters for a 14-day period to minimize the spread of the virus.

---

[3] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

Moreover, as part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.* Additionally, staff members and contractors are screened upon entry, including taking each individual's temperature, asking each individual a series of health-related questions, and denying entrance to the institution by anyone who poses a health risk. Inmates exhibiting flu-like symptoms are separated from the general population and tested for COVID-19 in accordance with local health authority protocols.

These and other steps were outlined in a March 18, 2020 letter from the BOP to Chief Judge Colleen McMahon in response to questions regarding institutional responses to COVID-19 at MCC and MDC. These institutions' swift action and strict containment and mitigation measures to date undermine the defendant's suggestion that the MCC is ill-prepared to manage COVID-19.

While it is true that the MCC itself is a densely occupied detention facility, the MCC is also by its very nature isolated from the outside world. Such relative isolation has, if anything, been increased by the COVID-19 outbreak because in response to the outbreak the MCC has taken steps to limit contact by visitors to the inmates. By contrast, the defendant has proffered no facts about the shelter where he would be released—the relative isolation of that shelter; any measures taken where that shelter is located to limit the spread of COVID-19; and, if there are any other residents present (as in a shelter can reasonably be assumed), whether those residents have tested positive for COVID-19 or manifested any symptoms related to COVID-19. The defendant similarly has not proffered how his access to medical care would be improved by residing outside the MCC in the event he contracted COVID-19.

In fact, the MCC has taken specific precautions with respect to individual inmates it deems "high risk" – namely, inmates such as the defendant who are over 55 years old or who are diagnosed with particular health conditions. In addition to the conditions outlined above with respect to general staff and the inmate population, the MCC has moved "at risk" individuals to a particular unit, to provide an additional layer of insulation from broader institutional contact, and, thus, COVID-19 health risk.

The cases that the defendant cites in support of his request for release are not relevant to his factual circumstances. For example, the defendant cites to an opinion issued by Judge Nathan, (Def. Letter at 3), who recently released a defendant facing specifications after violating the terms of his supervised release after finding that (a) the strength of the case against him was weaker than initially believed, and (b) the defendant would be unable to prepare for a March 25, 2020 hearing while in custody. *See United States v. Stephens*, 15 Cr. 95 (AJN) (Mar. 18, 2020). Of note, Judge Nathan expressly declined to release the defendant under Section 3142(i) based on health concerns. *See* Opinion at 6 n.3 ("The Defendant also argues that the current public health crisis itself provides an additional compelling reason necessitating his release for all the reasons already articulated above. . . . The Court need not decide this additional factor here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i)."). Most importantly, Judge Nathan determined that the evidence had changed such that the defendant had established by clear and convincing evidence that he did not pose a danger to the community

– something that Adamu cannot do. Unlike the defendant in *Stephens*, who faced the potential consequences of a supervised release violation, Adamu faces a 10-year statutory minimum sentence and allegations of international ton-quantity cocaine trafficking. Moreover, in *Stephens*, Judge Nathan fashioned bail conditions based on the defendant's ties to the community, existing probation supervision, and the availability of home confinement linked to electronic monitoring, all of which are unavailable and/or non-existent here.

The ability for a court to fashion bail conditions that include co-signers and home incarceration – conditions the defendant cannot meet – is a hallmark of nearly every case cited in counsel's bail application. For example, the defendant cites Magistrate Judge Ramon E. Reyes, Jr.'s decision to set bail conditions in *United States v. Eli*, 20 Cr. 50 (RJD) (E.D.N.Y. Mar. 24, 2020), without acknowledging the differences in bail conditions set in that case that this defendant neither proposes nor can meet, such as the $150,000 recognizance bond secured by co-signers, or home incarceration secured by electronic monitoring. So, too, were the defendants subject to 24-hour home incarceration secured by electronic monitoring in *United States v. Lopez*, 19 Cr. 323 (JSR) (S.D.N.Y. Mar. 26, 2020) (defendant also subject to $100,000 personal recognizance bond co-signed by four financially responsible suretors), and in *United States v. Hudson*, 19 Cr. 496 (S.D.N.Y. Mar. 23, 2020) (defendant also subject to $200,000 personal recognizance bond co-signed by defendant's wife and daughter, and secured by $10,000 cash).

