UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

JIBRIL ADAMU,

Defendant.

**ORDER**

(S1) 18 Cr. 601 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Defendant Adamu is charged with narcotics conspiracy on board a U.S. aircraft, in violation of 21 U.S.C. §§ 959(c), 959(d), 963, and 18 U.S.C. § 3238 ((S1) Indictment (Dkt. No. 39) Count One); and narcotics distribution on board a U.S. aircraft, in violation of 21 U.S.C. §§ 812, 959(c), 959(d), 960(a)(3), 960(b)(1)(B), and 18 U.S.C. §§ 3238 and 2 (id., Count Two).

Adamu was arrested in Croatia on October 30, 2018 (Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289) at 2), and was extradited to the United States in October 2019. (Id.) Adamu was presented in this District on October 17, 2019 (see Dkt. No. 154), and was ordered detained on consent. (Id.) Adamu – who is housed at the Metropolitan Correctional Center ("MCC") – now seeks release on bail.[1] (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281)) The Government opposes his application. (Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289)) Trial is scheduled for June 15, 2020. (Feb. 25, 2020 Order (Dkt. No. 242))

**I.    LEGAL STANDARDS**

The Bail Reform Act, 18 U.S.C. § 3142(g), directs courts to consider the following factors in determining whether pretrial release is appropriate:

---

[1] Adamu has consented to having his bail application decided on the papers, and has waived his right to a hearing. (See Apr. 7, 2020 Def. Ltr. (Dkt. No. 292)) The Government also consents to having Adamu's bail application decided on the papers. (See Apr. 7, 2020 Govt. Ltr. (Dkt. No. 291))

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the [defendant];
>
> (3) the history and characteristics of the [defendant], including . . . the [defendant's] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; . . . and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. . . .

18 U.S.C. § 3142(g).

In order for a defendant to be detained pending trial, the Government must demonstrate (1) by a preponderance of the evidence, that there are no conditions or combination of conditions that will ensure the defendant's return to court, or (2) by clear and convincing evidence, that there is no condition or combination of conditions that will reasonably assure the safety of the community.

## II. THE PARTIES' ARGUMENTS

### A. Defendant Adamu

Adamu argues that he should be released pending trial because of pre-existing medical conditions:

> [H]e has breathing issues and . . . these issues [have] increased over the last few days. Although he received no medical treatment to date he believes he may have some infection on his lungs. The compelling reason is that Mr. Adamu, like all other inmates at the Metropolitan Correction Center (MCC) is at heightened risk for contracting and

2

spreading the COVID-19 virus. The MCC placed Mr. Adamu on a list of inmates that are considered at "high risk" of being infected with the coronavirus.

(Apr. 1, 2002 Def. Ltr. (Dkt. No. 281) at 1)

Adamu also argues that the "30-day [Bureau of Prisons ("BOP")] suspension of all visits to all federal correctional facilities all but eliminat[es] defense counsel's ability to meet with Adamu. . . . With trial currently set to begin on June 15, 2020, there is no reason to believe that defense counsel will have had any meaningful opportunity to meet with Mr. Adamu and prepare for trial before then. To be clear, the defense is not asking the Court to adjourn the trial date yet again . . . . [T]he more straightforward and legally tenable solution is to simply release Mr. Adamu from custody so that he can meaningfully prepare for trial in the event that trial is able to proceed as scheduled." (Id. at 6) (emphasis in original).

Adamu seeks release subject to "conditions of home incarceration and electronic monitoring that would prevent any risk of flight or danger to the community during the COVID-19 crisis." However, because Adamu is a citizen of Nigeria and was extradited to New York from Croatia, he has no proposed co-signers. He also has "no place of residence . . . where [he] could live. [Adamu] can only offer that he initially live in a halfway house or shelter." Defense counsel is "attempting to contact [Adamu's] family to determine if they can provide financial support in which he could pay for a room." (Id. at 2) Adamu requests release "on a $100,000 bond with the condition of confinement at a shelter or halfway house, where he will be in a position to protect himself from exposure to COVID-19." (Id. at 7)

### B. The Government

The Government opposes Adamu's application for release on bail, arguing that he has "failed to rebut the statutory presumption that he poses a danger to the community and is a risk of flight. . . ." The Government contends that Adamu "is an even weaker candidate for bail

