**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -against- | 18 Cr. 601 (PGG) |
| JEAN-CLAUDE OKONGO LANDJI, and JIBRIL ADAMU, | |
| Defendants. | |

## DEFENDANTS' POST-*KASTIGAR* HEARING BRIEF

Thomas F.X. Dunn
Jacqueline Cistaro
225 Broadway
Suite 1515
New York, New York 10007
Tel: 212.941.9940
E-mail: thomasdunnlaw@aol.com

*Attorneys for Jibril Adamu*

Michael Tremonte
Noam Biale
Katie Renzler
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
E-mail: mtremonte@shertremonte.com

*Attorneys for Jean-Claude Okongo Landji*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS ESTABLISHED AT THE HEARING ...................................................................... 1

I.     The Government Was on Notice – Both Actual and Constructive – That the Documents
       in Its Possession Contained Privileged Material ................................................... 1

II.    The Agents and a USAO Paralegal Viewed the Material ....................................... 4

       A.     The Agents ..................................................................................................... 5

       B.     USAO Personnel ............................................................................................ 6

III.   The Government Took No Protective Measures ..................................................... 9

       A.     No Taint Team Was Used Until August 2021 .............................................. 9

       B.     The Prosecutors Gave No Instructions to the DEA ..................................... 10

       C.     Had the Agents Been Advised, They Would Not Have Viewed the Materials .... 11

       D.     The AUSAs Did Not Advise the Agents When They Became Concerned That the
              Materials Seized from the Defendants Included Privileged Documents ............. 12

       E.     Multiple Failures Meant the Defendants' Attorney-Client Privilege Could Not Be
              Preserved ..................................................................................................... 13

IV.    The Government Has Changed Its Theory and Provided No Explanation ...................... 14

V.     The Government's Representations Regarding the Documents Were Inaccurate and
       Misleading ................................................................................................................. 16

VI.    AUSA Hellman's Testimony Was Not Credible .................................................... 19

ARGUMENT ...................................................................................................................... 25

I.     The Burden Should Shift to the Government to Disprove Taint ........................... 25

II.    The Government's Pattern of Reckless Disregard for the Defendants' Rights Warrants a
       Significant Sanction ................................................................................................ 29

CONCLUSION .................................................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Emle Industries, Inc. v. Patentex, Inc.,*
  478 F.2d 562 (2d Cir. 1973)..................................................................................... 25

*Gov't of Virgin Islands v. Fahie,*
  419 F.3d 249 (3d Cir. 2005)..................................................................................... 31

*Kastigar v. United States.,*
  406 U.S. 441 (1972).......................................................................................... *passim*

*U.S. Equal Employment Opportunity Comm'n v. George Washington Univ.,*
  502 F. Supp. 3d 62 (D.D.C. 2020) ........................................................................ 25

*United States v. Allen,*
  864 F.3d 63 (2d Cir. 2017)................................................................................ 28, 29

*United States v. Chapman,*
  524 F.3d 1073 (9th Cir. 2008) .......................................................................... 30, 32

*United States v. Danielson,*
  325 F.3d 1054 (9th Cir. 2003) .......................................................................... 24, 30

*United States v. Dornau,*
  356 F. Supp. 1091 (S.D.N.Y. 1973)........................................................................ 29

*United States v. Gartner,*
  518 F.2d 633 (2d Cir. 1975)............................................................................. 29, 30

*United States v. Lang,*
  No. CR 2015-0018, 2019 WL 1673317 (D.V.I. Apr. 17, 2019).......................... 30-32

*United States v. Morrison,*
  449 U.S. 361 (1981).................................................................................................. 32

*United States v. Nemes,*
  555 F.2d 51 (2d Cir. 1977)....................................................................................... 25

*United States v. Renzi,*
  722 F. Supp. 2d 1100 (D. Ariz. 2010) ..................................................................... 30

*United States v. Schulte,*
  No. S-2 17 Cr. 548 (PAC), 2019 WL 5287994 (S.D.N.Y. Oct. 18, 2019) ............... 26

*United States v. Schwimmer*,
   892 F.2d 237 (2d Cir. 1989) ................................................................................... 25

*United States v. Schwimmer*,
   924 F.2d 443 (2d Cir. 1991) ................................................................................... 30

*United States v. Solnin*,
   No. 12-CR-0040 ADS, 2015 WL 6442361 (E.D.N.Y. Oct. 23, 2015) .................................... 26

*United States v. Spitzauer*,
   No. 13-CR-6071-SMJ, 2014 WL 7240266 (E.D. Wash. Dec. 19, 2014) ................................. 26

*United States v. Stewart*,
   No. 02 CR. 395 JGK, 2002 WL 1300059 (S.D.N.Y. June 11, 2002) ...................................... 26

**Other Authorities**

U.S. Attorney's Manual § 9-13.420 ................................................................................ 27

## PRELIMINARY STATEMENT

Jean-Claude Okongo Landji and Jibril Adamu (collectively "the defendants"), by and through their undersigned attorneys, respectfully submit this joint post-hearing brief following the hearing held on September 9 and 14, 2021, pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972).

The evidence adduced at the hearing established:  (1) the government was on constructive and actual notice that the property seized from the defendants during their extradition likely contained privileged materials; (2) members of the prosecution team accessed and viewed privileged material; (3) the government undertook no measures to protect the defendants' Sixth Amendment rights; (4) the government changed its theory of the case and has provided no explanation for that change independent of the contents of the privileged material; (5) the declarations of the AUSA and DEA agents submitted to the Court were inaccurate and misleading; and (6) the AUSA's explanation of the government's conduct in his sworn testimony was not credible.  These facts are more than sufficient under the law to shift the burden to the government to disprove taint and demonstrate a pattern of reckless disregard for the defendants' rights, warranting a significant prophylactic sanction.

## FACTS ESTABLISHED AT THE HEARING

I.   **The Government Was on Notice – Both Actual and Constructive – That the Documents in Its Possession Contained Privileged Material**

Common sense and the experience of lawyers and law enforcement agents involved in federal criminal investigations dictate that defendants in custody who are engaged in legal proceedings almost invariably possess legal documents in their cells, including privileged communications with their attorneys.  The DEA agents who testified at the hearing acknowledged that commonsense proposition, and indicated they are trained specifically on how

1

to deal with a prisoner's legal documents during a transport.  Special Agent Joseph Catalano testified that the DEA provides such training, and instructs its agents "[n]ot to view" any legal documents obtained during transport, "[b]ecause they are privileged materials that I should not see."  Tr. 26:4-10.  Special Agent Matthew Fihlman similarly acknowledged such training, Tr. 71:9-12, and noted that it was "[r]easonable" to assume that if a prisoner had documents in his possession, "there may be correspondence with their lawyers" among those documents, Tr. 71:4-5.  Special Agent Douglas Waters also stated that it "stood to reason that [the defendants] had legal counsel" in connection with the extradition proceeding, Tr. 136:14-16, and Intelligence Analyst Jeffrey Lloyd acknowledged that it was fair to assume that while defendants were fighting extradition, they would communicate with their counsel "[i]n some form."  Tr. 199:13.

Thus, while the agents testified they were not made aware of specific privilege concerns prior to the extradition, all acknowledged the likelihood that the defendants' personal paperwork would contain correspondence with their attorneys, which would be privileged.  *See, e.g.*, Tr. 26:8-10.  The only witness who stated that he did not "have a general idea," based on training or experience, of the kinds of items "defendants collect while they are sitting in jail" was AUSA Hellman, Tr. 252:20-22, but even he acknowledged that it "makes intuitive sense" that defendants would "routinely maintain legal papers in jail."  Tr. 252:25-253:4.  Accordingly, given that Mr. Landji and Mr. Adamu had been incarcerated for a year, fought extradition, and were represented by legal counsel in that proceeding, the government was on notice of a high likelihood that the papers the defendants had collected while incarcerated in Croatia contained privileged materials.

