LA6HLan1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          18 Cr. 601 (PGG)

 5   JEAN-CLAUDE OKONGO LANDJI, and
     JIBRIL ADAMU,
 6
                                           Trial
 7              Defendants.

 8   ------------------------------x
                                           New York, N.Y.
 9                                         October 6, 2021
                                           9:45 a.m.
10

11   Before:

12                      HON. PAUL G. GARDEPHE,

13                                         District Judge

14                            APPEARANCES

15   AUDREY STRAUSS
          United States Attorney for the
16        Southern District of New York
     MATTHEW HELLMAN
17   ELINOR TARLOW
          Assistant United States Attorneys
18
     SHER TREMONTE
19        Attorneys for Defendant Landji
     BY:  MICHAEL TREMONTE
20        NOAM BIALE
          KATIE ELIZABETH RENZLER
21
     THOMAS F.X. DUNN
22   JACQUELINE CISTARO
          Attorneys for Defendant Adamu
23
     Also Present:
24
     Emmanuel Orji, Interpreter (French)
25   Marie Jose Voigt, Interpreter (French)
```

LA6HLan1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LA6HLan1

1              (Case called)

2              THE DEPUTY CLERK:  United States of America v. Jibril

3    Adamu and Jean-Claude Landji, counsel for the government,

4    please state your name.

5              MS. TARLOW:  Good morning, your Honor.  Elinor Tarlow,

6    for the government.  I am joined at counsel table by my

7    colleague Matthew Hellman.

8              THE DEPUTY CLERK:  Counsel for the defendants, please

9    state your names.

10             MR. DUNN:  Good morning, your Honor.  Thomas Dunn and

11   Jacqueline Cistaro for Jibril Adamu.

12             MR. BIALE:  Good morning, your Honor.  Noam Biale and

13   Katie Renzler for Jean-Claude Landji.

14             THE COURT:  Please be seated.

15             Jury selection is going to begin in this matter later

16   this morning.  I want to address a few outstanding issues

17   before we head to the jury assembly room for the jury selection

18   process.

19             First, I want to correct something I said to you

20   earlier about peremptory challenges.  I think I told you at the

21   last conference that we would be selecting three alternates,

22   and I think I also told you that with respect to the three

23   alternates, the parties would have three peremptory challenges.

24   If I said that, that was incorrect.  We will be selecting three

25   alternate jurors.

LA6HLan1

1          MR. BIALE:  I'm sorry, your Honor.  I'm sorry to

2     interrupt.  The interpretation is apparently not working, so

3     Mr. Landji can't hear anything.

4          (Discussion off the record)

5          MR. BIALE:  Thank you.  I apologize, your Honor.

6          THE COURT:  Not a problem.

7          I was saying that we will be selecting three alternate

8     jurors, as I told the parties at our last conference.  I think

9     I may have told the parties that they would have three

10     peremptory challenges with respect to the selection of the

11     three alternate jurors.  If I said that, that was incorrect.

12     Each side will have two peremptory challenges for purposes of

13     selecting the three alternate jurors.  Citing Federal Rule of

14     Criminal Procedure 24(c)(4)(B).

15          I also want to review with the parties how I do jury

16     selection, which is through the use of the simultaneous

17     submission of lists of jurors against whom the parties wish to

18     exercise peremptory challenges.  So the way this is going to

19     proceed is I will qualify the 42 people sitting in the jury

20     assembly room.  That is capacity for the jury assembly room

21     given the pandemic.  After I've done that, I will hear the

22     lawyers up at the bench with respect to any challenges for

23     cause, and I will rule on those applications.  I will then ask

24     the lawyers to prepare a list of the panel members against whom

25     they wish to exercise peremptory challenges, and then those

LA6HLan1

1    lists will be submitted simultaneously.

2            In normal times it is my practice to take a recess and

3    send the jury panel out of the courtroom while the lawyers are

4    preparing their lists.  I've been told by the jury office

5    people who control this process that it is not practical for me

6    in current circumstances to send the jury panel out of the jury

7    assembly room.  So what that means is that I am going to need

8    the lists from you of the jurors against which you wish to

9    exercise peremptory challenges rather quickly.  So what that's

10   going to require you to do is as we're qualifying the jurors,

11   you're going to need to make notes about which panel members

12   you think you might want to exercise peremptory challenges

13   against, because I can't give you a half an hour to figure out

14   who they are after we've spent hours questioning them.  So

15   please try to keep that in mind as we go through the jury

16   selection process that, ultimately, you will be called upon to

17   prepare a list of the panel members against whom you wish to

18   exercise peremptory challenges, and I don't have the luxury to

19   give you a lot of time to do that.