The defendant's other cited decisions either involved (a) the consent of the Government to the proposed, and more restrictive, bail conditions or (b) well-documented and specific health conditions that demonstrated risk factors this defendant has not presented or substantiated. The Government either consented to or joined in a recommendation that bail conditions be set in: *United States v. De Alba*, 19 Cr. 563 (DLI) (E.D.N.Y. Mar. 27, 2020) (dark web vendor charged in narcotics conspiracy with Section 841(b)(1)(B) object, presenting neither the statutory minimum sentence nor the dangerous conduct present in the instant case); *United States v. Plascencia*, 20 MJ 205 (RML) (E.D.N.Y. Mar. 25, 2020) (defendant charged as felon-in-possession, presenting no statutory minimum sentence nor comparably dangerous conduct); *United States v. Barrett*, 19 Cr. 436 (KAM) (E.D.N.Y. Mar. 20, 2020) (defendant charged in health care fraud case, presenting no statutory minimum sentence nor comparably dangerous conduct); *United States v. Estime*, 19 Cr. 711 (NSR) (S.D.N.Y. Mar. 26, 2020) (defendant charged with receiving parcel containing cocaine in narcotics conspiracy with Section 841(b)(1)(B) object, presenting neither the statutory minimum sentence nor the dangerous conduct present in the instant case); *United States v. Baker*, 20 Cr. 125 (KMK) (S.D.N.Y. Mar. 24, 2020) (defendant charged in narcotics conspiracy mandated to attend inpatient drug treatment, with $250,000 bond secured by parents' residence as additional conditions of bond); *United States v. Almaleh*, 17 Cr. 25 (ER) (S.D.N.Y. Mar. 27, 2020) (defendant over 65 years of age with documented health difficulties charged in bank fraud conspiracy presenting neither the statutory minimum sentence nor the dangerous conduct present in the instant case); *United States v. Estrada*, 18 Cr. 18 (ALC) (S.D.N.Y. Mar. 17, 2020) (bail conditions reinstated for defendant who withdrew plea, submitted $35,000 secured bond, and submitted to home incarceration with electronic monitoring).

Finally, the defendant's reliance on cases involving defendants released strictly on the basis of unique health risks posed by pre-existing conditions can be distinguished by those defendants' ability to document and identify the history and nature of the health risks involved. In *United States v. Vizzari*, 19 Cr. 767 (VSB) (S.D.N.Y. Mar. 20, 2020), the court's decision to release the defendant under conditions including home incarceration with electronic monitoring at a specifically designated shelter designed to provide care for those suffering from particular immune-suppressed conditions was prompted by the defendant's serious health condition including emphysema, COPD, and a mass in the right lung. Similarly, in *United States v. Witter*, 19 Cr. 568 (SHS) (S.D.N.Y. Mar. 27, 2020), the defendant documented a diagnosis of hypertension and related prescriptions, and the court fashioned bail conditions which included a $150,000 personal recognizance bond co-signed by two financially responsible persons and home incarceration secured by electronic monitoring.

Indeed, courts that have relied on health risks in making recent bail determinations have typically taken care to distinguish the specific health considerations unique to those defendants. The defendant in *United States v. Perez*, 19 Cr. 247 (PAE) (S.D.N.Y. Mar. 19, 2020) documented progressive lung disease, leading the court to find the defendant's health conditions "place him at a substantially heightened risk of dangerous complications" and that the resultant Order "should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case." (*Id.*). Judge Daniels came to the same determination in *United States v. Brandon*, 19 Cr. 649 (GBD) (Mar. 24, 2020), outlining the reasons the defendant's particular health considerations merited release, and ruling "this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case." (*Id.*).

A majority of Courts in this District have reasoned in similar motions that bail is inappropriate for generally healthy inmates, as granting bail to them could lead to the inevitable conclusion that every single inmate should be released. *See, e.g., United States v. Nivar*, 19 Cr. 902 (S.D.N.Y. Mar. 19, 2020) (McMahon, C.J.) (denial of pretrial bail based on COVID-19); *United States v. Alvarez*, 19 Cr. 622, Dkt. #17 (S.D.N.Y. Mar. 24, 2020) (Cote, J.) (denial of pretrial bail based on COVID-19); *United States v. Bradley*, 19 Cr. 632 (S.D.N.Y. Mar. 24, 2020) (Daniels, J.) (denial of pretrial bail despite defendant's claim that his age, 58, and health conditions—recent stroke and high blood pressure—justified release due to the risk of contracting COVID-19); *United States v. White*, 19 Cr. 536 (S.D.N.Y. Mar. 25, 2020) (Castel, J.) (denying bail application for inmate detained at Valhalla on controlled substance and Hobbs Act charges with history of whooping cough); *United States v. Acosta*, 19 Cr. 848, Dkt #14 (S.D.N.Y. Mar. 25, 2020) (Buchwald, J.) (denying bail application for inmate charged with conspiring to sell crack cocaine and other controlled substances); *United States v. Roberson*, 19 Cr. 914 (S.D.N.Y. Mar. 26, 2020 (Buchwald, J.) (denying bail application for inmate detained at MCC); *United States v. Chavis*, 19 Cr. 620 (S.D.N.Y. Mar. 27, 2020) (Cote, J.) (denial of bail based on COVID-19); *United States v. Vincent*, 20 Cr. 78 (S.D.N.Y. Mar. 30, 2020) (Torres, J.) (denial of bail based on COVID-19); *United States v. Sanchez-Reyes*, 19 Cr. 502 (S.D.N.Y. Mar. 30, 2020) (Cote, J.) (denial of bail for post-plea defendant under 18 U.S.C. § 3145(c) based on COVID-19).