3

[than] . . . co-defendant Jean-Claude Okongo Landji[]," whose bail application the Court recently denied. (Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289) at 1; see also Apr. 5, 2020 order (Dkt. No. 286))

The Government asserts that

> [t]he evidence against Adamu, who was Landji's co-pilot, is equally [as] strong [as the evidence against Landji], and includes Adamu's post-arrest admissions regarding his involvement in schemes to fly massive quantities of cocaine on aircraft he has piloted. Adamu further is a Nigerian citizen, has absolutely no ties to the United States, and offers only that he would live in a shelter or other similar housing if released. There is nothing in Adamu's application to show that releasing him would offer any meaningful improvement from his current conditions of confinement in terms of risk mitigation or treatment, or that such release would actually safeguard him or the community. The Court should deny Adamu's bail application in light of the significant flight risk and danger that he poses, the insufficiency of his bail application, and the potential health risks to the defendant and the community if he were released.

(Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289) at 1)

### III. BAIL REFORM ACT ANALYSIS

#### A. Nature of the Offenses Charged

As noted above, Adamu is charged with narcotics conspiracy on board a U.S. aircraft and narcotics distribution on board a U.S. aircraft. ((S1) Indictment (Dkt. No. 39), Counts One and Two) The Government contends that Adamu participated in a scheme to traffic huge quantities of cocaine supplied by co-defendant Cardona-Cardona from west Africa – where Adamu resides – to Europe, using U.S.-registered aircraft. (Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289) at 2) According to the Government, Cardona-Cardona intended to sell the cocaine "in exchange for weapons that he would then sell to foreign terrorist organizations . . . in Africa and elsewhere." (Id. at 1-2) Cardona-Cardona intended to sell a "missile, a box of AK-47s, and night vision goggles" to foreign terrorist organizations. (Id.)

On October 30, 2018, Adamu and co-defendant Landji flew Landji's aircraft into Zagreb, Croatia. A kilogram of cocaine was stored in the airplane's baggage compartment. This

4

was intended "as a test run for future transactions that would involve hundreds of kilograms of cocaine." (Id. at 2) Croatian law enforcement officers arrested Landji and Adamu when they landed in Zagreb, and recovered a kilogram of cocaine after searching the airplane. (Id. at 2)

According to the Government, this is not the first large-scale drug transaction in which Adamu has been involved. In 2009, Adamu conspired to traffic tons of cocaine from South America to west Africa, and flew a Boeing 727 airplane to South America so that others could use it to transport cocaine. That plane was later used to transport five tons of cocaine to Mali (the "2009 Cocaine Flight"). (Id. at 3)

The Government further states that Adamu participated in taped conversations in which the flight to Zagreb and the sample kilogram were discussed. In an October 22, 2018 taped telephone conversation, Adamu told co-defendant Cardona-Cardona that he maintained contacts with drug suppliers in Africa, and advised that a kilogram of cocaine would cost $20,000 in Nigeria or Benin. Adamu told Cardona-Cardona that he and Landji would need visas for Croatia but were otherwise prepared for the flight to Zagreb. (Id. at 4-5)

After his arrest in Zagreb, Adamu met with agents of the Drug Enforcement Administration, waived his Miranda rights in writing, and admitted to his involvement in the 2009 cocaine conspiracy. Adamu also told agents that he had recently joined Landji's air transport business, and intended to work as a pilot for Landji. Adamu further stated that he understood Landji's business was distributing ton-quantities of cocaine. Adamu also stated that he knew that Cardona-Cardona is a drug trafficker, and that he had flown aircraft for Cardona-

5

Cardona's drug business in the past, including in connection with the 2009 Cocaine Flight. (Id. at 4-5)

In sum, the Government will offer at trial evidence that Adamu planned and engaged in the transport of cocaine from west Africa to Croatia. (Id.) The Government will also contend that at least a portion of a maritime shipment of 624 kilograms of cocaine that was interdicted by the U.S. Coast Guard in July 2018 was intended for delivery in west Africa, for later transmission to Europe in a flight operated by Landji and Adamu. (Mar. 6, 2020 Govt. Ltr. (Dkt. No. 254) at 2)

Adamu is charged with two serious narcotics trafficking offenses. ((S1) Indictment (Dkt. No. 39)) He faces a mandatory minimum sentence of ten years' imprisonment on each count, and a Sentencing Guidelines range that exceeds 25 years' imprisonment. (Apr. 6, 2020 Govt. Ltr. (Dkt. No. 289) at 6) Because Adamu is charged with narcotics trafficking offenses, there is a presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will ensure his return to court and the safety of the community.[2]