But even putting aside this commonsense notion, the agents and prosecutors were given specific, actual notice of the presence of legal papers among the documents seized from the

defendants.  First, Fihlman testified that he was "expecting" that, among the defendants' personal property, "documents might be there."  Tr. 70:18-23.  Mr. Adamu also told him expressly that there were "important court papers" among the documents that Mr. Adamu "wanted to retain."  Tr. 54:12, 55:12.[1]  Deputy U.S. Marshal Tramontana testified that, during the extradition, "one defendant said, my legal work is in the luggage."  Tr. 297:1-2.  Accordingly, the agents were on actual notice of the presence of legal papers at the time of the extradition.

The agents consequently made the prosecutors aware of the same within weeks of the extradition.  On November 8, 2019, Lloyd emailed AUSA Hellman and advised that "there was other paperwork we were given for both Adamu and [L]andji," which "appears to be *mostly paperwork they collected while they were sitting in jail waiting extradition*."  Gov. Ex. 7 (emphasis added).  When asked at the hearing if this email put AUSA Hellman on notice "that the documents the agents had seized from the defendants in extradition likely included legal documents," AUSA Hellman testified, "When you say on notice, was that my understanding at that point?  I don't think so, sitting here today.  Should I have been on notice?  Debatably.  Maybe the answer is yes."  Tr. 253:5-11.

At the same time, counsel for the defendants were raising this issue to the AUSAs' attention repeatedly.  On October 30, 2019, counsel for Mr. Adamu Thomas Dunn emailed AUSA David Denton saying, "I didn't hear back from you concerning my client's documents and property.  The co-defendant also had his property taken. . . .  [The DEA agents] advised our

---

[1]    Fihlman testified that he did not share that information with other DEA agents or the prosecutors at the time, Tr. 82:23-83:1, 83:18-21, but the information made its way to the investigative agents at some point, as Waters testified that "at some point in time there was communication between us or the agents that said, hey, I feel like I remember one of the defendants saying, I would like that [*i.e.*, the documents] to come with me."  Tr. 144:19-22.

clients their property and documents were evidence." Def. Ex. 14, at 2. Mr. Dunn followed up

on November 8, 2019 because he had received "no response concerning the below email that I

sent you on October 30th." *Id.* AUSA Hellman responded to Mr. Dunn and stated that the

government was working to produce the "materials received from Croatia." Def. Ex. 15, at 2.

Mr. Dunn replied, "Although you make reference to [Croatia] discovery I would like to obtain

the actual papers including the tape of a phone call which Adamu received from his lawyer in

Croatia. This would include any notes made by Adamu." *Id.* At this point, AUSA Hanft

advised, "I think he has been trying to say he believes something beyond discovery items were

taken from his client in transit," and cautioned, "I just want to make sure he's not saying there's

something we shouldn't be looking at for some reason or another." *Id.* at 1. AUSA Hellman

acknowledged, "That's a good point, right." *Id.* AUSA Hanft later followed up to spell out her

concern, saying, "tried [to call] earlier just to explain what I meant. *Seems like they're saying a*

*lawyer communication may have been involved?*" Def. Ex. 16, at 1 (emphasis added).

Accordingly, the government was on notice, at least constructively, as of the time of the

extradition – and within a month of the extradition was on actual notice – that documents the

defendants had collected while incarcerated in Croatia had been seized from them, and that those

documents likely contained privileged materials, including "lawyer communication[s]." *Id.*

## II.      The Agents and a USAO Paralegal Viewed the Material

Despite having constructive and actual notice, at least three agents involved in the

investigation, and a fourth who was not, viewed the documents. In addition, a USAO paralegal

who was not walled off from the investigation viewed the material on at least three occasions.

Finally, despite his denial in his sworn declaration and testimony, email correspondence suggests

AUSA Matthew Hellman (and possibly also AUSA Elizabeth Hanft) reviewed the materials.

A.  <u>The Agents</u>

The agents testified that they did not read the material carefully or retain the contents.
But the agents all admitted to viewing the materials with varying degrees of attention.  Catalano
testified, "I glanced at all the documents.  They were in front of me, yes."  Tr. 33:9-10.  Fihlman
testified, consistent with his email of January 8, 2020, Def. Ex. 5, that he "looked through as
much as [he] could in a very quick manner."  Tr. 51:23-24.  When pressed, Fihlman clarified that
he did review documents, but did not remember the specific documents or their contents.  When
asked, "Do you remember reading anything in that blue bag?" *i.e.*, the Shangzhewi Gentleman
bag that contained a privileged legal memo from Mr. Landji's Croatian attorney, Fihlman
testified, "To answer your question, I don't – I don't remember."  Tr. 53:9-10.  Fihlman further
testified that he recalled seeing handwritten notes in the documents.  When asked if he read
them, he testified, "Maybe reading them like as they were handwritten notes, but I don't – I don't
remember any – what they would have said."  Tr. 53:24-54:2.  Fihlman was later asked whether
he had a conversation with AUSA Hellman in which AUSA Hellman suggested he state in his
declaration that he had not reviewed anything.  Fihlman responded, "I don't remember saying
that; but in looking back, that could be an accurate statement, because I --- well, *it couldn't be* ---
*reviewing, yes,* but not to the extent that I remembered the things I was seeing."  Tr. 91:5-8
(emphasis added).  When asked about whether he requested that AUSA Hellman clarified he had
at least glanced at the documents, Fihlman testified, "I don't remember that, but that is --- but I
did glance --- *I didn't glance, I went through, you know, some of the documents, yes*."  Tr. 91:14-
16 (emphasis added).

As to Waters and Lloyd, both admitted to observing specific contents of the documents
during the copying and scanning process, which contents they later recalled.  Waters testified
that he "went through the bags" looking for "identifiable information" to determine which bag

5

belonged to Mr. Landji and which to Mr. Adamu.  Tr. 124:11-15.  He looked through the documents and was able to note, "hey, these look like these could be court, legal, or police documents, but I did not spend the time to figure out exactly what they were."  Tr. 145:25-146:2. With respect to a legal memorandum, Waters did not remember seeing one.  Tr. 159:11-14.

Lloyd recalled that he scanned everything with writing on it, and that where there were notebooks that had pages without writing, he would have gone through and scanned only the pages with writing, leaving out the pages without.  Tr. 186:20-187:4.  He recalled seeing the Shangzhewi Gentleman bag, did not remember specifically whether he took documents out of it, but acknowledged that the bag appeared to have contained documents at one point and now, after the scanning process, was empty.  Tr: 187:19-23, 188:2-3, 190:11-12; *compare* Gov. Ex. 1 *with* Def. Ex 10.  Finally, Lloyd observed various details about the documents as he was copying and scanning them:  references to Okland Aviation, documents that looked like they were collected by the defendants in jail, possibly court documents, dates that were subsequent to the defendants' arrest, notebooks, and a flight manual.  Tr. 193:19-195:1.  Lloyd reported these facts about the documents to the prosecutors nearly two years after he copied and scanned them, which he acknowledged was based on his "memory of reviewing the documents."  Tr. 196:16.