20            MR. TREMONTE:  Your Honor, may I be heard briefly?

21            THE COURT:  Yes.

22            MR. TREMONTE:  Just a few weeks ago, I participated in

23   jury selection in a trial that was before Judge Rakoff in that

24   room.  It is very socially distanced in terms of the spacing

25   between the lawyers.  That case was a single-defendant case, so

LA6HLan1

```
1    I'm not sure how it works with multiple defendants, but I think
2    we're going to want to be able to confer, as we share
3    challenges.  I'm not exactly sure how to do that, but I would
4    just ask the Court's patience as we sort that out.
5         THE COURT:  Yes.  I mean, you're going to have to
6    consult because you're going to have to jointly exercise these
7    challenges.  So absolutely I understand counsel are going to
8    have to confer, and I will certainly permit you to do that.
9    Don't worry about that at all.
10         In any event, the list that you develop, and there
11   will be -- the defense is entitled to ten peremptory challenges
12   as to the 12-member jury, and the government is entitled to
13   six.  You will submit those lists simultaneously.  At sidebar I
14   will review with you -- I will review with counsel the panel
15   members against whom the government has exercised peremptory
16   challenges and the defense has exercised peremptory challenges.
17   To the extent there were overlap between those lists, it just
18   simply means that the juror's is being struck by both sides.
19         So we will go through that exercise.  We will agree
20   upon who the 12 lowest number panel members are who survive the
21   process, and they will become our jury of 12.  We will then
22   turn to the selection of the alternates.  You will once again
23   prepare lists of the panel members against whom you wish to
24   exercise peremptory challenges.  As I said, each side will have
25   two peremptory challenges for purposes of the selection of the
```

LA6HLan1

three alternate jurors.  You will submit lists of the two panel

members against whom you wish to exercise peremptory

challenges.  We will review those lists with you.  We will

reach agreement on who are the three lowest numbered jurors who

have survived the process, and they will become our alternate

jurors.

Any questions about the process?

MS. TARLOW:  Not from the government.

THE COURT:  All right.  I'm going to turn to the

outstanding issues.  There is a *Kastigar* motion that's

presently pending before the Court.  At the outset, I want to

express my deep disappointment with both sides that this issue

is still being litigated moments before we're scheduled to

select a jury in this case which has been pending for more than

two years.  Briefing has continued to pour in from both sides

despite the fact that the issue of the government's access to

allegedly privileged information has been in play for two

years, during which the defendants have been held in custody in

the United States.

Defense counsel has known about this issue since at

least October 2019 when the defendants were extradited to the

United States from Croatia.  It appears that both clients told

their lawyers at that time that legal papers of some sort were

taken from them at the Zagreb airport by DEA agents.  The

government also apparently made a discovery production to

LA6HLan1

defendants in January 2020 that included documents that the

defendants claim were privileged. Despite this, neither

defendant ever laid before the Court this issue until

August 2021. Instead, the defendants filed a motion in

October 2020 that included no specifics about the government's

allegedly improper access to privileged material. Based on the

defendants' inadequate filing at that time, I denied their

application for a hearing as to whether the government's review

of privileged information had been improper. Now, at that time

defense counsel apparently already had had for months materials

indicating that the government had reviewed or at least had had

access to privileged information. None of that was laid before

me at the time.

        For the government's part, there has been an

inexplicable failure to give proper attention to this issue

despite repeated requests from Adamu's lawyer, Thomas Dunn, for

legal materials taken from his client in Zagreb at the time of

his extradition in October 2019. Mr. Hellman did not make

appropriate efforts to determine whether this was true. In

January of 2020, when Mr. Hellman began to have concerns that

privileged material may have been seized from the defendants at

the time of their extradition, he did not take appropriate

steps to get to the bottom of that issue. In particular, he

did not arrange for a taint team to review whatever it was that

had been seized from the defendants in Zagreb, even when a

LA6HLan1

1    colleague repeatedly raised concerns that privileged material

2    may have been taken from the defendants.