Courts have reached the same conclusion for defendants with histories of asthma and/or who appear a Bureau of Prisons "high-risk" list. *See, e.g.*, *United States v. Rivera*, 20 Cr. 6

Case 1:18-cr-00601-PGG   Document 289   Filed 04/06/20   Page 13 of 14

Page 13

(S.D.N.Y. Mar. 25, 2020) (Rakoff, J.) (asthma); *United States v. Gonzalez¸* 19 Cr. 123 (S.D.N.Y. Mar. 25, 2020) (Buchwald, J.) (asthma); *United States v. Fofana*, 19 Cr. 447 (S.D.N.Y. Mar. 30, 2020) (asthma); *United States v. Steward*, 20 Cr. 52 (S.D.N.Y. Mar. 26, 2020) (Cote, J.) ("high-risk" list).

Further, although the Bureau of Prisons is not currently permitting legal visits with inmates, such a restriction does not warrant the defendant's immediate release. First, only *unreasonable* interference with an accused person's ability to consult counsel may be an impairment of the Sixth Amendment. *See Benjamin v. Fraser*, 264 F.2d 175, 185-87 (2d Cir. 2011). The interference will also be evaluated in light of the circumstances at hand, as "even when an institutional restriction infringes a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

With respect to the unique challenges presented by COVID-19, measures such as those BOP has designed exclusively to mitigate potential harm and avoid widespread viral infection are reasonable under the Supreme Court's ruling in both *Benjamin* and *Wolfish* because "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of . . . pretrial detainees." *Wolfish*, 441 U.S. at 547. Here, the institutional restrictions—*i.e.*, prohibiting all inmates from temporarily having in-person legal visits—must be balanced against the need to safeguard institutional security—*i.e*., protecting the defendant and other inmates from exposure to COVID-19. These measures are neither arbitrary nor unreasonable viewed against the threat to institutional security posed by COVID-19. Rather, they are precisely the kind of measures the BOP is required to take in such circumstances, and the Supreme Court directly recognized that those administering carceral facilities must be unconstrained in their ability to reasonably assure the well-being of those in their charge: "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel." *Id*. Moreover, as the Supreme Court earlier recognized in the direct context of in-person meetings with incarcerated defendants, "[w]hen [. . .] the question involves the entry of people into the prisons for face-to-face communication with inmates, it is obvious that institutional considerations, such as security and related administrative problems, as well as the accepted and legitimate policy objectives of the corrections system itself, require that some limitation be placed on such visitations." *Pell v. Procunier*, 417 U.S. 817, 826 (1974). The same Court noted, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 827. Nothing in the BOP's response to date to the COVID-19 outbreak can be described as exaggerated; the approach is proportional to the potential risk presented and in accord with the guidance broadly promulgated not only by the federal government, but also by state and local governments around the United States.

As this Court noted in the Landji Bail Decision, the BOP's decision to suspend in-person legal visits for 30 days is not unreasonable in light of the COVID-19 pandemic, and that decision has not totally deprived the defendant of the ability to consult with counsel. (Landji Bail Decision at 11). The MCC has implemented methods to ensure that inmates are able to communicate by phone with their lawyers, including by providing increased access for legal phone calls and nearly doubling the phone minutes provided to each inmate. Indeed, the availability of such calls should

be deemed a suitable alternative where, as here, the defendant's trial is not scheduled for approximately three months.  *See id*. at 826 (quoting *Cruz v. Beto*, 405 U.S. 319, 321 (1972)) ("So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that, in drawing such lines, 'prison officials must be accorded latitude.'"). Given the medical community's near-universally accepted mandate that in-person meetings should be avoided for everyone, whether incarcerated or not, the defendant's access to legal calls is plainly a suitable alternative to face-to-face meetings for the duration of the most serious danger posed by COVID-19.

### III.   Conclusion

For the foregoing reasons, the defendant's request for pretrial release should be denied.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: ___/s/_____
Matthew J.C. Hellman / Elinor L. Tarlow
Assistant United States Attorney
(212) 637-2278 / 1036


cc:   Thomas Dunn (by ECF and email)