### B. Weight of the Evidence

As to the weight of the evidence, it appears quite strong. Croatian law enforcement officers recovered a kilogram of cocaine from the airplane in which Adamu landed in Zagreb. (Id. at 2) As noted above, the Government represents that Adamu participated in

---

[2] 18 U.S.C. § 3142(e)(3): "Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed –

(A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 . . . ."

tape-recorded conversations during which Adamu, his co-defendants, and confidential sources discussed the logistics of transporting cocaine from Africa to Croatia, including their plan to begin with a "test run" of one kilogram of cocaine. As is also discussed above, the Government represents that post-arrest, Adamu waived his Miranda rights and made a number of highly incriminating statements, including admitting involvement in the 2009 Cocaine Flight and joining Landji's cocaine distribution business. (Id. at 1-6)

### C. History and Characteristics of the Defendant

Adamu was born in Nigeria and is a citizen of Nigeria. He has lived in Nigeria his entire life and resides there with his wife and children. The Defendant's parents are deceased. Adamu is one of nine children born to his parents; all of his surviving siblings reside in Nigeria. Adamu has never lived in the United States, and he has no extended family or friends who live in the United States. The Defendant is a commercial pilot, and he has been employed as a pilot for Nigerian companies since 1992. Adamu reports no assets or liabilities, and states that he is financially supported by his family. (PTS Rpt. at 1-2)

In sum, Adamu does not report any family, community, residential, or employment ties to the United States, much less to the Southern District of New York. If he were released, it is not clear where Adamu would reside. He suggests that he could "live in a halfway house or shelter," or rent a room in a hotel or other location. (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 2, 7; PTS Rpt. at 2)

### D. Danger to the Community

The large-scale drug trafficking Adamu appears to have been engaged in presents a significant danger to the community, and he has not proffered any evidence that tends to rebut the presumption that he presents a danger to the community. See 18 U.S.C. § 3142(e)(3)(A).

7

### E. Conclusion

Having considered the factors listed in the Bail Reform Act, the Court concludes that Adamu poses an enormous risk of flight as well as a significant danger to the community. He has not rebutted the presumption that there is no condition, or combination of conditions, that will ensure his return to court and the safety of the community if he is released on bail.

There is evidence that Adamu was at the center of an international cocaine distribution conspiracy in which he – as a pilot who transported massive amounts of cocaine – was to play a leading part. There is compelling evidence against him, including highly incriminating tape recorded conversations, the kilogram of cocaine recovered from the plane in which he landed at Zagreb, Croatia, and highly incriminating post-arrest statements made to agents of the Drug Enforcement Administration. He has no ties of any sort to the United States – much less to this District – and is a citizen of Nigeria, where all of his family and business are located. As someone who has worked as an international commercial pilot for decades, the Defendant is obviously highly mobile. And the Defendant faces an enormous sentence if convicted, including a ten-year mandatory term of imprisonment.

For all of these reasons, the Court concludes that the Government has met its burden of demonstrating that there is no condition or combination of conditions that can ensure the return of the Defendant and the safety of the community if he is granted pretrial release.

### IV. "COMPELLING" CIRCUMSTANCES

Adamu contends that – regardless of the factors under the Bail Reform Act – the ongoing COVID-19 pandemic requires his release. Adamu asserts that he has "breathing issues," that he might have a lung infection, and that the "MCC placed [him] on a list of inmates [who] are considered at 'high risk' of being infected with the coronavirus." (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 1-2) As discussed above, Adamu also contends that pretrial release is

necessary to protect his Sixth Amendment right to counsel, given that "the Bureau of Prisons [has] announced a 30-day suspension of all visits to all federal correctional facilities." (Id. at 6)

Adamu has not cited any statute that would permit his release under these circumstances, but the Court will consider whether he has demonstrated "compelling reason[s]" for temporary release within the meaning of 18 U.S.C. § 3142(i).

### A. 18 U.S.C. § 3142(i)

18 U.S.C. § 3142(i) provides that a "judicial officer may . . . permit the temporary release of [a defendant], in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Adamu argues that the threat COVID-19 poses to his health provides an "extraordinary and compelling reason[]" for his release. He also contends that his lack of access to counsel requires his release. (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 6-7)

#### 1. Danger from COVID-19

There is no question that COVID-19 presents an enormous risk to inmates currently in detention.