    B.  <u>USAO Personnel</u>

The documents were also viewed on more than one occasion – and, it appears, as many as three occasions – by USAO Paralegal Specialist Michael DeLuca.  DeLuca was a paralegal in the unit that was prosecuting the case and worked on the case.  Tr. 274:13-14.  He was not walled off from the investigation.  Tr. 274:10-12.  When the agents had completed the copying and scanning process, Waters testified that he delivered a hard drive with the scans to the USAO in November 2019, and gave the drive to AUSA Hanft.  Tr. 130:21-131:1, 155:2-3.  He also

testified that in January 2020, he put the materials on a file exchange server, which was shared by the DEA and USAO.  Tr. 131:4-6.[2]

Contemporaneous emails introduced at the hearing established that these materials were reviewed at both points in time:  On November 21, 2019, Waters emailed AUSAs Hellman and Hanft that he was dropping off "a drive with DeLuca" with "additional copies [of] misc documents for LANDJI and ADAMU."  Def. Ex. 20, at 2.  AUSA Hellman then forwarded that email to DeLuca on November 24 and directed him to review the material, stating, "Whenever you have a chance, let me know what this stuff (re: Landji/Adamu) is?  I have no idea what he's dropped off haha."  *Id.* at 1.  DeLuca responded, "It looks mostly like documents except for the devices" in a separate folder.  *Id.*  AUSA Hellman then instructed DeLuca not to open the devices folder because the contents might be the subject of a suppression motion, but gave no such instruction as to the documents.  *Id.*  Then, on January 8, 2020, after Waters had uploaded the files to the file exchange server, DeLuca emailed AUSA Hellman and stated, "Was trying to figure out why that stuff looked familiar.  It was included in some materials that Doug gave us on 11/24, see below," and he forwarded the email chain from November 24.  *Id.*  Thus, DeLuca again reviewed the material in early January 2020 and noted that the "stuff looked familiar."  *Id.*

DeLuca reviewed the materials once again in preparing the January 21, 2020 discovery production.  As AUSA Hellman testified, "He was able to access those scans on USAFX, . . . he

---

[2]     The government spent much of the *Kastigar* hearing focused on whether the physical documents had been locked in a temporary storage locker or safe at the DEA's office in Virginia and who had access to that safe.  *See, e.g.*, Tr. 122:21-123:1, 216:2-8; Gov. Ex. 6 (photograph of the safe).  But the security of the physical documents is of little significance because the documents existed in electronic format on the hard drive delivered to the USAO; on a "file system" accessible "[w]ithin DEA;" and shared on an "electronic storage system" to which the prosecutors had access, so that the "U.S. Attorney's Office would have everything" the DEA had.  Tr. 203:4-15.

stamped them with Bates numbers and included them in a discovery production which was prepared and made available to counsel, I believe, on January 21, 2020." Tr. 234:7-10.  As DeLuca was preparing the production, AUSAs Hellman and Hanft appear to have accessed the documents and both removed and added individual pages.  By email dated January 14, 2020, DeLuca emailed the AUSAs with a link to the production and asked them to confirm "that the below is what we want to produce."  Def. Ex. 21, at 1.  The following day, AUSA Hanft replied, "Looks right to me except I think we take out the consular notification form and fax cover sheet. Hellman, take a look and let me know if you disagree."  *Id.*  AUSA Hellman replied shortly thereafter that he had added photos "to each folder" of the production, "and deleted the consular notification stuff you had mentioned.  Reviewed the rest and agree these are right."  *Id.*[3]

Thus, the evidence established that Catalano, Fihlman, Waters, Lloyd, DeLuca, and perhaps AUSAs Hellman and Hanft, all viewed the documents with varying degrees of attention between October 17, 2019 and January 15, 2020.  As noted above, during that time, all were on notice that the documents likely contained privileged material.  Further, with the exception of Catalano, all of these other individuals participated in the investigation.  Fihlman testified that his "office became involved in the tail-end of that investigation . . . to assist with an undercover operation."  Tr. 61:1-6.  He participated in meetings with the investigative team and Croatian National Police.  Tr. 67:13-20.  He was present at Mr. Adamu's interrogation.  Tr. 94:17-18. And he continued to speak with other agents and the AUSAs following the extradition.  Tr. 90:3-

---

[3]      To be sure, AUSA Hellman testified that he made these modifications, which included (as indicated in the email) removing particular pages from the production, "[w]ithout opening [the documents]."  Tr. 289:4.  It is unclear, however, how one could remove particular pages from documents without opening them.  As will be discussed below, this was one of numerous instances in which AUSA Hellman's testimony contradicted the plain implication of contemporaneous email correspondence.

7.  Waters "participated in proffers or interviews of people involved in the case." Tr. 131:14-15. He also participated in the interview with Mr. Adamu.  Tr. 133:9-10.  Lloyd also attended proffers.  Tr. 179:19-20.  In addition, he created an "overt acts chart," Def. Ex. 13, which constituted a "fairly extensive review of the evidence in the case."  Tr. 206:7-8.  DeLuca was the paralegal on the case.  Tr. 274:13-14.  And, of course, AUSAs Hellman and Hanft were (and, in the case of Hellman, still are) members of the prosecution team.

### III.    The Government Took No Protective Measures

A.  No Taint Team Was Used Until August 2021

As has been discussed at length in Mr. Landji's prior letters concerning the *Kastigar* hearing, the use of a "taint" or filter team is the standard method employed by the government to avoid exposure to privileged material.  *See, e.g.*, Dkt. # 508, at 13; Dkt. # 525, at 6.  Here, in an investigation that began in 2017, with an extradition that occurred in October 2019, the government acknowledged that the "first time that a taint paralegal or agent or anyone was assigned any role in this case was the summer of 2021."  Tr. 253:18-20.  While the agents were generally knowledgeable about the use of taint agents and the protections they offer, they conceded that there was never any discussion of having a taint agent involved in the extradition or in the process of opening evidence bags to scan documents.  *See* Tr. 75:23-76:1, 224:2-11.  In January 2020, when Waters provided scans of the documents to the prosecutors via USAFX, AUSA Hellman had "concerns about whether those documents could contain privileged information."  Tr. 267:19-22.  But there was "no consideration of a taint team" at that time, Tr. 274:15, and instead, AUSA Hellman directed a paralegal who was *not* walled off from the investigation to handle the documents.  The government implicitly conceded this was improper by having a taint paralegal scan and re-produce the documents on August 20, 2021, and AUSA

Hellman testified, "Sitting here today, I wish that a taint paralegal had been responsible for producing" the original production.  Tr. 286:13-14.[4]

B.  The Prosecutors Gave No Instructions to the DEA

The prosecution team in this case made affirmative efforts to place DEA agents on the extradition flight so they could obtain documents.  Emails sent by and among the agents in the lead-up to the extradition showed that the primary (indeed, only) purpose of the DEA's presence on the flight was "to hand carry some document evidence."  Def. Ex. 3, at 1.  That purpose was reinforced by DUSM Tramontana's testimony that the transport of the defendants was "fully covered by the marshals" and they "didn't need assistance from the DEA agents for that."  Tr. 296:13-17.  Indeed, contemporaneous emails show that the DEA's request to be present on the flight was initially rebuffed by the Marshals.  Def. Ex. 2, at 4.  The agents' supervisor, the Department of Justice Office of International Affairs, and the AUSAs from SDNY had to intervene in order to get the agents on the flight.  *Id.* at 3; *see also* Tr. 64:5-25.

Yet the government made *no* efforts whatsoever to prepare the agents for the likelihood that the defendants would have privileged materials.  Catalano testified that he had no debriefings at all prior to flying to Croatia to assist with the extradition.  Tr. 24:14-21.  He was never advised that the defendants were represented by counsel or what the names of their attorneys were.  Tr. 19:17-22.  Fihlman similarly recalled no discussions with any of the prosecutors about what his role was on the flight.  Tr. 66:8-13.  Indeed, Fihlman's understanding of his authority to seize the documents was that it was "similar to seizing evidence incident to an

---

[4]     While the government should be commended for finally acknowledging its error, it did so only after resisting Mr. Landji's renewed request for a hearing by arguing that no one from either the DEA or USAO had ever reviewed the documents and that the government's prior declarations "settle this point."  Dkt. # 518, at 1.

arrest," Tr. 76:6-7, even though this was not an arrest.  Although Fihlman did know the name of Mr. Landji's Croatian attorney, Krešimir Šušnjar, he does not appear to have shared that information with the other agents, apart from Special Agent Anton Kohut, who never came into contact with the documents.  *See* Tr. 86:22-87:6.

As to the agents who scanned the documents – Waters and Lloyd – they, too, did not receive "any specific instructions or information" regarding handling the materials.  Tr. 138:24-25.  Waters testified that he did not see any communications between the defendants and their attorneys, but he clarified that he "didn't know their attorneys or who they were."  Tr. 128:8-11.  He was not told the name of Mr. Landji's Croatian attorney.  Tr. 128:12-16.  Lloyd also did not know Mr. Šušnjar's name.  Tr. 176:4-8.  No one on the prosecution team ever gave him the name so that he would know not to look at communications with that person.  Tr. 200:6-9, 16-19.  As can be seen on the face of Government Exhibit 3, Mr. Šušnjar's name did appear on emails that were contained in the evidence bags.  Gov. Ex. 3, at 1.  But the agents did not know to avoid those documents because, despite Fihlman and the prosecutors knowing the name of Mr. Landji's attorney, *see* Tr. 241:15-242:6, they never gave his name to the other agents reviewing them.

C.  Had the Agents Been Advised, They Would Not Have Viewed the Materials

This omission of Mr. Šušnjar's name in particular and the general absence of any instructions were significant because, as discussed above, the agents testified that they are trained not to look at materials where they have been warned of a potential privilege issue.  Importantly, in describing that training, the agents did not testify that they are permitted to glance at or page through such documents so long as they do not read them.  To the contrary, Catalano testified that DEA agents are trained "[n]ot to *view*" legal documents in possession of

11

prisoners "[b]ecause they are privileged materials that I should not see." Tr. 26:3-10 (emphasis

added).  Similarly, Fihlman testified that the DEA's training is "[i]f it's privileged documents,

then we are not allowed to *look at* [them]." Tr. 71:11-12 (emphasis added); *accord* Tr. 71:18-13-

20 ("Q: [I]f it's documents that a prisoner has collected in a jail cell while he's challenging

extradition, it's logical that there could be legal documents there that are privileged, right?  A:

It's possible.  Q:  Okay.  And you know that if it's possible, *you shouldn't look at the documents*.

A:  Correct." (emphasis added)).

Accordingly, had the prosecutors advised the agents of the potential privilege issue either

before the extradition (based on high likelihood that the defendants retained attorney

communications in their jail cells) or when they were raising concerns internally about the

privilege issue, the agents would not have even opened the materials, and would have instead

"discussed with the U.S. Attorney's Office" whether to have "a taint agent open them up rather

than the investigative agent[s]." Tr. 224:3-6.

D.   The AUSAs Did Not Advise the Agents When They Became Concerned That the
     Materials Seized from the Defendants Included Privileged Documents

The evidence adduced at the hearing established that, as of November 18, 2019, the

AUSAs were raising concerns internally that the documents seized from the defendants may

have contained "a lawyer communication," Def. Ex. 16, at 1, or some other document "we

shouldn't be looking at," Def. Ex.  15, at 1.  Just days before that discussion, AUSA Hellman had

been advised by Lloyd that the agents were "in the process . . . in the middle of the scanning and

copying process . . . as it pertained to both defendants." Tr. 202:21-24.  Yet, no one in the U.S.

Attorney's Office thought to alert the agents at any point in November of 2019 that the

documents they were "in the middle of . . . scanning and copying," *id.*, contained potentially

privileged material.  No one thought to tell them that in December 2019 either.  Waters testified

12

that he was advised of the privileged materials in January 2020, Tr. 132:9, but his supervisor, Kyle Brannon, testified that while questions were raised about the documents in January 2020, "the person [who raised them (AUSA Hellman)] didn't say that they might be privileged at that time." Tr. 222:25-223:1.  Fihlman corroborated this, testifying that although AUSA Hellman asked him about the documents in January 2020, he was not told there might be privileged documents among them until *December* 2020.  Tr. 60:4-11.[5]  Lloyd was similarly not told the documents contained privileged material until December 2020.  Tr. 198:5-6.  And Catalano learned there was potentially privileged material among the documents only three weeks prior to the *Kastigar* hearing.  Tr. 24:18-24; *see* Tr. 40:15-18 ("Q:  Did anyone from the U.S. Attorney's Office discuss with you before three weeks ago that there might be privileged documents in those materials?  A:  No, not that I recall.").

Thus, for approximately thirteen months between when the AUSAs raised concerns internally about privileged documents – thirteen months during which defense counsel continued to press the issue – the AUSAs did not advise the DEA agents, who had scans of the documents accessible to them (and presumably their colleagues) on the DEA's shared file system.  *See* Tr. 203:4-15.

E.   Multiple Failures Meant the Defendants' Attorney-Client Privilege Could Not Be Preserved

As discussed in Mr. Landji's renewed motion for a *Kastigar* hearing and pre-hearing brief, the agents' treatment of the defendants' materials resulted in Mr. Adamu's privileged notes being contained in the evidence bags marked "Landji," and Mr. Landji's notes being similarly misplaced in the bag marked "Adamu."  *See* Dkt. # 508, at 7; Dkt. # 525, at 2 n.1.  The evidence

---

[5]     The transcript reflects that Fihlman said "December 2021," but he clearly meant December 2020.

at the hearing made clear that these problems are traceable to the very beginning of the agents'

seizure.  Catalano testified that he kept each defendant's documents separate from the other's by

laying them out on a table and taking pictures.  Tr. 30:2-6; *see* Gov. Ex. 1; Gov. Ex. 2.  But at

least one item – the folder in the picture of Mr. Adamu's materials with the word "ocean" and

"images of a nautical compass" and other maritime imagery, was, after being photographed,

erroneously placed among Mr. Landji's materials.  Tr. 304:23-305:4.  Catalano also testified that

some of the defendants' documents were placed loose on top of evidence bags rather than inside,

and that it was "possible that [both defendants'] items were mixed together in one suitcase."  Tr.

37:1-3.  He conceded that he could not reconstruct which documents were originally in the

possession of which defendant.  Tr. 37:14-17.  While Waters testified that he looked through the

documents in an attempt to identify whose materials belonged to whom, he looked for "things

with their names on it," Tr. 124:19, and had no reason to be able to recognize each defendant's

handwriting.  Thus, based on the agents' conduct, it was essentially guaranteed that the

privileged work product of each defendant would end up in the possession of the other, thereby

making it impossible for each defendant's privilege to be preserved.  And, in fact, that is

precisely what happened.  *See* Dkt. # 508-2 (Biale Decl.), ¶ 14 (describing handwritten notes in

Mr. Landji's material written by Mr. Adamu); Dkt. # 525, at 2 n.1 (noting the converse).

## IV.     The Government Has Changed Its Theory and Provided No Explanation

The evidence at the hearing established that prior to the extradition, Waters stated in a

sworn declaration to a United States Magistrate Judge that the case against Messrs. Landji and

Adamu – and the basis for their extradition – involved "a plan to ship cocaine to Croatia via an

aircraft (the Aircraft) flown by LANDJI and ADAMU."  Def. Ex. 9, ¶ 9.  In connection with that

plan, Waters averred, "flight plans signed by LANDJI were filed," and the Aircraft traveled to

Croatia on October 30, 2018.  *Id.* ¶¶ 10-11.  Waters averred that "the Aircraft flew as a 'black

flight' (*i.e.*, without its transponder on)."  *Id.* ¶ 11; *see also* Tr. 158:15-17.

Despite this sworn declaration, AUSA Hellman testified at the hearing that the

government was not planning to argue at the trial that the aircraft flew as a black flight.  Tr.

292:13-16.  He also testified that he did not know whether the government would argue that

Mr. Landji flew the plane.  Tr. 292:17-19.  He acknowledged that the pilot was in fact Curtis

Seal, but suggested that it was possible the defendants "had a hand at various points."  Tr.

292:25-293:1.  When asked directly whether the government was planning to argue that

Mr. Landji flew the plane, AUSA Hellman responded (three weeks prior to the commencement

of trial), "I can't answer that right now."  Tr. 293:8.

Thus, on two key elements of the government's case – whether the flight from Mali to

Croatia was a black flight and who piloted the plane – the government changed its theory from

the point before it viewed the defendants' privileged material to after.

The government has provided no explanation for this change; rather, it has simply

asserted that "the Government did not in any way shift its theory or strategy in this prosecution—

or otherwise take any investigative steps or obtain evidence—based on privileged materials, and

the Government stands ready to answer any questions the Court may have on that subject in any

form that the Court deems appropriate."  Dkt. # 530, at 2.  But when that question did arise at the

hearing, the government could not answer it, as evidenced by the following exchange with

AUSA Hellman:

> Q:   I believe you were asked on direct if you had discussed the
>       specific content of the documents in Government Exhibit 5
>       with the agents. I believe that your testimony was that you
>       had not, correct?
> A:   Yes.

> Q:  But since you had never seen the contents of Government
>     Exhibit 5, any of the documents in that bag, isn't it true that
>     if one of the agents raised an issue, based on the contents of
>     one of those documents, you would have no idea that it was
>     based on a document from Government Exhibit 5?
>
> A:  That's fair, yes.  If it's more accurate, I never knowingly
>     discussed the contents of this bag depicted in Exhibit 5 with
>     any member of the DEA.
>
> Q:  Right.  You never knowingly did it, but it could have
>     happened and you wouldn't have known, correct?
>
> A:  I agree with that.

Tr. 249:23-250:13.  This exchange illustrates precisely why *Kastigar* requires the government to

prove a wholly independent source for each piece of evidence, rather than simply deny that there

has been taint.  Here, the government has changed its theory on key points, and the prosecutors

cannot (or have chosen not to) say one way or the other whether those decisions were influenced

by members of the prosecution team that viewed privileged material in the defendants' property.

## V.    The Government's Representations Regarding the Documents Were Inaccurate and Misleading

The evidence at the hearing also established that the representations in the declarations

previously submitted to the Court in connection with the defendants' pretrial motions contained

material omissions and were affirmatively misleading.  At their core, the declarations indicated

that there could not have been taint because the bulk of the documents reviewed were in Croatian

and the agents do not read Croatian.  *See* Def. Ex. 7 (Fihlman Decl.), ¶ 5; Def. Ex. 8 (Waters

Decl.), ¶ 4; Def. Ex. 24 (Hellman Decl.), ¶ 4.  In fact, only a fraction – 11.5% – of the pages in

the defendants' property was in the Croatian language without an attached certified translation in

either English or French.  *See* Def. Ex. 23.  Yet the declarations were effective in the

misimpression they created:  the Court stated in its decision denying the motion that "[t]he

16

agents did not review these documents, which are in Croatian, a language that the agents do not understand and cannot read." Dkt. # 460, at 14.

The hearing revealed additional inconsistencies that, while not as central to the Court's determination, are nevertheless troubling in a sworn declaration. For example, in Waters's declaration, he stated that, following the extradition, he received "among other things, two packets, each containing approximately several hundred pages of documents." Def. Ex. 8, ¶ 3. When asked what those "other things" were that he received, Waters testified, "There was nothing other than what was contained in those bags." Tr. 142:24-25. When asked why there was a reference to "other things" that did not exist, Waters stated, "I think it's a matter of language and myself as reviewing this. I would still interpret it that I received only the package which we have identified earlier. Nothing more, nothing less." Tr. 143:3-6.

This puzzling answer suggests at least that Waters did not carefully review the assertions in the declarations that AUSA Hellman drafted to ensure they were accurate – with one exception: AUSA Hellman's internal email to his chiefs when he was drafting the declarations indicated that he contemplated obscuring the agents' actions by simply writing "that nobody has [reviewed the materials]." Def. Ex. 22. The agents pushed back on that plan, however, stating that they wanted AUSA Hellman "to be clear that while they didn't *read* the documents, they *glanced* at the documents to see if they were the thing we were asking them for. Obviously they had to do this because otherwise they'd have no idea what to send us." *Id.* This email – which also suggests there may have been additional occasions when the agents viewed the materials in response to a request from the prosecutors – evidences an effort to minimize the facts that ultimately were adduced at the hearing.

Finally, as to AUSA Hellman's declaration, his statement that, based on his conversations with all the AUSAs involved in the prosecution, "the contents of the Documents have not been reviewed by any personnel of the United States Attorney's Office" omitted the role of DeLuca, who, as discussed above, reviewed the documents no less than three times:  on or about November 24, 2019 (Def. Ex. 20); on or about January 8, 2020 (*id.* ("stuff looked familiar")); and in preparing the January 21, 2020 production (Tr. 234:7-10).  In addition, even assuming that AUSA Hellman did not review any of the PDFs Lloyd sent him on November 8, 2019 – as his email indicated he planned to do, Gov. Ex. 7 – the emails between AUSAs Hellman and Hanft as the January 21, 2020 production was being prepared indicate they were adding and removing pages in the documents.  *See* Def. Ex. 21.

To be sure, AUSA Hellman adhered in his testimony to his claim in the declaration:

> The Court:  Did you have an understanding of whether anyone associated with the U.S. Attorney's Office had reviewed the documents contained in the bags that are shown in Government Exhibit 3 and 4?
>
> The Witness:  I did have an understanding, and my understanding was that no one from the U.S. Attorney's Office had reviewed those contents.

Tr. 249:13-19.  But AUSA Hellman later admitted that he did not know whether DeLuca had reviewed the documents:

> Q:    And Mr. DeLuca was looking for those scans two days after you raised this issue on January 6?
>
> A:    Right.
>
> Q:    And when he says they looked familiar, that means he has looked at them before, correct?
>
> A:    I don't know.
>
> Q:    That's what it suggests, right? It's a clear implication.
>
> A:    When you say looked at, I think, yes. The number of files and the names. I think that's actually what he's referring to. But --
>
> Q:    But you don't know?
>
> A:    Correct.

18

Tr. 285:13-24.   Accordingly, the sworn declarations submitted to the Court were incomplete, inaccurate, and misleading.

**VI.     AUSA Hellman's Testimony Was Not Credible**

Finally, AUSA Hellman's explanation of the prosecution team's conduct with respect to the defendants' privileged documents was not credible.   AUSA Hellman's testimony did not demonstrate any malicious intent to deceive, but whether stemming from forgetfulness, a belief in the good faith of his team, or a desire to explain conduct for which there is no good explanation, the many inconsistencies in his testimony rendered it overall unworthy of belief. What follows is selected statements from the testimony, and the various ways those statements were impeached:

AUSA Hellman testified that he learned there were materials seized from the defendants in "January of 2020." Tr. 232:13-15.   In fact, AUSA Hellman was aware of the materials much earlier.   On October 30, 2019, Mr. Dunn emailed the prosecution team and stated, "I didn't hear back from you concerning *my client's documents and property*. The co-defendant *also had his property taken*.   Apparently the DEA agents stationed in Croatia *took the property* . . . .   They advised our clients *their property and documents* were evidence."   Def. Ex. 14 (emphasis added). Mr. Dunn forwarded this email again on November 8, 2019.   *Id.*   Also on November 8, 2019, Lloyd emailed AUSA Hellman and advised he had "*paperwork that [the defendants] collected while they were sitting in jail [a]waiting extradition.*"   Gov. Ex. 7 (emphasis added).   On November 18, 2019, AUSA Hanft emailed AUSA Hellman regarding Mr. Dunn's emails and said, "I think he has been trying to say he believes something beyond discovery items *were taken from his client in transit*."   Def. Ex. 15 (emphasis added).   AUSA Hellman replied, "Yes, I think that's what he's saying also."   *Id.*   Thus, contrary to his testimony, AUSA Hellman did not learn

that there were materials seized from the defendants in January 2020 – he acknowledged that Mr. Dunn had advised him of that at least by November 18, 2019 (though by that time the issue had already been raised several weeks earlier).

AUSA Hellman explained that he thought the documents taken from the defendants were the same as the documents in the "blue binders" in the Croatian discovery.  Tr. 236:7-12.  This assertion, too, is belied by AUSA Hellman's acknowledgement that Mr. Dunn was talking about "something *beyond discovery items* [that] were taken from his client."  Def. Ex. 15 (emphasis added).  In addition, in Lloyd's email of November 8, 2019, he stated he "forgot to mention" that there was other paperwork.  Gov. Ex. 7.  AUSA Hellman admitted on cross-examination that Lloyd was referring to a prior conversation they had when Lloyd and other agents "had come to the U.S. Attorney's Office to deliver the Croatian government evidence that I previously described, *the binders* and bags and disks."  Tr. 252:9-12 (emphasis added).  Thus, the other paperwork was plainly in addition to – not the same as – the blue binders.  Finally, to the extent AUSA Hellman believed at the time that the "other paperwork" was the same as what was contained in the blue binders, he did not testify that he did anything to verify that assumption.

AUSA Hellman testified that he did not review the materials in January 2020 because "*by then* the conversations that I had been having with counsel suggested to me that there was a potential privilege issue."  Tr. 237:6-8 (emphasis added).  Once again, the contemporaneous emails between AUSA Hanft and AUSA Hellman belie the claim that he only realized there might be a privilege issue in January 2020.  AUSA Hanft had earlier raised the issue in mid-November 2019, and AUSA Hellman acknowledged it at that time as a "good point."  Def. Exs. 15 & 16; *see also* Tr. 261:19-22.  AUSA Hellman tried to minimize the import of this email from AUSA Hanft, claiming that after he received the email, he had discussions with defense counsel

20

in which he determined that the documents were not privileged.  Tr. 266:3-5.  But that claim is
contradicted by his testimony that the conversations he had with counsel "suggested to me that
there was a potential privilege issue" and that, as of January, he had concerns that some of the
documents were in fact privileged.  Tr. 237:68, 267:22.

AUSA Hellman testified that "prior to January 2020, [he] did not know the agents were
busy scanning the documents that had been seized from the defendants."  Tr. 264:6-9.  Lloyd
specifically told AUSA Hellman on November 8, 2019, that he and Waters were "in the
process . . . in the middle of the scanning and copying process . . . as it pertained to both
defendants."  Tr. 202:21-24; *accord* Gov. Ex. 7.

AUSA Hellman testified that, subsequent to his emails with AUSA Hanft, "I
was . . . under the belief that this second category of documents, i.e., the ones that are at issue in
this hearing that ha[d] been seized from the defendants during extradition, did not exist."  Tr.
268:19-23.  At that point, AUSA Hellman had already received some of the documents by email
from Lloyd, and only three days after this email, Waters advised him and AUSA Hanft that he
was dropping off a hard drive with the documents.  Def. Ex. 20.  AUSA Hellman also claimed
that he learned that Waters "had already provided . . . electronic copies of some of the
documents" only in January 2020.  Tr. 233:7-12.  But upon receiving the hard drive from Waters,
on November 24, 2019, he asked DeLuca to review the contents of the drive "re:
Landji/Adamu."  Def. Ex. 20.  DeLuca advised it contained documents and provided a link to a
saved version on the USAO's file sharing system.  *Id.*

AUSA Hellman claimed that scans of the contents of Government Exhibit 5 were never
produced to him.  AUSA Hellman's primary explanation for why the government did not
provide discovery of the items in Government Exhibit 5 was because "I had not received scans of

those documents to provide to counsel." Tr. 247:11-12.  That explanation was directly

contradicted by the agents' consistent testimony about what they did.  Lloyd specifically testified

that he recognized Government Exhibit 5 "as the Landji bag [he] scanned."  Tr. 186:2-3.  He

stated that the bag itself could have been different, but "[f]rom looking at the bag [depicted in

Government Exhibit 5], I can recall seeing those items."  Tr. 186:4-6.  He further testified that he

"scanned everything with writing on it," Tr: 186:20-22, and uploaded all of the scans to the

DEA's "case management file," Tr. 192:11.  Lloyd's "purpose was to get a complete digital copy

of all the documents in those bags . . . [a]s best we could" and that is what he did.  Tr. 192:12-16;

*see also* Tr. 130:21-131:8 (Waters testimony that he transferred "the electronic copies of the

materials [he and Lloyd] had scanned" to the USAO in November 2019, again in January 2020,

and he retained electronic copies of the materials).  Thus, AUSA Hellman's claim that the

contents of Government Exhibit 5 were either not scanned or those scans were not made

available to him is contradicted by Lloyd's testimony and the record of how the scans were

delivered to the USAO, via the hard drive in November 2019 and USAFX in January 2020.

Ultimately, with regard to whether the contents of Government Exhibit 5 were scanned,

AUSA Hellman conceded, "I just don't know.  I don't believe they did, but I don't actually – I

don't know what they did in Virginia."  Tr. 244:20-21.  Yet he did not make any effort to

confirm that all the documents had been scanned until 2021, Tr. 245:11-19, while making

representations to counsel and to the Court throughout 2020 that all documents in the

government's possession had been turned over.  *See* Dkt. # 364, at 19 (stating that all documents

responsive to defendants' requests have been produced and the "Government is not aware of any

other documents that responsive to the Defendants' request for materials that the Defendants had

when they were transferred to DEA custody").

AUSA Hellman testified that the contents of Government Exhibit 4 – the Adamu bag – were produced in January 2020.  Tr. 243:20-22.  On this point, AUSA Hellman appears still to be confused about what was produced in discovery and when.  AUSA Hellman cited representations from Mr. Landji's counsel as the basis for his belief that Government Exhibit 4 had been produced in January 2020.  Tr. 243:17-23.  But Mr. Landji's counsel, Noam Biale, previously stated in his declaration supporting Mr. Landji's renewed motion that he "declined to review the bag marked 'Adamu,' since it presumably contained privileged material belonging to Adamu."  Dkt. # 508-2 (Biale Decl.), ¶ 7.  Moreover, Mr. Landji did not receive the production of Adamu documents in January 2020, so would have no basis to compare that to the contents of Government Exhibit 4.  Finally, as stated in the defendants' joint pre-hearing brief, counsel for Mr. Adamu reviewed the contents of Government Exhibit 4 and "found extensive material that had not been previously disclosed, including privileged material."  Dkt. # 525, at 2.

AUSA Hellman testified that he never saw the name Krešimir Šušnjar on any of the documents.  Tr. 241:15-17.  The name is apparent on the face of Government Exhibit 3.

\*       \*       \*

Finally, when confronted with emails that undermined his explanation of the government's conduct, AUSA Hellman repeatedly claimed not to remember the correspondence:

- Shown the October 30, 2019 email from Mr. Dunn, Def. Ex. 14:  "I don't have a recollection of that."  Tr. 256:4-8.

- Shown January 6, 2020 email exchange with Mr. Dunn where he describes the documents as documents provided by Mr. Adamu's Croatian lawyer, Def. Ex. 17:  "Q: Do you remember reading this at the time?  A:  Not particularly."  Tr. 271:9-10.

- In response to the above email from Mr. Dunn, AUSA Hanft requests that he document phone calls with defense counsel about this issue, Def. Ex. 17: "Q: Do you remember this exchange? A: Not particularly, no." Tr. 271:23-24.

- Shown an email he wrote in response to Waters dropping off a hard drive, stating "let me know what this stuff re: Landji/Adamu is. I have no idea what he's dropped off haha," Def. Ex. 20: "Q: Do you remember writing that? A: No." Tr. 284:11-12.

- Asked: "Q: In that intervening time between January of 2020 and October, both Mr. Landji and Mr. Adamu continued to assert that there were documents including privileged documents, that they had not received, correct? A: Not to my recollection." Tr. 289:19-23.

- Asked about a November 29, 2020 email to the unit chiefs regarding the declarations ordered by the Court, in which he stated, "I suppose the easiest course would simply be to write that nobody has [reviewed the documents]," Def. Ex. 22: "Q: You remember writing that? A: No." Tr. 292:4-5.

To summarize: AUSA Hellman's testimony was undermined by contemporaneous email correspondence, his account of what occurred was contradicted by the agents' testimony, and on key issues, such as being put on notice of the privilege issue, he either could not recall the conversation or provided explanations that strained credulity.

It must be emphasized that whether or not any prosecutor, or any personnel of the USAO, personally reviewed privileged material is of no moment. For taint purposes, much like discovery violations (which also occurred here), the government includes the investigative agents. Prosecutors therefore cannot evade potential taint by claiming they personally were insulated from the privileged material. *See United States v. Danielson*, 325 F.3d 1054, 1073 (9th Cir. 2003) (prosecutor's effort to insulate himself and members of prosecution team from privileged information "did not go far enough" where "the record reveals no attempt, at any point, to insulate the police officers working . . . as part of the prosecution team from the privileged information"). But although not necessary, the record here cannot give the Court comfort in AUSA Hellman's disclaimer that neither he nor anyone else at the U.S. Attorney's

24

Office viewed the privileged material.  In the light of his testimony as a whole, the Court cannot credit or rely upon those assertions.

## ARGUMENT

The evidence adduced at the hearing more than suffices to shift the burden under *Kastigar* and, moreover, demonstrates a pattern of reckless disregard for the defendants' rights by the government that warrants a significant prophylactic sanction.

### I.      The Burden Should Shift to the Government to Disprove Taint

With respect to legal authority on the burden shift, we refer the Court to our letter dated September 13, 2021, Dkt. # 537.  That letter set forth authority from compelled testimony cases decided pursuant to *Kastigar* holding that affirmations from the prosecutor and agents that they did not read the privileged testimony do not obviate the need to "prov[e] that [the] evidence comes from sources independent of the immunized testimony."  *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977).  While the Second Circuit has held that the *Kastigar* framework applies to invasions of the attorney-client privilege, *see United States v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989), it has not prescribed a standard for access to privileged material to shift the burden to the government.  Nevertheless, as discussed at more length in our letter, Dkt. # 537, at 4-6, authority from other areas of law – such as the rules of civil procedure governing inadvertent disclosure of privileged material and ethical rules governing migrating lawyers – makes clear that mere glances or even just *access* to privileged material shifts the burden to those lawyers to show protective measures undertaken to preserve the privilege.  *See, e.g.*, *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir. 1973); *U.S. Equal Employment Opportunity Comm'n v. George Washington Univ.*, 502 F. Supp. 3d 62, 72-73 (D.D.C. 2020).  It would be odd, to say the least, if the protection of the common law privilege in these civil areas were stronger than in criminal cases where the invasion of the privilege implicates the

defendant's constitutional rights. *See United States v. Stewart*, No. 02 CR. 395 JGK, 2002 WL 1300059, at *5 (S.D.N.Y. June 11, 2002) ("[T]he Sixth Amendment guarantees criminal defendants the right to counsel and supports an expectation of privacy regarding a defendant's legitimate communications with the defendant's attorney.")

Indeed, in the criminal context, the law and prevailing practice *are* fully consistent with these decisions in other areas. In cases where courts have found no intrusion into the attorney-client privilege, the government has shown that steps were taken to prevent access to the privileged materials by the prosecution team. *See, e.g.*, *United States v. Schulte*, No. S-2 17 Cr. 548 (PAC), 2019 WL 5287994, at *3 (S.D.N.Y. Oct. 18, 2019) (blanket suppression unwarranted where agents executing search warrant alerted prosecutors immediately upon encountering privileged material and prosecutors "obtained a second search warrant the very same day implementing [a] wall team to facilitate review of any potentially privileged materials"); *United States v. Solnin*, No. 12-CR-0040 ADS, 2015 WL 6442361, at *8 (E.D.N.Y. Oct. 23, 2015) (no basis for concluding government intruded into privileged communications where "a Taint Review Team independently performed a privileged review" and the AUSA "unequivocally stated that no member of the trial team prosecuting this case accessed any privileged material"); *United States v. Spitzauer*, No. 13-CR-6071-SMJ, 2014 WL 7240266, at *6-*7 (E.D. Wash. Dec. 19, 2014) (no prima facie case of intrusion in attorney-client privilege where, after attorney-client calls were recorded by jail, government submitted evidence that "no one on prosecution team accessed those calls," took steps to identify phone numbers of attorneys and filter out those calls, and removed an agent who inadvertently listened to several minutes of a privileged call from the investigation, after ensuring that the agent had not discussed the call with anyone else on investigative team).

The precautionary measures approved by courts are similar to those that the Department of Justice imposes on itself when there is a likelihood that a search will disclose privileged communications.  For example, the U.S. Attorney's Manual ("USAM") provides guidance on searches of premises of subject attorneys.  *See* USAM § 9-13.420.  The USAM notes that "because of the possibility that, during such a search, the government may encounter material protected by a legitimate claim of privilege, it is important that close control be exercised over this type of search."  *Id.*  The USAM provides specific guidelines as to how such searches are authorized and conducted.  It states, "Procedures should be designed to ensure that privileged materials are not improperly *viewed*, seized or retained during the course of the search."  *Id.* (emphasis added).  Where a search requires "limited review of arguably privileged material to ascertain whether the material is covered by the warrant," the USAM provides that "to protect the attorney-client privilege and to ensure that the investigation is not compromised by exposure to privileged material relating to the investigation or to defense strategy, a 'privilege team' should be designated, consisting of agents and lawyers not involved in the underlying investigation."  *Id.*  The USAM advises that instructions should be given to the searching agents and "thoroughly discussed" with the privilege team *prior* to the search, and that the privilege team lawyers should be available to advise the agents during the search but should not participate in the search itself.  *Id.*

Thus, the caselaw and Department of Justice guidance are in accord that precautionary measures must be taken to prevent mere *access* or *viewing* of privileged materials.  And the caselaw is uniform that merely accessing or glancing at privileged material at a minimum shifts the burden to show the use of protective measures.  Here, however, the evidence adduced at the hearing shows that the agents did *more* than glance.  In Fihlman's words, he "review[ed], yes,

27

but not to the extent that I remembered the things I was seeing." Tr. 91:7-8. Lloyd admitted that he did, in fact, review with sufficient attention that he remembered key details about the documents nearly two years after reviewing them. Tr. 196:16. DeLuca viewed the documents on several occasions and, on one of those reviews, recognized materials that "looked familiar." Def. Ex. 20, at 1. In addition, the record is replete with evidence that the prosecutors took *no protective measures whatsoever*, despite being on constructive and actual notice about potential privilege concerns. *See* Section III, *supra*. They did not engage a taint team until nearly two years after obtaining the documents; they provided no instructions to the agents about how to handle the documents; they failed to provide the name of Mr. Landji's attorney (though they knew it) to the agents; and when the prosecutors raised concerns internally about the exposure of privileged documents, they did not bother to tell the agents about those concerns for many months, even while they were on notice that the scanning and copying process was ongoing.

Moreover, the evidence at the hearing established that the prosecution in this case has materially changed its theory from the time prior to its viewing of the privilege material to after. As the Second Circuit held in its most recent *Kastigar* decision, conclusory denials of taint, as the government provided here, are "insufficient as a matter of law" to disprove use under *Kastigar* "in the face of materially inconsistent pre-exposure testimony." *United States v. Allen*, 864 F.3d 63, 94 (2d Cir. 2017). Although framed with respect to the government's burden, it would eviscerate this holding and the Second Circuit's holding in *Nemes* to allow the government to change its theory but evade its *Kastigar* burden simply by denying that anyone read the material. The government here has denied any change in its theory, and, in support of that denial, submitted *ex parte* the transcript of the grand jury proceeding. Dkt. # 530, at 2. The evidence at the hearing established, however, based on Waters's declaration in support of

28

extradition, Def. Ex. 9, and AUSA Hellman's testimony, Tr. 292:13-16; 293:1-8, that the government has, in fact, changed its theory.[6]  Consequently, the Court should now put the government to the "heavy burden" of proving that its trial evidence is "derived from a wholly independent source."  *Allen*, 864 F.3d at 97.

## II.   The Government's Pattern of Reckless Disregard for the Defendants' Rights Warrants a Significant Sanction

The government's conduct in this case reflects a pattern of reckless disregard for the defendants' Sixth Amendment rights, disregard for the government's duty to take protective measures when it is on notice of a claim of privilege, and repeated discovery violations.  Under Second Circuit law, where the "Government's intrusion upon the attorney-client relationship of a defendant . . . has been an offensive interference with the defendant's rights without any justification," dismissal of the indictment is warranted.  *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975).  Here, the government's conduct from before the extradition through at least January 2020 intruded on the attorney-client relationship of both Mr. Landji and Mr. Adamu, exposing the defendants' privileged communications and work product not only to the investigative and prosecution teams, but each to the other.  The government has offered no justification for this conduct other than AUSA Hellman's implausible professions of confusion about the existence of the documents and their privileged nature.  Even where the government's conduct "has not been so manifestly and avowedly corrupt" and the defendant must therefore show prejudice, the Circuit has indicated that exposure of "trial strategy" *would* constitute such

---

[6]      Mr. Landji previously requested the disclosure of the grand jury transcript, which the Court denied without prejudice.  Dkt. # 522.  Given that the government is relying on it to counter the defendants' argument that it changed its theory, we respectfully renew our request. *See United States v. Dornau*, 356 F. Supp. 1091, 1098-1100 (S.D.N.Y. 1973) (holding that defendant showed "particularized need" for disclosure of grand jury testimony to test government's burden under *Kastigar* and *in camera* review by court would be insufficient to vindicate defendant's rights).

prejudice.  *Id.* at 637-38; *cf. United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) (no

prejudice from disclosure of confidential workpapers where "hearing evidence demonstrated that

no preview of defense strategy was derived from the workpapers").  That is what was exposed

here, and the prejudice to the defendants is in the difficulty of untangling the government's

exposure to that defense strategy from its trial presentation.  *See Danielson*, 325 F.3d at 1070

(noting that in cases where defense strategy is revealed, "the question of prejudice is . . . subtle,"

and defendants are at a disadvantage in showing prejudice since "[t]he prosecution team knows

what it did and why.  The defendant can only guess.").

At a minimum, the government's conduct here demonstrated a pattern of recklessness.

To restate in brief:  the government took no precautions despite a high likelihood that the agents

would seize privileged materials, did nothing once the AUSAs realized there could be a breach

of the privilege, repeatedly misrepresented to defense counsel and the Court that all documents

in the government's possession had been disclosed, and submitted misleading declarations to the

Court in response to the defendants' motions.  "Reckless government conduct may be remedied

under the Court's supervisory powers even when prosecutors act in good faith."  *United States v.

Renzi*, 722 F. Supp. 2d 1100, 1132 (D. Ariz. 2010) (citing *United States v. Chapman*, 524 F.3d

1073, 1084 (9th Cir. 2008)).  Although "accidental or merely negligent governmental conduct is

insufficient to establish flagrant misbehavior," a finding of intentional, "willful misconduct" is

not required.  *Chapman*, 524 F.3d at 1085.  Rather, "reckless disregard" satisfies the standard for

sanctions, including dismissal of an indictment.  *Id.*

In *United States v. Lang*, No. CR 2015-0018, 2019 WL 1673317 (D.V.I. Apr. 17, 2019),

the government violated *Brady v. Maryland*, and then compounded the violation by causing

AUSAs unfamiliar with the issue to make representations to the court without engaging in due

30

diligence with the AUSA who was knowledgeable about the matter.  *Id.* at *19.  This resulted in the government making representations that it later acknowledged were false.  *Id.*  The district court then ordered a response to the defendant's allegation of a *Brady* violation, which the government failed to acknowledge until forced to appear at an evidentiary hearing to explain its conduct.  *Id.*  The court found that the government's conduct could not "be attributed to mere disorganization, inadvertence, or oversight.  Instead, the actions of the AUSAs indicate to the Court that the government failed to take seriously its obligations under *Brady*, and to the Court, and that the Government acted with reckless disregard for Defendant's due process rights."  *Id.*  Such a "pattern of violations," the court held, "demonstrate[s] reckless, and therefore willful, misconduct."  *Id.* (quoting *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 256 (3d Cir. 2005)).

Here, similarly, the government failed to take seriously its obligations to the defendants both by viewing their confidential communications and work product and failing to produce copies of their documents, despite numerous, repeated demands from defense counsel.  At the same time, the government permitted review of the documents by its agents and personnel of the prosecutor's office without a taint team, despite being on notice of the potential privilege issue.  The AUSAs then made representations to defense counsel and to the Court about the documents without conducting any due diligence to confirm that those representations were accurate.  In fact, they were not.  Yet the Court relied on them in denying the defendants' motion for return of their property and for a hearing.  The government then resisted the defendants' renewed request for a hearing after defense counsel discovered the previously undisclosed documents by arguing that the motion was too late based on the actions of defense counsel rather than the government's discovery violation.  *See* Dkt. # 518, at 4-5.  The government only admitted to any error in failing to have a taint team handle the material (while still denying wrongdoing) when forced to

explain its actions in live testimony at the *Kastigar* hearing.  Tr. 286:13-14.  As in *Lang*, such conduct represents a "pattern" of "reckless disregard" for the defendants' rights.  *Lang*, 2019 WL 1673317, at *19.

The question, then, is what sanction is appropriate.  "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation."  *United States v. Morrison*, 449 U.S. 361, 364 (1981).  "When the government acts with reckless disregard for a defendant's rights, dismissal is appropriate if the defendant would otherwise suffer substantial prejudice and if no lesser remedial action is available."  *Chapman*, 524 F.3d at 1085 (internal quotation marks omitted).  Here, we respectfully submit that under the Second Circuit caselaw cited above, dismissal of the indictment would be appropriate.  In the alternative, if the Court is inclined to impose a lesser sanction, we respectfully submit that disqualification of the tainted agents and prosecutors or preclusion of evidence developed after the invasion of the privilege are both appropriate sanctions tailored to the injury.  As to preclusion of evidence, a substantial portion of the government's evidence, including recorded conversations, phone evidence, and the kilogram of cocaine itself, was obtained prior to the extradition, and therefore is arguably untainted.  In contrast, any witnesses whose testimony was developed after the extradition – and whose proffers were attended and potentially influenced by the tainted agents – should be precluded.

The defense entrusts to the sound judgment of the Court the fashioning of a sanction that is just and proper, but urges that such sanction be sufficient to deter the government from acting in the future with such reckless disregard for defendants' rights as occurred here.

## CONCLUSION

For the foregoing reasons, the Court should put the government to its burden of

disproving taint in the continuation of the *Kastigar* hearing and should impose sanctions based

on the government's pattern of reckless disregard for the defendants' rights.

Dated: September 21, 2021
New York, New York

          SHER TREMONTE LLP


          By:


          /s/Michael Tremonte
          Michael Tremonte
          Noam Biale
          Katie Renzler
          90 Broad Street, 23rd Floor
          New York, New York 10004
          T: (212) 202-2600
          F: (212) 202-4156
          mtremonte@shertremonte.com

          *Attorneys for Jean-Claude Okongo Landji*


          /s/Thomas F.X. Dunn
          Thomas F.X. Dunn
          Jacqueline Cistaro
          225 Broadway
          Suite 1515
          New York, New York 10007
          T: 212.941.9940
          thomasdunnlaw@aol.com

          *Attorneys for Jibril Adamu*