3            It was not until August of 2021, when the defense

4    lawyers reviewed the hard copy material that had been seized

5    from their clients in October 2019, that it became clear that

6    the government had seized additional privileged material from

7    the defendants, material that had not been disclosed in

8    January 2020 in the government's discovery production.

9            These circumstances have led to a cascading series of

10   submissions from the parties, a two-day testimonial hearing,

11   and extensive briefing regarding the legal implications of the

12   government's access to the defendants' privileged material.  As

13   I noted, briefing on this subject has been extensive and has

14   continued right up until the last few days.  The issues

15   presented in the briefing are complex, in part because there's

16   no governing authority in the Second Circuit as to the

17   standards that apply when a *Kastigar* issue arises in the

18   context of government access to a defendant's privileged

19   material.  Accordingly, the law is not well established

20   regarding burden of proof and when it shifts to the government.

21           In normal times, I would adjourn the trial, but I

22   can't do that in the midst of this pandemic given that the

23   defendants have been held already for nearly two years in

24   custody, not including the year they spent in custody in

25   Croatia.  Were I to adjourn the trial, given the restrictions

LA6HLan1

1    on courtroom availability required by the COVID-19 pandemic, it

2    could be six months before I am again given access to another

3    courtroom, and the defendants would remain in custody during

4    that time.  Accordingly, we must press on to trial despite the

5    unfortunate circumstances I have outlined.

6           With respect to defendants' *Kastigar* motion, in the

7    *Kastigar* case, the Supreme Court established a broad

8    prohibition on the use of compelled testimony protected under

9    the Fifth Amendment.  Citing *Kastigar v. United States*,

10   406 U.S. 441, 453 (1972).  The *Kastigar* Court established a

11   mechanism to enforce this protection: "When a witness has been

12   compelled to testify relating to matters for which he is later

13   prosecuted, the government bears the heavy burden of proving

14   that all of the evidence it proposes to use was derived from

15   legitimate, independent sources." *United States v. Allen*,

16   864 F.3d 63, 91 (2d Cir. 2017)(quoting *Kastigar*, 406 U.S.

17   461-62).  "The government must prove it has met this heavy

18   albeit not insurmountable, burden of the evidence." *Id.* at

19   page 92.  The same protection applies to information protected

20   by the attorney-client privilege.  *United States v. Schwimmer*,

21   924 F.2d 443, 446 (2d Cir. 1991)("The government must

22   demonstrate that the evidence it uses to prosecute an

23   individual was derived from a legitimate independent sources"

24   and not "improperly" derived from "privileged information.")

25   However, as I have noted, the Second Circuit has not set forth

LA6HLan1

the threshold showing necessary to shift the burden to the

government to show that its evidence comes from an untainted

source.  Defendants have moved for a continuation of the

evidentiary hearing that I conducted back on September 9 and

September 14 of this year, arguing that "the evidence adduced

at that hearing more than suffices to shift the burden" to the

government to prove "that its trial evidence is derived from a

wholly independent source."  Citing the defendant's

post-hearing brief, Dkt. No. 554, at pages 29 and 33.

Defendants argue that "mere glances or even just

access to the privileged material" should shift the burden to

the government to disprove taint.  *Id.* at page 29.  The

government maintains that "defendants have not adduced

sufficient evidence to shift the burden of proof to the

government under *Kastigar*."  Citing the government's

post-hearing brief, Dkt. No. 562, at page 51.

While the government argues that "defendants have

failed to prove that anyone from the government reviewed

allegedly privileged materials," *Id.* at page 41, there is no

question, given the evidence before the Court, that the agents

and an analyst at the DEA, as well as members of the

prosecution team in the U.S. Attorney's Office, accessed the

materials seized from defendants during extradition which

defendants claim contained privileged attorney-client material.

Further, the government has argued in its post-hearing

LA6HLan1

```
 1    brief that, contrary to defendants' assertions, it has not
 2    changed its theory of the prosecution after reviewing
 3    defendants' material seized during extradition and "that the
 4    government did not use any privileged material."  Citing the
 5    government's post-hearing brief, Dkt. No. 562, at pages 46-50
 6    and 52-55.  However, as defendants point out, the government
 7    cannot satisfy its burden under Kastigar in an unsworn filing
 8    where defendants have not been afforded the opportunity to
 9    confront the government's evidence.
10           As I have noted, there's no governing authority from
11    the Second Circuit as to the circumstance in which a burden
12    shift occurs where the government has had some amount of access
13    to privileged material.  As I have said here, there is no doubt
14    that the government accessed privileged material in the sense
15    that privileged material was scanned for purposes of producing
16    it to the defendants.  It is possible that the Second Circuit
17    could conclude that such proven access is sufficient to shift
18    the burden to the government to disprove taint.  It is also
19    possible that the Second Circuit could determine that there is
20    no burden shift until a defendant has proffered evidence that a
21    government agent or prosecutor actually read the privileged
22    material.  I have no way of predicting how the Second Circuit
23    would come out on that issue.
24           Accordingly, I am going to give the defendants the
25    hearing they have requested as to whether the government's
```

LA6HLan1

prosecution of the defendants has been tainted by the
government's access to admittedly privileged information.

We will conduct that hearing tomorrow morning at 9:30,
assuming that the jury selection process has been completed by
that time.  If not, we will proceed with a hearing immediately
after the jury selection process has been completed.

The government will proceed first at that hearing,
particularly in light of factual allegations it has made in a
recent briefing that are not supported by affidavit or
declaration.  The defendants will have an opportunity to
cross-examine the government's witnesses and to offer any
evidence that they wish on the subject of whether the
government's prosecution of the defendants has been tainted by
the government's access to privileged material.

The defendants have repeatedly sought access to the
government's grand jury presentation in this matter, arguing
that this access is necessary for them to demonstrate that the
government's strategy has changed as a result of the
government's access to privileged information.  I previously
ruled that the defendants had not demonstrated an adequate
basis for piercing grand jury secrecy.  The defendants have
recently renewed their application, which remains deficient.
The government has disclosed to the defense that DEA agent
Waters testified before the grand jury in this case.  On
December 19, 2018, long before the government came into

LA6HLan1

1    possession of any privileged material, Agent Waters submitted a

2    detailed affidavit in support of the government's request for

3    extradition of the defendants from Croatia.  Citing the

4    December 19, 2018, Waters affidavit.  The state of the

5    government's proof at that time is fully set forth in the

6    Waters' affidavit.  Given the circumstances, defendants have

7    not provided a sufficient basis for me to order the government

8    to produce Agent Waters' testimony before the grand jury.

9          Now, I would note that Agent Waters is going to be a

10   government witness at trial.  Is that true?

11         MS. TARLOW:  He may be, your Honor.

12         THE COURT:  He may be.

13         Now, have you provided 3500 material for Agent Waters?

14         MS. TARLOW:  Yes, with respect to the limited topic

15   that he might testify to regarding defendant Adamu's postarrest

16   statement.

17         THE COURT:  All right.  Now, I believe that in his

18   affidavit, Agent Waters discusses Adamu's postarrest statement.

19   Isn't that true?

20         MS. TARLOW:  The affidavit for extradition?  I think

21   that is accurate, your Honor.

22         THE COURT:  Right.  So to the extent that Agent Waters

23   testified in the grand jury about Adamu's statement, you would

24   be required to disclose that under 3500, right?

25         MS. TARLOW:  Yes, your Honor, to the extent he

LA6HLan1

1    testified about the postarrest.

2            THE COURT:  So to summarize, we will proceed to jury

3    selection today.  Assuming we complete that process today,

4    tomorrow at 9:30 a.m., instead of proceeding to trial, we will

5    meet in this courtroom to conduct the evidentiary hearing I

6    have referenced.  As for the trial, after we complete jury

7    selection, given the issues we have encountered in connection

8    with the defendants' *Kastigar* motion, the need for an

9    additional hearing on that matter, and the fact that Monday is

10   a federal holiday, it is likely that I will excuse the jury

11   until Tuesday, October 12, 2021.  It is my expectation we will

12   begin with opening statements at that time.  I will endeavor to

13   issue an opinion on the outstanding *Kastigar* motions before

14   that time.

15           I want to turn to a motion *in limine* regarding the

16   defendants' application with respect to cross-examination of

17   the government's anticipated witness, DEA Agent Matthew

18   Fihlman.  This is in relation to a letter of reprimand that

19   Agent Fihlman received from the DEA back in 2008.  Defendants

20   argue that cross-examination on this point is appropriate under

21   Federal Rule of Evidence 608(b) because the letter of reprimand

22   involves "the accuracy and truthfulness of sworn statements

23   [Agent Fihlman] made to the DEA office of professional

24   responsibility (OPR)" such that it "bears on [his] for

25   character for truthfulness or untruthfulness."  Citing

LA6HLan1

1    October 4, 2021, defense letter, Dkt. No. 575, at page 1.  The

2    government opposes defense counsel's application, arguing that

3    the proposed cross-examination "pertains to remote historical

4    conduct, is not probative of the witness' character for

5    truthfulness, and will likely confuse and mislead the jury."

6    Citing the October 5, 2021, government letter, Dkt. No. 577, at

7    page 1.

8         The background is as follows:  In August 2006, the FBI

9    began investigating members of the Dallas Police Department for

10   possible misconduct.  During that investigation, the government

11   came -- the FBI came to suspect that a former DEA task force

12   officer working with the Dallas Police Department, a person

13   named Sanders, "may have kept moneys actually due to [a

14   confidential source she had utilized] for [the source's]

15   cooperation."  Citing the October 4, 2021, defense letter,

16   Exhibit A, Dkt. No. 575-1, at page 3.  The FBI requested the

17   assistance of the DEA's Office of Professional Responsibility

18   to obtain the payment records for this confidential source.

19   *Id.*

20        Agent Fihlman was interviewed by the FBI and OPR

21   investigators, and on June 13, 2007, he provided a sworn

22   statement in which he said he had assisted Sanders "in

23   conducting several investigations generally on a daily basis,"

24   that Sanders introduced Fihlman to the confidential source, and

25   that Fihlman "participated in debriefings of the [confidential

LA6HLan1

source] and participated in making payments to the

[confidential source] with both DEA and Dallas Police

Department funds." *Id.* at page 4.

Agent Fihlman also said that he was "either a claimant

or a witness to those payments and that [his] signature appears

as one or the other on a number of DEA documents corroborating

those payments," and that he "signed as a witness on Dallas

Police Department forms documenting payments to the

[confidential source] utilizing DEA funds and witnessed several

payments made by Sanders with Dallas Police Department funds on

a Dallas Police Department form." *Id.*

When Agent Fihlman was confronted with the Dallas

Police Department payment forms "bearing [his] signature as the

witness for money paid to the [confidential source's] son, he

said [he] did not witness the payments to [the source's son],"

and that "on most occasions [he] witnessed Sanders hand the

confidential source the money, but that on a few occasions

[Fihlman] did not physically see Sanders hand the [confidential

source] the money." *Id.* Fihlman also "admitted that on some

occasion [he] did not witness the money being counted out

and/or physically exchanged," and that "there were occasions

when Sanders had already physically paid the [confidential

source] before [Agent Fihlman] was called upon to sign as a

witness to the payment," which Agent Fihlman admitted he

nonetheless signed, relying on Sanders' representation that the

LA6HLan1

 1    payment had been made.  *Id.*

 2           Based on Agent Fihlman's sworn statement in 2008, the

 3    DEA OPR charged Agent Fihlman with (1) "inattention to duty"

 4    for "signing as a witness to a confidential source payment [he]

 5    did not actually observe*," Id.* at page 4, and (2) "failure to

 6    follow instructions" for contravening the DEA standards of

 7    conduct requiring that employees sign documents only after

 8    reading and confirming them as accurate."  *Id.* at page 5.

 9    Based on these charges, which Agent Fihlman did not contest and

10    which the DEA found to be "fully supported by the evidence,"

11    the DEA issued a letter of reprimand to him in May 2008.  *Id.*

12    at page 7.

13           I have not been provided with a sworn statement Agent

14    Fihlman made during the investigation, nor the attestation he

15    made regarding the payments to the informant.  The government

16    says that it has requested these materials from the DEA and

17    will provide them to the Court and defense counsel once they

18    are received.  Citing the October 5, 2021, government letter,

19    Dkt. No. 577, at page 3.

20           Accordingly, I will not rule on this matter now.

21    However, I will give the parties my reaction to what I have

22    seen so far.

23           Federal Rule of Evidence 608(b) provides that

24    generally "extrinsic evidence is not admissible to prove

25    specific instances of a witness' conduct in order to attack or

LA6HLan1

support the witness' character for truthfulness, but the court

may on cross-examination allow them to be inquired into if they

are probative of the character for truthfulness or

untruthfulness of the witness."  Citing Federal Rule of

Evidence 608(b).

Defendants argue that Agent Fihlman's "false sworn

statements made to the OPR and signed statements in which he

falsely attested to witnessing certain types of payments" are

"probative of his character for truthfulness or untruthfulness"

and that they should be permitted to cross-examine him on this

subject.  Citing the defendant's October 4, 2021, letter

Dkt. No. 575, at page 3.  Defendants also argue that because

the "proposed line of questioning will be limited to the

findings associated with the letter of reprimand" and will

comprise "just a few questions," there is no danger of unfair

prejudice under Rule 403.  *Id.* at pages 3-4.

The government contends that "OPR's findings do not

support the conclusions that Fihlman made false statements on

forms and to OPR."  Citing the government's October 5, 2021,

letter, Dkt. No. 577, at pages 2-3.  According to the

government, "the OPR investigation did not charge Fihlman with

making a false or a dishonest statement in connection with the

payments [for which Sanders was investigating], and it did not

find that Fihlman had lied during the course of the OPR's

investigation." *Id.* at pages 1-2.

LA6HLan1

1        However, the documents that have been submitted to me

2   indicate "when inspectors presented [Agent Fihlman] with Dallas

3   Police Department [confidential source] payment forms bearing

4   [Agent Fihlman's] signature as the witness for money paid to

5   the [confidential source's] son, [Agent Fihlman] said he did

6   not witness the payments to the source's son."  October 4,

7   2021, defense letter, Exhibit A, Dkt. No. 575-1, at page 4.

8        (Continued on next page)

LA68LAN2

1    THE COURT:  But when Agent Fihlman was signing the

2    form, he was attesting to the fact that he witnessed a payment

3    when, in fact, he had not witnessed a payment on a number of

4    occasions.  Accordingly, his attestation that he had witnessed

5    the payment was false.  The fact that he made a false statement

6    under these circumstances, and again, I need to see the form

7    that he actually signed and what it says with respect to the

8    attestation, but based on what I have seen so far, it does seem

9    to me that Agent Fihlman's false attestation that he had

10   witnessed a payment that was made when, in fact, he had not

11   witnessed the payment, it does seem to me that is probative of

12   his truthfulness.

13       The government further argues that cross-examination

14   on this point should be precluded under Rule 403 because "the

15   underlying fact pattern is complex," and would require "a

16   lengthy discursion regarding these incidences, distracting the

17   jury from the substance of Fihlman's testimony and the case on

18   trial."  Citing the government's October 5, 2021 letter, Dkt.

19   No. 577 at page 3.  This argument does not appear persuasive to

20   me because the facts underlying this incident seem very

21   straightforward.  When agents or police officers are making

22   payments to confidential informants, it's obviously important

23   that a record be maintained of that payment.  Confidential

24   informants are inherently suspect.  They are often people who

25   have engaged in criminal conduct, and the payments they receive

LA68LAN2

from law enforcement agencies give them an obvious motive to fabricate. So these are not outstanding citizens. They are people who have to be dealt with very carefully, and it's for that reason that law enforcement agencies have documentary requirements about payments that are made to such individuals. And so all of that seems very straightforward. And inherent in that circumstance, or those circumstances, is it's important that there be witnesses to payments that are made to such people because disputes can arise later about whether a payment was made or not.

And so it should have been obvious to everyone involved that it was important to the agency, important to the Dallas Police Department, that payments made to this particular confidential source's son, or to the confidential source him or herself, be properly documented. So it does seem to me that none of this requires extensive background. It's obvious that when money is paid, it's important to document it, and part of the documentary process is a certification from the agents or police officers involved that the money was actually paid. And given that Agent Fihlman admitted that he was actually not present when certain payments to the source or the source's son were made, it should have been obvious to him that attesting to the payment, or certifying that it was made, was improper, and it was in that context that he was reprimanded.

Now, it is true that the reprimand doesn't make a

LA68LAN2

finding of dishonesty or false statement or anything of that

sort.  As I said at the outset, Mr. Fihlman was disciplined for

inattention to duty and a failure to follow DEA policy.  So

with respect to their reprimand, that's what it was for.  There

was no finding made that he was intentionally dishonest or that

he intentionally made a false statement.  And the government

would of course be permitted to bring out those circumstances.

But subject to my receiving the underlying documents, my

inclination would be to permit cross-examination on the

subject.

           I want to turn some other issues that we discussed on

Monday.  There was an issue regarding David Cardona-Cardona's

guilty plea to narcoterrorism and weapons charges.  The defense

raised concerns about what evidence would be admitted.  I gave

the parties my views regarding how the guilty plea of

Cardona-Cardona to the narcoterrorism and firearms charges

should be handled.  Yesterday the parties submitted a joint

letter informing me that they have agreed that the government

will elicit from Mr. Cardona-Cardona on direct that he pled

guilty to narcoterrorism and weapons charges, as well as the

penalties he faces on those charges, together with the

penalties he faces based on the narcotics charges he pled

guilty to.  But that neither defendant plans to cross-examine

Cardona-Cardona on those charges, and the parties at this point

don't plan to introduce Cardona-Cardona's cooperation

LA68LAN2

agreement.  Moreover, the joint letter informs me that in the

event it becomes necessary to introduce the cooperation

agreement, the parties have agreed to redactions to remove any

suggestion that the narcoterrorism and weapons charges are

related to the defendants.  The parties tell me they will

provide a copy of the redacted cooperation agreement to the

court before offering it as an exhibit.  Accordingly, issues

regarding Cardona-Cardona's narcoterrorism firearms crimes

appear to have been resolved.

Defendant Adamu has submitted a letter seeking to call

an expert witness, Michael Levine, to testify as to defendant's

"blind mule" defense.  Citing Dkt. No. 574.  The government

filed its opposition to that application last night, arguing

that Levine's proposed testimony should be precluded because it

"squarely invades the province of the jury in determining the

defendant's state of mind at the time of the offense."  Citing

Dkt. No. 579.

Adamu's application to call Levine as an expert

witness is denied without prejudice because counsel's

submission disclosing the nature of the opinions Levine would

offer is entirely inadequate under Federal Rule of Criminal

Procedure 16(b)(1)(C).

Adamu's counsel has submitted a transcript of Levine's

testimony in another case, United *States v. Gloria*

*Cespedes-Cano*, 01 Cr. 157 (SJ), a trial that proceeded before

LA68LAN2

Judge Sterling Johnson in the Eastern District of New York. *See* October 4, 2021 Dunn letter, Exhibit B, Dkt. No. 574. Although I wasn't given background concerning the case before Judge Johnson, I gather that the defendant was the subject of a drug trafficking charge in that case. Drugs were found in a bag she was carrying, perhaps at the airport. The drugs were hidden in a compartment sewn in the bottom of her bag. *Id.* Levine offered testimony for the defense. His testimony indicates that he is an expert concerning the use of so-called drug mules, and he opined, for a variety of reasons that he explains in great detail, that the defendant in that case likely had been a "blind mule," that is to say, someone who did not know that there were drugs in her bag. *Id.* at ECF pages 15-16.

Although Mr. Dunn proffers Mr. Levine as an expert on "blind mules," see Dkt. No. 574, he does not provide any explanation of the opinions Mr. Levine will offer as to why Mr. Levine believes that Mr. Adamu was a so-called blind mule -- that is, in these circumstances, someone who did not know that a kilogram of cocaine had been stored on board the G2 that was flown into Zagreb airport. Because of the deficiencies in Mr. Dunn's letter and disclosures, Adamu's application to call Levine as an expert witness is denied.

Are there other issues that the lawyers want to raise?

MS. TARLOW:  Not from the government.

LA68LAN2

1              MR. BIALE:  Not on behalf of Mr. Landji.

2              MR. DUNN:  No, your Honor.

3              THE COURT:  My deputy informs me that the jury office

4    personnel have asked that defense counsel and the government,

5    defendants, the marshals, etc., as well as the interpreter,

6    proceed to the jury assembly room in the courthouse across the

7    street so that they can show you the situation and so that they

8    can make sure that the audio functions are appropriate, that

9    the interpreter can be heard, etc., etc.  And then once they

10   have made sure that the arrangements are appropriate, they will

11   contact me and we will head over.  So if no one has any

12   questions, I would ask you to please proceed across the street

13   to the jury assembly room, and I will see you there once I am

14   told that we are ready to proceed.

15             Thank you, all.

16             (Recess)

17             (Jury selection commenced)

18

19

20

21

22

23

24

25