> Though the BOP has admirably put transmission mitigation measures in place, see Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp, in the event of an outbreak at the [MCC] (where the Defendant is currently being detained), substantial medical and security challenges would almost certainly arise. A comprehensive view of the danger the Defendant poses to the community requires considering all factors – including this one – on a case-by-case basis.

United States v. Stephens, 2020 WL 1295155, at *2 (citing United States v. Raihan, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020)).

Adamu, who is 56 years old, has not demonstrated that he suffers from any condition that makes him especially vulnerable to COVID-19, however. Instead, he asserts that "he has breathing issues . . . . Although he [has] received no medical treatment to date he believes he may have some infection on his lungs." (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 1) These conclusory assertions are not sufficient to demonstrate that Adamu has a pre-existing condition that makes him more susceptible to COVID-19 than other inmates, however. Nor has Adamu alleged that he has been exposed to the virus or that he has sought and not received appropriate medical care. See United States v. Marte, No. 19-cr-795 (SHS), 2020 WL 1505565, at *1 (S.D.N.Y. Mar. 30, 2020) ("Pursuant to 18 U.S.C. § 3142(i), the Court concludes that, in the absence of any evidence that defendant has a special condition making him substantially vulnerable to Covid-19, the pandemic alone, which is affecting the community in its entirety, is not a compelling reason warranting release at this point in time."); see also United States v. Steward, No. 20-cr-0052 (DLC), 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020).

Given the conclusory and unsupported nature of Adamu's claim of breathing issues, he is in essence making "a generalized argument that the fact of the ongoing pandemic itself is enough to justify temporary release." United States v. Chandler, 2020 WL 1528120, at *2 (citing United States v. Hamilton, No. 19-cr-54-01 (NGG), 2020 WL 1323036, at *1 (E.D.N.Y. Mar. 20, 2020)). This argument is not sufficient to justify pretrial release under the circumstances here, however, particularly where Adamu proposes that he be released to a shelter or halfway house – settings that are unlikely to offer better separation or medical care than Adamu currently enjoys. (See Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 7 (proposing that Adamu be released to a shelter or halfway house))

### 2. Sixth Amendment Argument

Adamu contends that the MCC has been closed to all outside visitors since March 13, 2020, and that as a result, his Sixth Amendment right to counsel has been violated. Adamu contends that the only remedy for this constitutional violation is immediate pretrial release. (Apr. 1, 2020 Def. Ltr. (Dkt. No. 281) at 6; see also 18 U.S.C. § 3142(i))

The spread of COVID-19 throughout New York City, New York State, and the wider United States has compelled the Bureau of Prisons to suspend all visits, including legal visits. United States v. Stephens, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (citing Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (explaining that "legal visits will be suspended for 30 days" nationwide); see also Federal Bureau of Prisons, COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp). Inmates do have access to counsel, however. They receive 500, instead of 300, minutes of phone time per month. Federal Bureau of Prisons, Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. And prison officials have stated that "case-by-case accommodation will be accomplished at the local level and confidential legal calls will be allowed in order to ensure inmates maintain access to counsel. Attorneys seeking an in-person visit with their client or a confidential call should contact the institution Executive Assistant . . . or contact the appropriate Consolidated Legal Center for the BOP institution." Id.

Although the Court is concerned about Adamu's access to counsel, it cannot find that BOP's decision to suspend all legal visits for 30 days is unreasonable in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large.

Moreover, Adamu has not identified an "appropriate person" into whose custody he could be released, nor has he shown a compelling reason for his release. As stated above, he

is a danger to the community and poses a significant flight risk. Given these circumstances, Adamu is not entitled to pretrial release under 18 U.S.C. § 3142(i).

## **CONCLUSION**

Adamu's application for pretrial release is denied. Given the rapidly evolving nature of this health crisis, however, and the challenges it poses to prison facilities, see <u>Federal Defenders of New York, Inc. v. Federal Bureau of Prisons</u>, No. 19-1778, slip op. at 26-27 (2d Cir. Mar. 20, 2020), his motion is denied without prejudice to renewal in the event that circumstances materially change.

Dated: New York, New York
April 10, 2020

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge