LADNLAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                           18 Cr. 601 (PGG)

5   JEAN-C LAUDE OKONGO LANDJI, and
    JIBRIL ADAMU,
6
            Defendants.                  Jury Trial
7   ------------------------------x

8                                        New York, N.Y.
                                         October 13, 2021
9                                        9:45 a.m.

10  Before:

11                 HON. PAUL G. GARDEPHE,
                                         District Judge
12                                         and a Jury

13                       APPEARANCES

14  AUDREY STRAUSS
        United States Attorney for the
15      Southern District of New York
    MATTHEW HELLMAN
16  ELINOR L. TARLOW
        Assistant United States Attorneys
17
    SHER TREMONTE LLP
18      Attorneys for Defendant Landji
    MICHAEL TREMONTE
19  NOAM BIALE

20  THOMAS F.X. DUNN
    JACQUELINE E. CISTARO
21      Attorneys for Defendant Adamu

22  Also present:

23  Eric Heuberger, Interpreter (French)
    Sophie Pierson, Interpreter (French)
24  Carmen Ess, Interpreter (Croatian)
    Teodora Burian, Interpreter (Croatian)
25  Elizabeth Caruso, Interpreter (Spanish)
    Anna Maria Riso, Interpreter (Spanish)

LADNLAN1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Please be seated.  I received a letter

4    from the government last night around 1 a.m. concerning two

5    issues.  One portion of the letter addresses extractions from

6    cell phones seized from the defendants at the time of their

7    arrest in Zagreb.  The other has to do with the admissibility

8    of the cocaine seized from the plane in Zagreb.

9          I don't want to take a lot of time to address these

10   matters now because the jury is here and ready to go.  I will

11   say, based on what I have read so far, and subject to defense

12   counsel's arguments, my inclination would be to admit the

13   extractions from the defendants' cell phones.  I will explain

14   that in more detail later.

15         I haven't had time to study the government's

16   submission with respect to the cocaine.  I will say that what I

17   need to see in order to admit the cocaine is case law

18   demonstrating that it would be appropriate for me to do so.

19   What I mean by referring to case law that would support

20   admission of the cocaine under these circumstances, what I mean

21   is not general case law about what the standard is, but rather

22   case law that addresses the admission of the drug evidence

23   under circumstances comparable to those here.  That is what I

24   am looking for.

25         I am not entirely confident that the government's

LADNLAN1

1  letter contains such case law, but as I said, I haven't had

2  time to study it, and will do so later.

3         Before we bring the jury in, are there matters the

4  lawyers want to take up?

5         MR. HELLMAN:  Not from the government.

6         MR. BIALE:  Your Honor, just to briefly address, not

7  with argument, but you granted our request yesterday to respond

8  in writing to the government's letter.  We will try to get you

9  that response as early as possible this afternoon.  We have

10  already done some research.  It seems from the government's

11  letter that actually there are not any additional facts that we

12  didn't sort of already have a sense of yesterday.  So we will

13  work very hard to get you our response.  We will work on it as

14  soon as we leave court today and try to get it to you early

15  this evening so that you have the benefit of our arguments.

16         THE COURT:  All right.

17         Mr. Dunn, anything you want to say?

18         MR. DUNN:  No, your Honor.  I could bring it up later.

19  I don't want to delay the jury.

20         THE COURT:  Thank you.

21         The witness should take the stand.

22  TOMISLAV MILUNIC, resumed.

23         (Continued on next page)

24

25

LADNLAN1

1              (Jury present)

2              THE COURT:  Please be seated.

3              Good morning, ladies and gentlemen.

4              JUROR:  Good morning.

5              THE COURT:  You may recall that when we broke

6     yesterday we were in the midst of the direct examination of

7     Mr. Milunic.  At the time that we broke, Mr. Dunn on behalf of

8     Mr. Adamu was asking some questions, which we refer to as voir

9     dire questions, about Government Exhibit 102.

10             Mr. Dunn, do you have additional questions that you

11    would like to put with respect to Government Exhibit 102 at

12    this point?

13             MR. DUNN:  No, your Honor.

14             THE COURT:  All right.

15             Does Mr. Landji wish any voir dire with respect to

16    102?

17             MS. RENZLER:  No, your Honor.

18             THE COURT:  Mr. Hellman, are you offering 102?

19             MR. HELLMAN:  Yes.

20             THE COURT:  Any objection?

21             MR. DUNN:  No objection, your Honor.

22             MS. RENZLER:  No, your Honor.

23             THE COURT:  Government Exhibit 102 is received.  You

24    may proceed, Mr. Hellman.

25             (Government Exhibit 102 received in evidence)

LADNLAN1                          Milunic - Direct

1    DIRECT EXAMINATION (Continued)

2    BY MR. HELLMAN:

3    Q.  Good morning, Mr. Milunic.

4    A.  Good morning.

5         MR. HELLMAN:  Mr. Minikel, would you please display

6    Government Exhibit 241 for the Court, parties, and witness

7    only.

8    BY MR. HELLMAN:

9    Q.  Mr. Milunic, are you able to see Government Exhibit 241?

10   A.  Yes.  Yes, I see it.

11        THE INTERPRETER:  The batteries are dead, your Honor.

12        THE COURT:  Go ahead, Mr. Hellman.

13        MR. HELLMAN:  All right.  Thank you.

14   Q.  What do you recognize Government Exhibit 241 to be?

15   A.  This is the plastic baggie with yellow and red markings,

16   inside which there was the black baggie and inside which was

17   the package with the suspicious material which we had recovered

18   after the search we searched the airplane.

19   Q.  Is Government Exhibit 241 a photograph of that bag?

20   A.  That's correct.

21   Q.  Were you present when this photograph was taken?

22   A.  Yes.

23   Q.  Do you know when the photograph was taken?

24   A.  On October 5, when we were reviewing the evidence.

25        THE COURT:  Sorry.  You can't hear?

LADNLAN1                              Milunic - Direct

1              JUROR:  Yes.

2              THE COURT:  You need to keep up your voice.

3              THE INTERPRETER:  Okay.

4    A.  On October 5 during the review of the evidence material in

5    the state attorney's office.

6              THE COURT:  Is the microphone not working?

7              THE INTERPRETER:  No, the microphone is not working.

8    We're waiting for fresh batteries, your Honor.  They were

9    ordered before the proceedings.  They are on their way.

10             THE COURT:  Well, you are going to have to keep up

11   your voice.

12             THE INTERPRETER:  Okay.

13             THE COURT:  Your voice has to be loud enough so that

14   people at the back of the room can hear you.  They are a long

15   ways away.

16             THE INTERPRETER:  I understand.

17             THE COURT:  Okay?

18             THE INTERPRETER:  Yes.

19             THE COURT:  Go ahead, Mr. Hellman.

20             MR. HELLMAN:  I would offer Government Exhibit 241 in

21   evidence.

22             THE COURT:  Any objection?

23             MR. DUNN:  No, your Honor.

24             MS. RENZLER:  No, your Honor.

25             THE COURT:  Government Exhibit 241 is received.

1              (Government Exhibit 241 received in evidence).

2              MR. HELLMAN:  Permission to publish Government Exhibit

3    241, your Honor.

4              THE COURT:  Yes.

5              MR. HELLMAN:  Mr. Minikel, will you please display

6    Exhibit 241.

7    BY MR. HELLMAN:

8    Q.  Mr. Milunic, can you please explain by describing what you

9    can see in Government Exhibit 241 what about it you recognized

10   from the time you first saw it on the airplane in October 2018?

11   A.  Well, I have seen the red and yellow markings on the white

12   baggie.

13             MR. HELLMAN:  Permission to approach?

14             THE COURT:  Yes.

15   BY MR. HELLMAN:

16   Q.  All right.  Mr. Milunic, I've handed you Government Exhibit

17   102 in evidence and also Government Exhibit 103.

18             Could you please take a look first at Government

19   Exhibit 103.

20   A.  I looked at it.

21   Q.  What do you recognize Government Exhibit 103 to be?

22   A.  This is the official brown baggie that our laboratory sent

23   to the office of crime investigations, April 15, 2020,

24   regarding Mr. Landji.

25   Q.  Have you recently inspected the contents of Government

1  Exhibit 103?

2  A.  I reviewed it in the office of the assistant state's

3  attorney on October 5.

4  Q.  And at the time you reviewed it, did you open the bag,

5  Government Exhibit 103, and examine its contents?

6  A.  That's correct.

7  Q.  Was the bag sealed before you did that?

8  A.  It was sealed.

9  Q.  How did you open Government Exhibit 103?

10 A.  By scissors we have cut off the bottom part of the baggie.

11 Q.  Do you see the bottom part of the baggie contained within

12 Government Exhibit 103?

13 A.  Yes, I see it.

14 Q.  After you finished examining the contents of Government

15 Exhibit 103, did you seal that bag?

16 A.  That's correct.  We have put the contents of the baggie

17 back inside and we have sealed it again --

18 Q.  And did you mark it --

19 A.  -- at the bottom.

20 Q.  Excuse me.  Sorry.  Did you mark the seal in any way?

21 A.  That is correct.  I have put my initials and the date when

22 the review was done.

23 Q.  Turning your attention, please, back to Government Exhibit

24 102.  I think you have been provided gloves and scissors.  If

25 you could put on the gloves and use the scissors to open

1    Government Exhibit 102, please.

2    A.   I have the gloves and the scissors.

3    Q.   Would you please open Government Exhibit 102?

4    A.   Okay.

5    Q.   Will you please remove the contents of Government Exhibit

6    102?

7    A.   It has been done.

8    Q.   All right.  Mr. Milunic, do you see in Government Exhibit

9    102, the white bag that you have described in your testimony?

10   A.   Yes.  Here it is.

11   Q.   It looks like you are unfolding the bag.  If that is the

12   white bag that you have previously described as the outermost

13   packaging of the powder you found on the plane in October 2018,

14   can you please hold it up so that members of the jury can see

15   it.  You may need to stand.

16   Q.   Thank you.  Do you believe that to be the bag which was the

17   outermost packaging of the package that you referred in October

18   2018?

19   A.   That's correct.

20   Q.   You previously testified about a black bag inside of the

21   white bag.  Do you see that from the contents of Government

22   Exhibit 102?

23   A.   Yes, I see it.  Here it is.

24   Q.   Will you please hold that up so that members of the jury

25   can see it.  How would you describe the material that you're

LADNLAN1                          Milunic – Direct

1    currently holding.  What material is it?

2    A.  Plastic baggie of black color.

3    Q.  Are you able also to see from the contents of Government

4    Exhibit 102, the next layer of packaging that you observed

5    during your search and recovery of the packet?

6    A.  Yes, I see.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LADHLan2                     Milunic - Direct

1    Q.  What are you holding right now?

2    A.  The plastic wrapping with brown tape with the rectangle and

3    the markings that resemble the brand name of Adidas inside

4    which the suspicious powdery material was found.

5    Q.  Would you please display that packaging for the jury.  And

6    would you show both sides, please.

7    A.  (Witness complies)

8    Q.  Mr. Milunic, would you please display Government

9    Exhibit 229 -- sorry, 232.

10           Mr. Milunic, are you able to see the logo in

11   Government Exhibit 232 on the packaging that you're handling

12   right now?

13   A.  Yes.

14   Q.  And it may just be the Plexiglas, but I wasn't able to see.

15   Would you please display that.  Thank you.

16           Is there any additional packaging inside of Government

17   Exhibit 102 that you recognize from the day of your recovery of

18   the object?

19   A.  This is the remnant of the same package, and something

20   rubbery which I had not seen at the time.

21   Q.  And how would you describe the rubbery item that you're

22   holding?

23   A.  As a rubbery black baggy which is now torn.

24   Q.  Are you able to see anything on the rubber itself?

25   A.  Only the traces of white powdery material.

LADHLan2                    Milunic - Direct

1    Q.  You testified previously that when you recovered the

2    packet, you observed white powder inside of it, is that right?

3    A.  Yes.

4    Q.  What did you do to access the white powder within the

5    packet?  How, if at all, did you open the packet?

6    A.  We punctured a little hole on the package from which we

7    retrieved a small quantity of the powdery material, and we

8    performed the test.

9    Q.  How did you make the hole?  What kind of implement did you

10   use?

11   A.  I believe that we used a screwdriver.

12   Q.  Taking a look at Government Exhibit 232 on your screen, did

13   you remove the packaging that you can see in Government

14   Exhibit 232 the day that you recovered the item?

15   A.  No, we did not.

16   Q.  So in Government Exhibit 232, can we see the total extent

17   to which you unwrapped the object the day of the recovery?

18   A.  That's correct.

19   Q.  You testified yesterday about what you did with this object

20   after the examinations that you performed.  Could you -- do you

21   see in Government Exhibit 102 a brown bag?

22   A.  Yes, here it is.

23   Q.  Would you please open that bag and display it for members

24   of the jury.

25              What is that kind of a bag?

LADHLan2                           Milunic - Direct

1    A.   This is our official baggy into which police officers place

2    the recovered objects after -- smaller objects after the

3    search.

4    Q.   And you're familiar with that type of bag?

5    A.   Yes.

6    Q.   Is it standard for you, based on your training and

7    experience, to use those type of bags when recovering evidence?

8    A.   It has been used for the last 15 years.

9    Q.   Do you believe that that is the kind of bag that you used

10   to transport the package depicted in Government Exhibit 232 to

11   Ivica Sestak on October 31, 2018?

12   A.   Yes.

13   Q.   Why did you provide it to Ivica Sestak in particular?

14            MS. RENZLER:  Objection.

15            THE COURT:  Ground?

16            MS. RENZLER:  Foundation.

17            THE COURT:  I don't understand.  He said that he --

18   he's previously testified that he gave the package to Sestak.

19            MS. RENZLER:  He testified that that's the type of bag

20   and not the specific bag.

21            THE COURT:  Your objection's overruled.

22            Can you repeat the question, Mr. Hellman.

23   BY MR. HELLMAN:

24   Q.   I believe the question was why did you provide the package

25   depicted in Government Exhibit 232 to Ivica Sestak in

LADHLan2                           Milunic - Direct

1    particular?

2              THE COURT:  Well, defense counsel has objected on

3    grounds of ambiguity, so let me inquire of the witness.

4              Is this the bag that you gave to Sestak?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  Go ahead.

7    Q.  Why did you provide that bag and its contents to Ivica

8    Sestak in particular?

9    A.  Because Ivica Sestak was in charge of leading the case.

10   Q.  Did he have responsibility for the evidence in the case as

11   far as you knew?

12   A.  Yes.

13   Q.  Do you know if there was any particular purpose in

14   providing it to Mr. Sestak?

15   A.  My boss told me that when we complete the case, we have to

16   give all the material --

17             MS. RENZLER:  Objection.

18   A.  -- to him.

19             THE COURT:  All right.  Sustained.

20             What was your purpose in giving this bag or the

21   evidence that it contained to Sestak?  What was your purpose in

22   doing that?

23             THE WITNESS:  I was responsible for the package during

24   the transport and during the giving part of this package to the

25   next person.

LADHLan2                          Milunic - Direct

1          THE COURT:  All right.  Did you have an understanding

2     of what Sestak was going to do with the package after you gave

3     it to him?

4          THE WITNESS:  The common practice in Croatia is that

5     the suspicious material is going to be transported into the

6     laboratory.

7          THE COURT:  All right.  Could you tell us what

8     Mr. Sestak's duties and responsibilities are for the Croatian

9     police.

10         THE WITNESS:  The colleague works in the office for

11    the drug-related crimes, together with the other witness,

12    Tomislav Stambuk.  Together they were in charge of leading the

13    case.

14         THE COURT:  All right.  Go ahead, Mr. Hellman.

15    BY MR. HELLMAN:

16    Q.  Just to be clear, at the time you provided the package

17    shown in Government Exhibit 232 to Mr. Sestak, did you provide

18    it in the condition that you can see it in Government

19    Exhibit 232?

20    A.  That's correct.

21    Q.  Did you also provide the bags and other packaging in which

22    you had found Government Exhibit 232?

23    A.  Yes.

24    Q.  Prior to October 31, 2018, had you had any other

25    involvement in this case?

LADHLan2                          Milunic - Cross

1    A.  I was not.

2    Q.  Was your only involvement in this case your conducting the

3    search on October 31, 2018?

4    A.  Yes.

5    Q.  After you provided the packet and the other physical

6    evidence from the airplane to Ivica Sestak, did you have any

7    further involvement in this investigation?

8    A.  This was the end of my work.  I didn't have any further

9    connection with the case.

10           MR. HELLMAN:  May I have one moment, your Honor?

11           THE COURT:  Yes.

12           THE COURT:  Cross-examination.

13   CROSS-EXAMINATION

14   BY MS. RENZLER:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  On October 31, 2018, you drove Mr. Adamu to the Zagreb

18   airport, right?

19           THE INTERPRETER:  I'm sorry.  I didn't hear.  Can you

20   say it louder.  I'm sorry, the interpreter couldn't hear what

21   you asked.

22   Q.  Sure.  On October 31, 2018, you drove Mr. Adamu to the

23   Zagreb airport, right?

24   A.  This is correct.

25   Q.  The plane had landed in Zagreb the day before?

LADHLan2                          Milunic - Cross

1   A.  Yes.

2   Q.  And you were there to assist in the search of the plane?

3   A.  Yes.

4   Q.  You participated in that search?

5   A.  Yes.

6   Q.  And that search was conducted by nine Croatian police

7   officers, correct?

8   A.  Yes, yes.

9   Q.  No U.S. agents participated in that search?

10  A.  Yes.

11  Q.  You searched alongside one of your colleagues, correct?

12  A.  Yes.

13  Q.  Your colleague took notes during this search, correct?

14  A.  My colleagues and myself, we were doing the search

15  together.

16  Q.  A different colleague took photos during the search,

17  correct?

18  A.  And the pictures were taken by the crime technician.

19  Q.  You did not take the photos?

20  A.  No, I did not.

21  Q.  You started your search at the front of the plane, correct?

22  A.  Yes, we started with the cockpit.

23  Q.  And then you made your way to the back of the plane?

24  A.  Yes.

25  Q.  And at the end of the cabin, there was a door, correct?

LADHLan2                          Milunic – Cross

1    A.  Yes.

2    Q.  That door was to a luggage area?

3    A.  Yes.

4    Q.  You opened that door?

5    A.  Yes.

6    Q.  It wasn't locked, right?

7    A.  As far as I can recall, the door was not locked.

8    Q.  And right behind that door was a storage compartment,

9    correct?

10   A.  On the left-hand side.

11   Q.  It wasn't a secret compartment?

12   A.  No, you could see the shelf.

13   Q.  So the compartment wasn't hidden, right?

14   A.  Yes.

15         MS. RENZLER:  Ms. Young, can you please pull up

16   Government Exhibit 224.

17   Q.  Are you able to see that, sir?

18   A.  I see it.

19   Q.  This shows the door to the storage compartment, correct?

20   A.  Yes.

21         THE COURT:  All right.  Whenever an exhibit is

22   displayed, you have to say what it is for the record.  So we're

23   looking at Government Exhibit 224, right?

24         MS. RENZLER:  Yes, your Honor.

25         THE COURT:  OK.  Go ahead.

LADHLan2                           Milunic - Cross

1    Q.   So Government Exhibit 224 displays the door to the storage

2    compartment, correct?

3    A.   Yes.

4    Q.   This door was not locked?

5    A.   As far as I can recall, the door was not locked.

6    Q.   So you didn't need a key to open it, correct?

7    A.   We didn't need the key.

8    Q.   And you didn't need a combination code, correct?

9    A.   Correct.

10   Q.   So you and your colleague opened this door?

11   A.   Yes.

12        MS. RENZLER:  Ms. Young, can you please pull up

13   Government Exhibit 225.

14   Q.   I'm showing you Government Exhibit 225 on the screen.  Can

15   you see that?

16   A.   I see it.

17   Q.   This is what was inside of the compartment when you opened

18   the door, correct?

19   A.   Correct.

20   Q.   So there was a shelf, right?

21   A.   Yes.

22   Q.   On top of the shelf were some oil cans?

23   A.   Correct.

24   Q.   And there's a plastic bag also, correct?

25   A.   Correct.

LADHLan2                          Milunic – Cross

1  Q.  The bag wasn't buried underneath any other items?

2  A.  It was exactly the way you see it on the picture.  That's

3  how we found it.

4  Q.  So it wasn't hidden?

5  A.  Correct.

6  Q.  It wasn't made to look like something else, correct?

7  A.  You could see that was the plastic bag.

8  Q.  So all someone had to do to put the bag there was to open

9  the storage compartment?

10  A.  Yes.

11  Q.  And place the bag inside?

12        THE INTERPRETER:  I'm sorry?

13  Q.  Place the bag inside the compartment.

14  A.  OK.  I don't understand.

15        THE INTERPRETER:  I'm sorry.  The witness doesn't

16  understand the question.

17  Q.  In order to put the bag inside of the compartment, all

18  someone had to do was open the door and place it inside?

19  A.  Yes, this is correct.

20  Q.  The bag was about the size of a book?

21  A.  Yes.

22  Q.  It could have fit in any number of places on the plane?

23  A.  Yes, this is possible.

24  Q.  And it could easily be carried on to the plane?

25  A.  And that was easy to be done by the people who owned the

LADHLan2                          Milunic – Cross

1    plane.

2    Q.  But I asked it would be easy to carry a bag of this size on

3    to the plane, correct?

4    A.  Yes, it will be easy.

5    Q.  Aside from this bag, no other drugs were found on the

6    plane, correct?

7    A.  This is correct.

8    Q.  You testified on direct that the package was removed from

9    the storage compartment, correct?

10   A.  Yes.

11   Q.  At that time you didn't examine it for any evidence of

12   fingerprints, correct?

13   A.  Correct.

14   Q.  As a result of the search of the plane, items other than

15   that package were also recovered, right?

16   A.  Correct.

17   Q.  Cell phones were recovered?

18   A.  Yes.

19   Q.  But you didn't review the contents of those phones,

20   correct?

21   A.  Personally, I didn't listen to the contents of the

22   telephones.

23   Q.  Luggage was also recovered from the plane, correct?

24   A.  Yes, we took out the item that we found in the plane.

25   Q.  You placed those items in a box, right?

LADHLan2                        Milunic - Cross

1    A.  We took some items, and we made the list of those items.

2    And the rest of them, we put into two different boxes, and we

3    sealed those boxes.

4    Q.  And you didn't finish the inventory on the plane, correct?

5    A.  The object that we put into the boxes, we didn't have a

6    chance to make the list of all of them.

7    Q.  You testified that you brought the boxes back to your

8    office, correct?

9    A.  Yes.

10   Q.  Where they were given to Mr. Sestak?

11   A.  Yes.

12   Q.  After the boxes were given to Mr. Sestak, you didn't see

13   them again, correct?

14   A.  This is correct.

15           MS. RENZLER:  No further questions.

16           THE COURT:  All right.

17           Mr. Dunn.

18           MR. DUNN:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MR. DUNN:

21   Q.  Sir, isn't it a fact that these plastic bags with the

22   cocaine were recovered in a brown piece of luggage?

23   A.  The plastic bag was found on the shelf among the oil cans

24   in the store -- in the cargo area of the plane.

25   Q.  But they were in a brown piece of luggage, correct?

LADHLan2                          Milunic - Cross

A.  First we found the piece of luggage, which included the

cell phones, some SIM cards.

Q.  There was another -- withdrawn.

        So when you opened this compartment, the storage area,

isn't it a fact in that storage area, there was a brown piece

of luggage, and within that luggage was this plastic wrapping

and the drugs, isn't that a fact?

A.  No, this is not correct.  The plastic bag was together with

the oil cans on the shelf.

Q.  Prior to the search on that plane, did you have any

experience with searches before?

A.  Yes, I been working for the last 15 years in the police of

the crime, crime police.

Q.  How many times have you searched planes, approximately?

A.  No, this was the first time I was doing the search of the

plane.

Q.  Excuse me?

A.  This was the first time I was searching the plane.

Q.  So the first time that you ever searched a plane was this

plane that you've testified to about today, is that right?

A.  This is correct.

Q.  What time did you get to the area where the plane was when

you -- after you had driven Mr. Adamu to the airport?

A.  As far as I could recall, that was about 9:30 in the

morning.

LADHLan2                        Milunic - Cross

1    Q.  And you testified, I believe, that at some point you had to

2    take Mr. Adamu, Mr. Landji, and Mr. Seal to court because you

3    had to do that, according to Croatian law, within 24 hours,

4    correct?

5    A.  After they found cocaine and they packed all the boxes, we

6    went -- we drove them all into our office.  After that, our

7    colleagues did the necessary work, and within 24 hours they had

8    to turn in the arrested people to the court.

9    Q.  All right.  Sir, what time did they leave the area of the

10   plane that day?

11   A.  I would have to look at our records, but I think it's about

12   6:30 in the afternoon.

13   Q.  So you searched -- is it fair to say that you searched this

14   plane from 9:30 a.m. to 6:30 p.m., is that fair to say?  Yes or

15   no?

16   A.  This is not exactly correct.

17   Q.  Well, sir, would it be fair to say that you searched the

18   plane for at least four hours?

19   A.  Yes.

20   Q.  I'm sorry?

21   A.  This is correct.

22   Q.  Would it be fair to say that you searched it for at least

23   five hours?

24   A.  We can say that also.

25   Q.  Would it be fair to say that you searched the plane for at

LADHLan2                    Milunic - Cross

1   least six hours?

2   A.   Exact.

3   Q.   And would it be fair to say that you searched the plane for

4   seven hours?

5   A.   Correct.

6   Q.   And how about eight hours?  Could it have taken as long as

7   eight hours to search that plane?

8   A.   I think that's approximately correct time.

9   Q.   Now, isn't it a fact, sir, that you had three canine dogs

10  that were used in the search, isn't that true?

11  A.   No, we only had one dog.

12  Q.   Have you had any training with canines doing searches?

13  A.   On a few occasions, I was observing my colleagues while

14  they were doing their work.

15  Q.   On this particular day when you're doing this search, did

16  you search the wing areas of the plane on the outside?

17  A.   We inspected, we searched, the whole plane.

18  Q.   What about the wing areas on the outside?  Did you search

19  those?

20  A.   We were looking at everything, and we are trying to see if

21  possible there were some shelves.

22  Q.   I'm sorry?

23       THE INTERPRETER:  OK.  He says we inspected the whole

24  plane, and we were looking if maybe there might be some

25  shelves.

LADHLan2                       Milunic - Cross

1    Q.  Sir, I want to talk about the outside of the plane itself.

2    Was there any part of the outside of the plane searched?

3    A.  We did visual inspection to see if maybe outside of the

4    plane there was some shelves where something could have been

5    hidden.

6    Q.  In fact, during this search, you witnessed members of the

7    search party open some part of each wing, isn't that true?

8    A.  I can't recall this.

9    Q.  What about the tail of the plane?  Were you ever outside in

10   the back of the plane where the tail is and someone in the

11   search party opened the tail area to -- did you witness that?

12   A.  I saw it.

13   Q.  So you saw a member of the search team -- withdrawn.

14       Was it a mechanic that opened the tail area or a

15   member of the search team?

16   A.  We were using the mechanics that work for the Croatian

17   airline.

18   Q.  So is it fair to say that the reason that you looked at the

19   tail area is because you thought there was a possibility there

20   could be drugs in that tail area, isn't that true?

21   A.  Yes, this is correct.

22   Q.  So you're in this -- withdrawn.

23       The search lasts for eight hours.  This is a small

24   plane, correct?

25   A.  Yes.

LADHLan2                         Milunic - Cross

1  Q.  And you're telling this jury that -- withdrawn.

2          So during this eight hours, you were conducting a

3  search from the front of the plane to the back of the plane, is

4  that right?  Sir, it calls for a yes-or-no answer.

5  A.  Correct.

6  Q.  Were you on the plane when the canine was in the plane?

7  A.  No, I was outside of the plane.

8  Q.  What about Mr. Seal, Mr. Adamu, and Mr. Landji, were they

9  in the plane?

10 A.  I can't recall.

11 Q.  Did you testify that during searches in Croatia, that the

12 people that are arrested have to be present during the search?

13 Did you testify about that?

14 A.  Yes, I testified that.

15 Q.  Would it be fair to say that a search that lasts eight

16 hours is a long search, is that fair to say?

17 A.  Yes, we could say that.

18 Q.  Now, have you said in the past that the reason the search

19 took so long was because you had to inventory items, is that

20 true?

21 A.  Yes.

22 Q.  And the items that you inventoried, were those inventoried

23 before you found the cocaine?

24 A.  Correct.

25 Q.  Would it be fair to say that the most important thing that

LADHLan2                    Milunic - Cross

1   you wanted to find was cocaine or any other type of drug, is

2   that fair?  I'll withdraw the question.

3          You had learned that this plane might be carrying

4   drugs, is that right?  And it was -- I'm sorry.

5   A.  Correct.

6   Q.  And it was important for you to see if you could locate the

7   drugs on the plane, correct?

8   A.  Correct.

9   Q.  At what point during these eight hours did you find the

10  drugs?

11  A.  It's about 16 hours, which means 4 p.m. we found the drugs.

12  Around 16 hours, which is 4 p.m.

13  Q.  What time -- withdrawn.

14         So you're saying that you arrive at the airport at

15  9:30, and you find the drugs at 4 p.m., is that right?

16  A.  Correct.

17  Q.  Do you recall how many passenger seats were on this plane?

18  A.  I'm not sure.  Six or eight, maybe more.

19         MR. DUNN:  Just have one moment.

20  Q.  During this search, what were the other eight people doing?

21  A.  With me inside the plane, there were other four officers.

22  The rest were standing around the plane.

23  Q.  How many law enforcement officials were inside the plane

24  during this search?

25  A.  Five.

LADHLan2                    Milunic - Redirect

1   Q.  Sir, so it's your testimony that it took you and all these

2   other officers until 4 p.m. to find the drugs, is that fair to

3   say?  Yes or no?

4   A.  Yes.

5          MR. DUNN:  I have no further questions, your Honor.

6          THE COURT:  Any redirect?

7          MR. HELLMAN:  Briefly.

8   REDIRECT EXAMINATION

9   BY MR. HELLMAN:

10  Q.  Why did the search take as long as it took?

11  A.  After we have found the first objects on the seat of the

12  plane, we were taking evidence of those for about two hours.

13  After that, we continued with the search, taking apart the

14  whole plane.  All the possible shelves we took apart.  That is

15  why it lasted so long.

16  Q.  When you were deciding which items from luggage to place

17  into evidence, were you discussing those items with the

18  defendants?

19  A.  No.

20  Q.  Did you ask the defendants if items were theirs or somebody

21  else's?

22  A.  Only those questions.

23  Q.  Were you having those conversations through an interpreter?

24  A.  No.  After the interpreter familiarized the suspects with

25  their rights, the interpreter left.

LADHLan2                        Milunic - Redirect

1   Q.  In what language did you speak with the defendants when

2   attempting to determine what items belonged to them?

3   A.  In English.  The leader of the search, Hrvoje Kralj, speaks

4   fluent English.

5   Q.  So is it your testimony that the search took the amount of

6   time that it did because you went step by step through the

7   plane?

8   A.  That's correct.

9   Q.  You recovered some items from the plane which were

10  ultimately placed into evidence, correct?

11  A.  That's correct.

12  Q.  And you also found items like clothing and other personal

13  property which you returned to the defendants?

14  A.  That's correct.

15  Q.  Do you believe that you looked inside every compartment in

16  that plane and every piece of luggage on the plane as well?

17          MS. RENZLER:  Objection.

18          THE COURT:  Grounds?

19          MS. RENZLER:  Leading.

20          THE COURT:  Can you make it less leading.

21          MR. HELLMAN:  I'll rephrase.

22  Q.  Do you believe -- withdrawn.

23          What did you search on the plane, what areas?

24  A.  The complete plane, starting with the cockpit, the

25  passenger area, and the storage area, and from the end of the

LADHLan2                        Milunic - Recross

1    plane, the part of the tail that we opened.

2            MR. HELLMAN:  So I have no other questions, but I

3    would ask that the witness repackage the items from Government

4    Exhibit 102 as the witness found them, and I'll provide tape

5    for the package to be sealed.

6            May I approach?

7            THE COURT:  Yes.

8    BY MR. HELLMAN:

9    Q.  Mr. Milunic, did you just close Government Exhibit 102?

10   A.  I did.

11   Q.  Did you place your initials on tape which you affixed to

12   the closure?

13   A.  Yes, I did.

14           MR. HELLMAN:  No other questions.

15           MR. DUNN:  Your Honor, may I have a couple questions?

16           THE COURT:  Yes.

17   RECROSS EXAMINATION

18   BY MR. DUNN:

19   Q.  Sir, what was the most important thing that you took off

20   that plane after the search?

21   A.  The cocaine.

22   Q.  Now, the canine, it was your understanding the canine had

23   sniffed out evidence of cocaine in the cockpit and in the

24   storage area, correct?

25   A.  That's correct.

LADHLan2                         Kohut – Direct

1    Q.   And you went to the cockpit area first, correct?

2    A.   That's correct.

3    Q.   Then it wasn't for seven or eight hours that you went back

4    to the storage area where you knew, because of the dog, that

5    there may be some drugs.  It took you that long to get back

6    there, correct?

7    A.   That's correct.

8                MR. DUNN:  No further questions, your Honor.  Thank

9    you.

10               THE COURT:  Ms. Renzler, did you have anything else?

11               MS. RENZLER:  No, your Honor.

12               THE COURT:  The witness can step down.  Government

13   call its next witness.

14               (Witness excused)

15               MR. HELLMAN:  Government calls Anton Kohut.

16               THE INTERPRETER:  Your Honor, may the interpreters be

17   excused?

18               THE COURT:  Yes.

19               THE DEPUTY CLERK:  Please step around, sir.

20   ANTON KOHUT,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. HELLMAN:

25   Q.   Good morning.

LADHLan2                          Kohut - Direct

1   A.  Good morning.

2   Q.  Until recently, where did you work?

3   A.  Until recently, I worked as a special agent at the U.S.

4   Drug Enforcement Administration in our office in Zagreb,

5   Croatia.

6   Q.  How long were you part of the DEA?

7   A.  A little over 23 and a half years.

8   Q.  When did you leave?

9   A.  I left on August 31, 2021.

10  Q.  Why?

11  A.  Family reasons.

12  Q.  What was your last assignment when you were with DEA?

13  A.  I was the acting country attaché of the DEA office in

14  Zagreb, Croatia.

15  Q.  What were your responsibilities there?

16  A.  I was primarily a liaison between DEA and the various

17  counter narcotics units in several countries of the former

18  Yugoslavia, to include Croatia.

19  Q.  Where is the DEA's office located in Croatia?

20  A.  It's in the U.S. embassy in Zagreb.

21  Q.  In your capacity as an assistant country attaché in Zagreb,

22  were you aware of an investigation conducted by the DEA and

23  Croatian law enforcement involving Jean-Claude Landji, Jibril

24  Adamu, and others?

25  A.  Yes, I am.

LADHLan2                         Kohut - Direct

1   Q.  Directing your attention to October 15, 2019, were you

2   working in Croatia at that time?

3   A.  Yes, sir, I was.

4   Q.  Did you have occasion to handle any evidence related to the

5   Landji and Adamu case that day?

6   A.  Yes, I did.

7   Q.  What did you handle?

8   A.  Nondrug evidence that was given to me by the Croatian

9   National Police.

10  Q.  What do you mean when you say "nondrug evidence"?

11  A.  I mean material like electronic devices, phones, material

12  that is not actual narcotic matter.

13  Q.  How were those items packaged when they were given to you?

14  A.  They were in brown paper bags.

15  Q.  Did you recognize the kind of brown paper bags that you

16  were given?

17  A.  Yes.  It's a type of wrapping that I have seen associated

18  with exhibits that are processed by the Croatian National

19  Police.

20  Q.  Do you recall approximately how many bags you received?

21  A.  I believe it was 19.

22  Q.  Do you remember who in particular gave it to you?

23  A.  Yes, Inspector Ivica Sestak of the Croatian National

24  Police.

25  Q.  Do you recall if any other members of Croatian law

LADHLan2                    Kohut - Direct

1    enforcement observed the transfer?

2    A.  Yes.  The transfer would have been witnessed.  I believe it

3    was Inspector Tomislav Stambuk.

4    Q.  Had you had occasion in your work in Croatia to work with

5    Ivica Sestak and Tomislav Stambuk before October 2019?

6    A.  Yes, sir, many times.

7    Q.  Where were you when you received that evidence?

8    A.  I was in Inspector Sestak's office in Zagreb.

9    Q.  Do you recall where that office is?

10   A.  Yes.  It's on Ilica Street, which is in the western part of

11   the city, part of a larger Minister of the Interior complex.

12           THE COURT:  You'll have to spell that.

13           THE WITNESS:  Sorry?

14           THE COURT:  You'll have to spell that.

15           THE WITNESS:  Oh, the street.  Yes, your Honor.  Ilica

16   is spelled I-l-i-c-a.

17   BY MR. HELLMAN:

18   Q.  Can you describe generally what evidence you received that

19   day?

20   A.  Yes.  As I recall, it consisted of cell phones.  I believe

21   there were some documents, although I don't remember

22   specifically all the items that were there.

23   Q.  Had any inventory been prepared of the evidence you

24   received?

25   A.  Yes.  Inspector Sestak had prepared a very detailed

LADHLan2                          Kohut - Direct

1   inventory of the items.

2   Q.  What language was the inventory in?

3   A.  It was -- it was one copy in Croatian and one copy in

4   English.

5   Q.  Can you read Croatian?

6   A.  Yes, I can.

7   Q.  Why did you accept the evidence at that particular point in

8   time?

9   A.  Well, we understood that Mr. Adamu and Mr. Landji were

10  about to be extradited to the United States on charter aircraft

11  accompanied by DEA and other members of law enforcement.  We

12  knew that this evidence was no longer necessary in a Croatian

13  criminal proceeding but would be required in the Southern

14  District of New York, so we took the evidence to provide the

15  opportunity to transport it with the agents who were already

16  going to New York, escorting Mr. Landji and Mr. Adamu.

17  Q.  After taking custody of the bags from Ivica Sestak, what

18  did you do with them?

19  A.  I brought them back to the DEA office.

20  Q.  What happened with them at that point?

21  A.  They're maintained until such time, I think it was just a

22  couple of days later, that the extradition flight occurred.

23  Q.  Did you provide those evidence bags to anyone in

24  particular?

25  A.  Yes.  That would have been country -- then country attaché

LADHLan2                        Kohut – Direct

1    Matt Fihlman and/or Joe Catalano, another agent.  Both of them
2    were on the flight.
3    Q.   The flight meaning what?
4    A.   Sorry.  The extradition flight.  This was a chartered
5    flight organized by the U.S. Marshal Service for the purpose of
6    transporting Mr. Adamu and Mr. Landji from Zagreb to New York.
7    Q.   Did you see those bags again?
8    A.   I did, yes.
9    Q.   When?
10   A.   I believe it was maybe a month or two after that, after
11   that flight.
12   Q.   Where?
13   A.   In the U.S. Attorney's Office, Southern District of New
14   York.
15   Q.   What was their condition when you saw them at the U.S.
16   Attorney's Office?
17   A.   The bags appeared the same to me, the same condition that I
18   got them.
19   Q.   Were the bags sealed when you received them from Ivica
20   Sestak?
21   A.   Yes, they were.
22   Q.   And were they sealed when you observed them in the U.S.
23   Attorney's Office?
24   A.   Yes.
25   Q.   What did you do at the time you saw them in the U.S.

LADHLan2                        Kohut - Direct

1   Attorney's Office with the bags?

2   A.  Opened the bags and compared the inventory and began

3   looking at some of the evidence.

4   Q.  What did you learn when you compared the contents of the

5   bags to the inventory that was provided with them?

6   A.  It matched.  The inventory matched the items that we

7   received.

8   Q.  Did the bags include cell phones?

9   A.  Yes, there were cell phones.

10  Q.  Do you recall if the bags contained a hard drive?

11  A.  Yes, as I recall, there was, I believe, one hard drive.

12  Q.  Did there come a time you received any other evidence in

13  this case?

14  A.  Yes, there did.

15  Q.  Directing your attention to June 24, 2020, were you working

16  that day?

17  A.  Yes, I was.

18  Q.  Did you receive evidence that day?

19  A.  I did, sir.

20  Q.  What did you receive?

21  A.  I received just under one kilogram of cocaine and some

22  packaging.

23  Q.  From who?

24  A.  That would have been from Inspector Ivica Sestak again.

25  Q.  Where?

1    A.   At his office in Zagreb.

2    Q.   The same place you received the other evidence that you

3    described today?

4    A.   Yes, sir, that is correct.

5    Q.   So can you explain what exactly it was that you received

6    from Inspector Sestak?

7    A.   Yes.  I received a white powdery substance in a sealed

8    Ziploc bag that was contained within some brown wrapping.  I

9    also received some other bags and packaging that was contained

10   in some brown paper wrapping.

11   Q.   What kind of brown paper bags are we talking about?

12   A.   Those that are commonly used by the Croatian police to seal

13   evidence.

14   Q.   How exactly did these bags appear when you first arrived at

15   Sestak's office?

16   A.   Well, one of them had some markings on it, labeling,

17   indicating that it had come from a forensic examination center

18   in Zagreb.

19   Q.   Were the bags open or closed?

20   A.   They were closed when they first had them, as I recall.

21   Q.   Were they opened at some point in your presence?

22   A.   Yes.

23   Q.   Why?

24   A.   I wanted to make sure what drug evidence that I was

25   receiving was something that at least appeared to be that which

LADHLan2                          Kohut - Direct

1   was purported.

2   Q.  And did you observe the opening of those bags?

3   A.  Yes.

4   Q.  What was contained within -- withdrawn.

5           Did you take custody of the bags at that point in

6   time?

7   A.  I did, yes, sir.

8   Q.  What did you do with those two bags?

9   A.  I took them and their contents directly to the embassy in

10  Zagreb.

11  Q.  To your office?

12  A.  Yes, to my office.

13  Q.  What did you do with them when you arrived at your office?

14  A.  Specifically with the drugs, I then processed those as DEA

15  evidence, DEA evidence bag, witnessed its sealing in

16  preparation to be shipped via diplomatic pouch from the U.S.

17  embassy to the United States.

18  Q.  Can you explain the diplomatic pouch.  What does that mean?

19  A.  Yes.  Embassies, U.S. embassies, abroad have the ability to

20  send items and packages back to the United States in a really

21  secure way.  A diplomatic pouch refers to a collection of items

22  that the embassy puts together for official business that are

23  then made into one package that is escorted by a diplomatic

24  courier on a flight from, say, Zagreb back to the United

25  States.

LADHLan2                        Kohut - Direct

1  Q.  How do you place -- what did you do with the drug evidence

2  prior to placing it in a diplomatic pouch?

3  A.  Well, I had to put it into a DEA evidence bag and fill out

4  that label and sealing and signing and witnessing the sealing

5  of that label.  I had to fill out what's referred to as a DEA

6  Form 7 and a DEA-6 that documents the acquisition of those

7  items.  And then because they were going by diplomatic pouch, I

8  had to submit them to the embassy's pouch vault, which is a

9  special secure room, and I had to do some additional packaging

10 to prepare them to be shipped via diplomatic courier.

11 Q.  Did you take all those steps?

12 A.  I did, sir.

13 Q.  What did you do with the other evidence that you had

14 recovered that day?

15 A.  Yes, with the brown paper bags and the other packaging,

16 those were processed as nondrug exhibits.

17 Q.  And what did you do -- how did you do that?

18 A.  Oh, that was also putting them in DEA evidence bags and

19 sealing them, using the DEA Form 7A, a report to document their

20 acquisition, and then, ultimately, we shipped those via FedEx

21 to the United States.

22 Q.  Did you have the ability -- withdrawn.

23        Was the diplomatic pouch designated to go anywhere in

24 particular after arriving in the United States?

25 A.  The items -- there are many items in a given pouch

LADHLan2                          Kohut - Direct

1   shipment, and often they have different destinations.  So when

2   one puts -- submits them to the pouch, one has to designate

3   where it's going to go.  In this case it was DEA special

4   testing laboratory, and I marked that accordingly.

5   Q.  Where is that laboratory?

6   A.  It's in Virginia.

7   Q.  What about the other packaging that you said you shipped

8   via FedEx; where was that going?

9   A.  That went to the DEA office in New York.

10          MR. HELLMAN:  May I approach?

11          THE COURT:  Yes.

12  Q.  I've handed you what has been marked Government

13  Exhibit 101.  Do you recognize it?

14  A.  I do.

15  Q.  What is it?

16  A.  This is the evidence bag in which I sealed the cocaine that

17  I received on the 24th of June in Zagreb, Croatia.

18  Q.  How do you know that?

19  A.  Because of the markings and my signature on "sealed by" on

20  both the label and the sealed portion at the top of the bag.

21  Q.  Is there anything about the bag which has changed from the

22  last time you saw it?

23  A.  Yes.

24  Q.  What?

25  A.  For one, there's some additional stickers on the outside of

LADHLan2                          Kohut - Direct

1    the bag.  Additionally, on the bottom of the bag, it appears as

2    though that was opened and then later resealed.  Finally, on

3    the main evidence label itself, there's a portion at the bottom

4    noted "for laboratory use only."  That was blank when I sent it

5    to the lab.  Some portions of that have subsequently been

6    filled in.

7    Q.  What signatures, in particular, do you recognize on the

8    bag?

9    A.  My signature and that of my former supervisor, Matt

10   Fihlman.

11   Q.  Is the seal that you affixed to the bag still in place?

12   A.  It is, sir.

13   Q.  Can you tell if that seal has been opened?

14   A.  It has not been opened.

15   Q.  Is your signature also on that seal?

16   A.  It is.

17   Q.  Have you recently examined Government Exhibit 101?

18   A.  Yes.

19   Q.  When was that?

20   A.  Within the last couple of days.

21   Q.  Where?

22   A.  In the U.S. Attorney's Office.

23   Q.  Prior to that, when was the last time you saw it?

24   A.  When I would have put it into the pouch.

25   Q.  Now, I think in the witness booth with you are also

LADHLan2                          Kohut - Direct

1    Government Exhibits 102 and 103.

2    A.  Yes, sir.

3    Q.  Could you pick those up, please, starting with Government

4    Exhibit 102.

5         Do you recognize that?

6    A.  Yes.  One contains the packaging in which the drugs that

7    the Croatian police analyzed were placed, and the other

8    consists of bags of what I understand to be the original

9    packaging from the time of the seizure.

10   Q.  Do you recognize, are you able to, how many DEA evidence

11   bags -- starting with Government Exhibit 102, how many DEA

12   evidence bags do you see?

13   A.  Let's see.  I see at least two.  I can remove contents to

14   check?

15   Q.  Do you see a white strip of tape at the top, a white strip

16   of tape?

17   A.  Yes, I do, with the initials TM.

18   Q.  OK.  Is that tape open?

19   A.  It is.  It is open.

20   Q.  All right.  Yes, please remove the inner bag and tell us if

21   you recognize anything about that bag.

22   A.  Yes, this is the bag that we used to seal this evidence

23   once we received it from Inspector Sestak.

24   Q.  What do you recognize about that bag?

25   A.  I notice my name and signature, as well as my former boss

LADHLan2                          Kohut - Direct

1    on the main evidence label and as well on the original seal on

2    the top.

3    Q.  Does it appear that that bag has been opened since the time

4    you sealed it?

5    A.  It has.

6    Q.  Where on the bag was it opened?

7    A.  On the bottom.

8    Q.  Would you please take a look at Government Exhibit 103.

9    A.  Yes, sir.

10   Q.  What do you recognize about Government Exhibit 103?

11   A.  I see a New York DEA evidence label.  Below that is what

12   appears to be my original label.  However, the outer bag is

13   still sealed.

14   Q.  So the outermost bag, is that the bag that has the DEA

15   New York label on it?

16   A.  Yes, sir.

17   Q.  Do you recognize any of the names on that label?

18   A.  I recognize Special Agent Jeff Stratton.

19   Q.  All right.  Was there also a DEA New York label on the

20   outermost bag of Government Exhibit 102 that you just

21   inspected?

22   A.  Yes, sir, there is.

23   Q.  What name do you recognize from that label, if any?

24   A.  The same name, Special Agent Jeff Stratton.

25   Q.  Turning back to Government Exhibit 103, then, do you

LADHLan2                        Kohut - Direct

1    believe you can see a bag that you signed inside of that

2    exterior bag?

3    A.   Yes.   In fact, I see a portion of my name and my former

4    boss' name on the label of the innermost bag.

5    Q.   Is there a pair of scissors in the witness box?

6    A.   Not that I can see.

7    Q.   All right.  Well --

8    A.   Oh, I'm sorry.  Yes, down here I did see some.  I have

9    scissors.

10   Q.   Have you reviewed Government Exhibit 103 recently?

11   A.   Yes.

12   Q.   How recently?

13   A.   Within the past couple days at the U.S. Attorney's Office.

14   Q.   All right.  Just a moment, please.

15              May I approach?

16              THE COURT:  Yes.

17              (Counsel confer)

18   BY MR. HELLMAN:

19   Q.   All right.  I took Government Exhibit 103 from you, but

20   I've handed it back to you.

21              At this time I would like to ask that Mr. Kohut open

22   Government Exhibit -- the outermost bag of Government

23   Exhibit 103.

24              THE COURT:  All right.

25   A.   I have done so.

LADHLan2                    Kohut - Direct

1   Q.  All right.  Have you removed the outermost DEA bag from

2   Government Exhibit 103?

3   A.  Yes, sir.

4   Q.  Are you able to see the label now on Government Exhibit 103

5   that you were partially describing earlier?

6   A.  I am, yes.

7   Q.  What do you recognize about that label?

8   A.  I recognize that this documents the nondrug exhibit created

9   on that date after I received the material from Inspector

10  Sestak.  I see my name and signature and that of my former

11  boss, Matt Fihlman, on the label and on the seals at the top.

12          MR. HELLMAN:  Government offers Government Exhibit 103

13  in evidence.

14          THE COURT:  Any objection?

15          MR. TREMONTE:  Your Honor, may we have a moment to

16  confer?

17          THE COURT:  Yes.

18          (Counsel confer)

19          MS. CISTARO:  Your Honor, we would object to the

20  admission.

21          THE COURT:  All right.  Ladies and gentlemen, we're

22  going to take our midmorning recess.  Don't discuss the case.

23  Keep an open mind.  We'll be back to you in about 15 minutes or

24  so.  Thank you very much.

25          (Jury excused)

LADHLan2

```
1              (Jury not present)

2              THE COURT:  The witness can step down.

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  Please be seated.

5              What's the basis for the objection?

6              MS. CISTARO:  Judge, we're objecting under Rule 901.

7              THE COURT:  I can't hear you.

8              MS. CISTARO:  Judge, we're objecting under Rule 901.

9    We're not quite clear as to what the bag is purporting to be.

10   And its relevance in --

11             THE COURT:  All right.  You want to explain that,

12   Mr. Hellman.

13             MR. HELLMAN:  The witness has testified that the bag

14   is the bag that was provided to him by Inspector Sestak which

15   contained cocaine which he then sent to the DEA laboratory.

16   It's very clear what this bag is.

17             THE COURT:  Can I see the bag, please.

18             (Continued on next page)

19

20

21

22

23

24

25
```

Ladnlan3                          Kohut - Direct

1          THE COURT:  It seems to me the witness has described

2     the contents of the bag.  I guess I should say for the record

3     that Government Exhibit -- I am not seeing a government sticker

4     on this.

5          MR. HELLMAN:  I'm sorry, your Honor.  The outermost

6     bag was removed.

7          THE COURT:  Okay.

8          MR. HELLMAN:  I can provide it to your Honor.

9          THE COURT:  All right.  So this is Government Exhibit

10    103 that we are looking at.  I guess the first thing I should

11    say for the record is it doesn't include the cocaine.

12          It includes a brown paper bag bearing the markings of

13    the Croatian national police, and there's also a sticker on the

14    outside of the evidence bag from the Drug Enforcement

15    Administration.  So it frankly seemed to be a fairly innocuous

16    exhibit to me, but, anyway, tell me what your objection is.

17          MS. CISTARO:  Your Honor, if the government is

18    offering this exhibit for the purposes of Agent Kohut's

19    testimony, that he received this bag from Inspector Sestak,

20    then we don't have an objection to that.

21          THE COURT:  Does Landji have an objection to 103?

22          MS. RENZLER:  No, your Honor.

23          THE COURT:  All right.  So when the jury comes back I

24    will receive 103.

25          Mr. Hellman, how much longer do you have with the

Ladnlan3                    Kohut - Direct

1    agent?

2              MR. HELLMAN:  A question or two at most.

3              THE COURT:  All right.  How much cross-examination is

4    there going to be of Agent Kohut?

5              MS. CISTARO:  I don't anticipate it being very long at

6    all, your Honor.

7              MS. RENZLER:  Little, if any, your Honor.

8              THE COURT:  Okay.  So then who is next, Mr. Hellman?

9              MR. HELLMAN:  Mr. Cardona.

10             THE COURT:  Okay.  All right.

11             So we will take a recess.  Mr. Dunn?

12             MR. DUNN:  Your Honor, I just want to voice a concern

13   at about 9:45 this morning I found out that from the marshals

14   and my client that they have been ordered to pack up and

15   tomorrow morning they are going to MDC.

16             Based on that, I sent an e-mail to Nicole McFarland,

17   the legal person over at MCC, and asked to make arrangements to

18   see Mr. Adamu tonight.  I was advised that they don't have

19   attorney visits after the count, which is around 4:00.  I

20   explained the situation to her and she said she would get back

21   to me.  She understands, she would get back to me, but as of

22   now I haven't heard.  I just wanted to alert your Honor.

23             THE COURT:  All right.  Well, we will be breaking at

24   2:30.  Will you be able to see him then or not?

25             MR. DUNN:  I could, but it is my understanding in

1    discussions with the marshals that he gets back at 3:15, 3:30,

2    and that's when they basically start the count.  So the odds

3    are low.  But, again, I haven't heard back from Ms. McFarland

4    maybe things will change.  I will keep you apprised.

5           MR. BIALE:  It is our understanding from Mr. Landji

6    that the packing up included BOP officials taking all of his

7    discovery and everything that he had been using to participate

8    in his defense.  Hopefully he will get that back as soon as he

9    gets to the MDC, but I just wanted to alert the Court about

10   that concern.

11          THE COURT:  Mr. Hellman, could you please alert the

12   folks dealing with Mr. Landji's move that it is absolutely

13   critical that his legal materials get back to him given the

14   fact that we are in the middle of the trial.  I don't want to

15   hear from defense counsel that everything has been lost or it

16   hasn't been given to him because that risks disrupting the

17   trial.  So I am going to ask you either yourself or to have

18   somebody else get in touch with the people at the Bureau of

19   Prisons who are dealing with Mr. Landji's materials, explain

20   the significance of where we are, in the middle of trial, the

21   man needs access to his legal materials, and we can't have a

22   situation where everything gets lost, because if we do, then we

23   are going to have a delay in the trial.

24          So please try to make sure that this move goes forward

25   in such a way that we don't have a disruption caused by loss of

Ladnlan3                    Kohut - Direct

1  discovery and legal materials and so forth.  Okay?

2       MR. HELLMAN:  Yes.

3       MR. DUNN:  Your Honor, I just would note that concerns

4  Mr. Adamu too.

5       THE COURT:  Yes.  The same concern for Mr. Adamu.

6       MR. HELLMAN:  Of course.

7       THE COURT:  We are in the middle of trial.  I

8  understand they're closing down the MCC.  Obviously there's

9  nothing I can do about that, but what it does mean is that

10  these men are going to be moved, and it's critically important

11  that they have access to their materials after the move.

12       So we kind of need special handling.  That's what we

13  need.  We need special handling.  We are in the middle of

14  trial.  We can't have a disruption caused by loss of legal

15  papers.

16       MR. HELLMAN:  I will bring the resources of my office

17  to bear on this issue.  I understand that we are on a break

18  now, and Mr. Kohut's remaining testimony is brief, but in light

19  of the fact that the next witness is a cooperating witness in

20  custody, I imagine there will be a brief break at that time

21  where I can start making arrangements to address that issue.

22       THE COURT:  So you want me to send the jury out again?

23       MR. HELLMAN:  It's my understanding that that is

24  standard practice when an in-custody witness is brought out.

25       THE COURT:  All right.  Of course, nothing about this

Ladnlan3                    Kohut - Direct

1    whole proceeding is standard.

2           MR. HELLMAN:  Of course.

3           THE COURT:  There isn't anything that's standard

4    that's going on.  One of the things that's not standard it

5    takes about ten minutes to get the jury back and forth.  But if

6    that's what we have to do, that's what we have to do.  So if

7    you're telling me I need to take another recess, frankly, if I

8    knew that I wouldn't have taken a recess then.  I would have

9    pushed through with Kohut and finished him and then taken a

10   recess.  But lesson learned.  If I have to take a recess after

11   Agent Kohut is done, then that's what I will do.

12          All right.  We'll take about ten more minutes, I

13   guess.

14          (Recess)

15          THE COURT:  Please be seated.

16          MR. HELLMAN:  Your Honor, I during the intervening

17   period reached out to Nicole McFarland about that issue, and I

18   will advise the Court if I hear back, that is, the return of

19   the defendants' papers.

20          Secondly, I conferred with the U.S. marshals assisting

21   with the trial.  They are able to bring Mr. Cardona out while

22   the jury is present, so there's no need to take a second break.

23          THE COURT:  All right.  Thank you, sir.

24          MS. TARLOW:  Your Honor, may I address one additional

25   logistical issue.

Ladnlan3                          Kohut - Direct

1          We expect that when Mr. Cardona is testifying, he will

2     testify about certain recordings for which government has

3     transcripts in a transcript binder.  We can distribute those

4     transcript binders at the appropriate time to the jurors or we

5     can place them on their chairs now, whatever your Honor

6     prefers.

7          THE COURT:  Why don't you place them under their

8     chairs.

9          MS. TARLOW:  Thank you, your Honor.

10          THE COURT:  Agent Kohut can retake the stand.

11          (Witness resumed)

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Ladnlan3                      Kohut - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Mr. Hellman, is the government offering Government

4     Exhibit 103?

5              MR. HELLMAN:  Yes.

6              THE COURT:  I understand there's no objection to 103.

7              MS. RENZLER:  Correct, your Honor.

8              MS. CISTARO:  That's correct, your Honor.

9              THE COURT:  All right.

10             Government Exhibit 103 is received.

11             (Government Exhibit 103 received in evidence)

12             THE COURT:  Please proceed, Mr. Hellman.

13    BY MR. HELLMAN:

14    Q.  Mr. Kohut, do you still have the interior DEA evidence bag

15    from Government Exhibit 103 with you?

16    A.  Yes, sir, I do.

17    Q.  Could you pick it up.

18    A.  I have it with me, sir.

19    Q.  So now inside of that evidence bag is -- what's inside that

20    evidence bag?

21    A.  Some brown paper wrapping and a label in white paper.

22    Q.  What do you believe that bag to be?

23    A.  The packaging which the cocaine that was turned over to me

24    on the 24th of June came in.

25    Q.  Are you able to read that label?

Ladnlan3                    Kohut - Cross

1    A.  Yes.

2    Q.  What does it say?

3    A.  It notes, from the Republic of Croatia, Ministry of

4    Internal Affairs, Center for Forensic Testing and Analysis,

5    Ivan Vucidic.  And it notes here from the headquarters of the

6    police, criminal police service, organized crime fight against

7    corruption service, service for drugs, in the matter of John

8    Claude Okongo Landji.

9              MR. HELLMAN:  No other questions.

10             THE COURT:  Cross-examination.

11             MS. RENZLER:  Nothing for Mr. Landji.

12             THE COURT:  All right.

13             MS. CISTARO:  Yes, your Honor.

14             Thank you.

15   CROSS-EXAMINATION

16   BY MS. CISTARO:

17   Q.  Good afternoon, Agent Kohut.

18   A.  Good afternoon, ma'am.

19   Q.  You are aware that allegedly one kilo of cocaine was found

20   on the aircraft on October 30, 2018, correct?

21   A.  I am aware of that, yes.

22   Q.  And you are aware that it was found in a storage closet,

23   correct?

24   A.  It was found on an airplane.

25   Q.  Okay.  Through your investigation at some point you learned

Ladnlan3                    Kohut - Cross

1    that it was found in the storage closet, correct?

2                MR. HELLMAN:  Objection.

3                THE COURT:  Sustained.

4    BY MS. CISTARO:

5    Q.  Isn't it true that the Croatian police maintained custody

6    of the alleged kilo of cocaine?

7    A.  Yes.

8    Q.  And the Croatian police also processed the drugs, correct?

9    A.  Yes.

10   Q.  And it's your understanding that the drugs were seized on

11   October 31, 2018, correct?

12   A.  I don't recall if it was the 30th or 31st, but it was

13   around that time, yes.

14   Q.  And you reviewed your reports, case notes, and other

15   documents in preparation of your testimony today, correct?

16   A.  Some of them, yes.

17   Q.  Okay.  As part of your job, you completed certain DEA

18   forms, correct?

19   A.  That is correct.

20                MS. CISTARO:  Judge, may I approach the witness?

21                THE COURT:  Yes.

22   BY MS. CISTARO:

23   Q.  I'm showing the witness what's been marked for

24   identification purposes as Defense Exhibit AAA.

25                Do you recognize that document?

Ladnlan3                          Kohut - Cross

1    A.  Yes, ma'am, I do.

2    Q.  And what do you recognize it to be?

3    A.  It's a DEA Form 7 documenting what DEA refers to as an

4    information-only report of seizure of approximately one

5    kilogram of suspected cocaine on October 30, 2018.

6    Q.  And that document bears your signature, correct?

7    A.  It does not, but I prepared the form.

8    Q.  Sir, do you see an item No. 24, backslash, S, backslash --

9    A.  Yes.

10   Q.  -- Anton C. Kohut Special Agent?

11   A.  Yes.

12   Q.  That is your electronic signature?

13   A.  Ah, yes, that's correct, yes.

14   Q.  Below your electronic signature is October 2, 2018,

15   correct?

16           MR. HELLMAN:  Your Honor, I have an objection.

17           THE COURT:  Grounds?

18           MR. HELLMAN:  The document has been handed to the

19   witness.  I don't understand the hearsay exceptions.

20           THE COURT:  Are you offering the exhibit?

21           MS. CISTARO:  Yes, your Honor, I am going to move to

22   admit Defense Exhibit AAA.

23           THE COURT:  Do you object?

24           MR. HELLMAN:  No, that's fine.

25           THE COURT:  Defense Exhibit AAA is received in

Ladnlan3                         Kohut - Cross

1    evidence.

2              (Defense Exhibit AAA received in evidence)

3    BY MS. CISTARO:

4    Q.  As I stated, Agent Kohut, the date below your electronic

5    signature is October 2, 2018, correct.

6    A.  I see that, yes.

7    Q.  And that's 28 days before the aircraft even arrived in

8    Zagreb, Croatia, isn't that true?

9    A.  That is true, yes, ma'am.

10   Q.  In the remarks portion, No. 23, you also indicate that the

11   Croatian customs officials found a kilo of cocaine on October

12   30, 2019, isn't that correct?

13   A.  That is correct.

14   Q.  Which is a year after the alleged cocaine was found in the

15   storage closet of the aircraft, correct?

16   A.  That is correct.

17   Q.  And your supervisor at the time, Special Agent Matthew

18   Fihlman, he signed this document on September 13, 2019,

19   correct?

20   A.  Yes.  That's what's on the paper.

21   Q.  Again, the Croatian officials maintained custody of the

22   drugs, correct?

23   A.  Yes.

24   Q.  On direct examination you indicated that you met with

25   Inspector Ivica Sestak on June 24, correct?

Ladnlan3                    Kohut - Cross

1   A.  Of 2020, yes.

2   Q.  At that time you met in order to obtain a kilo of cocaine,

3   true?

4   A.  Yes, ma'am.

5   Q.  And you indicated that was the first time you had seen the

6   drugs in this case at all, correct?

7   A.  That is correct, yes, ma'am.

8   Q.  So you do not know how the alleged kilo of cocaine was

9   maintained with the Croatian national police, true?

10  A.  If you mean precisely where and by whom within the Croatian

11  police, no, I do not.

12  Q.  Okay.  On June 24, 2020, you took custody of the drugs,

13  correct?

14  A.  Yes, ma'am.

15          MS. CISTARO:  Your Honor, may I approach the witness?

16          THE COURT:  Yes.

17  Q.  I'm showing you what's been marked as Defense Exhibit BBB

18  for identification purposes.  Do you recognize that document?

19  A.  Yes, ma'am, I do.

20  Q.  How do you recognize that document?

21  A.  I see the Zagreb -- actually, I don't see the Zagreb case

22  number.  I do see my name and my then supervisor's name, and I

23  recognize this is a DEA Form 7.

24  Q.  And that document also bears your electronic signature in

25  item No. 24, correct?

Ladnlan3                        Kohut – Cross

1    A.  That is correct.

2            MS. CISTARO:  Your Honor, we would move to admit

3    Defense Exhibit BBB.

4            THE COURT:  Any objection?

5            MR. HELLMAN:  That's fine.

6            THE COURT:  Defense Exhibit BBB is received.

7            (Defense Exhibit BBB received in evidence)

8    Q.  In that document, Agent Kohut, you indicated that you met

9    with Ivica Sestak on June 24, 2020, correct?

10   A.  That is correct.

11   Q.  You took custody of the drugs, correct?

12   A.  Yes.

13   Q.  And you have no idea how those drugs were maintained by the

14   Croatian police department from October 30 to June 24, 2020?

15   A.  I would imagine it was maintained in accordance with

16   Croatian police protocol.

17   Q.  Okay.  But your own personal knowledge, you do not have any

18   personal knowledge with respect to how those drugs were

19   maintained with the Croatian law enforcement authorities,

20   correct?

21   A.  That is correct.

22   Q.  Now, on this document it also indicates that your

23   supervisor, Special Agent Matthew Fihlman, signed off on this

24   document on September 28, 2020, correct?

25   A.  Yes.

Ladnlan3                        Kohut - Cross

Q.   Okay.  Your testimony on direct examination is that you had

placed the drugs in an embassy pouch?

A.   That's correct.

Q.   And then that pouch was given to a courier?

A.   Yes.  The embassy organization organized periodically what

is called a diplomatic pouch run, where several packages from

the embassy, this being just one of them, are sent as one

collective shipment accompanied by a diplomatic courier.

Q.   Now, prior to that, you separated the packaging from the

cocaine and you shipped them in separate mailings, correct?

A.   That's correct.

Q.   In fact, you took the packaging from the cocaine, and you

sent it via Federal Express, by mail, correct?

A.   That's correct, yes.  Either that or UPS.  Usually it's

FedEx.

Q.   Okay.  So you didn't have any personal knowledge as to what

happened to that packaging from the moment you put it in the

envelope, correct?

A.   Other than knowing that it was received on the other end.

Q.   Now, when the drugs were kept in the Croatian police

department, it's fair to say you don't know who had access to

those drugs either, correct?

A.   No, I don't know any list of individuals who had access.

Q.   At the embassy, when you dropped off the pouch, you don't

know who, if anyone, had access to that pouch prior to it being

Ladnlan3                         Kohut – Cross

1    delivered to the courier, correct?

2    A.   Actually, that room, that specific vault room is very well

3    controlled by the embassy, I believe there's only two or three

4    individuals at a given embassy who are authorized to access

5    that room.

6    Q.   Okay.  Then, your personal knowledge, you have no idea if

7    anyone accessed that pouch, correct?

8    A.   I did not maintain any visual observation of it after such

9    time that I deposited it in the pouch for shipment.

10   Q.   So you had no visual observation from the time you dropped

11   it off to the time it was delivered in the United States, isn't

12   that true?

13   A.   That is correct, ma'am, yes.

14   Q.   So from June 24, 2020, to September 10, 2020, you had no

15   personal knowledge as to whether anyone accessed the drugs,

16   correct?

17   A.   Correct.

18   Q.   In fact, the drugs were not delivered to the Department of

19   Justice DEA administration special testing and research

20   laboratory until September 10, 2020, isn't that true?

21            MR. HELLMAN:  Objection.  Foundation.

22            THE COURT:  Overruled.

23   A.   I don't know the exact date, ma'am --

24   Q.   Okay.

25   A.   -- when they were --

Ladnlan3                        Kohut - Cross

1    Q.  Would showing you this document refresh your recollection?

2    A.  Which document?

3    Q.  I can't hear.  I'm sorry.

4            THE COURT:  What document?

5    Q.  I'm showing you the lab report that indicates when the

6    drugs were received.

7            THE COURT:  All right.  If you want to approach to

8    hand him something, you may do that.

9            MS. CISTARO:  Thank you, your Honor.

10           THE COURT:  If you are going to show him something, it

11   has to be marked as an exhibit.

12           MS. CISTARO:  It is, your Honor.

13           THE COURT:  Okay.

14   Q.  I'm showing you what's been marked as Defense Exhibit CCC

15   for identification purposes only.  Please read that document

16   over and look up when you're finished.

17           Now, according to that document, which is the

18   laboratory in the United States, in Virginia, the laboratory

19   received the drugs --

20           MR. HELLMAN:  Objection.

21           THE COURT:  Sustained.  You have to ask a question.

22   BY MS. CISTARO:

23   Q.  Does that document refresh your recollection as to when the

24   drugs were received by the laboratory?

25   A.  Well, I had no prior knowledge or recollection of the date,

Ladnlan3                          Kohut – Cross

1    but as I look at it I see a date on here.

2    Q.  Okay.  So that refreshes your recollection, correct?

3            MR. HELLMAN:  Objection.

4            THE COURT:  No, he said he never knew, so it can't

5    refresh his recollection.

6            MS. CISTARO:  Okay.  May I approach to take that?

7            THE COURT:  Of course.

8            MS. CISTARO:  Thank you.

9    BY MS. CISTARO:

10   Q.  When you received the packaging and the kilo of cocaine

11   from Inspector Sestak, you didn't have those packaging dusted

12   for fingerprints, correct?

13   A.  I did not, no.

14   Q.  And you didn't have it checked for DNA, correct?

15   A.  I did not have means of doing that in Zagreb, no.

16   Q.  To your knowledge, the Croatian police department didn't

17   advise you that they had dusted for fingerprints, correct?

18   A.  I don't recall one way or the other.

19   Q.  And they also did not advise you that there was any DNA

20   testing done on the packaging, correct?

21   A.  I don't recall that either.

22           MS. CISTARO:  Thank you.  I have no further questions.

23           THE COURT:  All right.

24           Anything else, Mr. Hellman?

25           MR. HELLMAN:  Briefly.

Ladnlan3                         Kohut – Redirect

1    REDIRECT EXAMINATION

2    BY MR. HELLMAN:

3    Q.  Mr. Kohut, do you still have Defense AAA in front of you?

4    A.  I do not.

5           MR. HELLMAN:  May I approach?

6           THE COURT:  Yes.

7    BY MR. HELLMAN:

8    Q.  Do you have it now?

9    A.  I do, sir.

10   Q.  Were you asked questions about dates that appear on that

11   form?

12   A.  Yes, I remember.

13   Q.  What is your understanding of the dates that are on that

14   form with respect to your signature?

15   A.  That the dates that were typed in and filled on this in

16   some cases are before or after the event.

17   Q.  Why is that?

18   A.  These were typos, administrative errors, typos.

19   Q.  I'm sorry?

20   A.  Typos.

21   Q.  What is Defense Exhibit AAA?  What kind of a form is that?

22   A.  It is a DEA 7.

23   Q.  What is the purpose of a DEA 7?

24   A.  Report of drug property collected, purchased, or seized.

25   Q.  And what particular property is memorialized in that DEA 7?

Ladnlan3                        Kohut – Redirect

1    A.   Brick-shaped object containing approximately one kilogram

2    of cocaine reported for information purposes.

3    Q.   What does that mean?

4    A.   Information purposes?

5    Q.   Yes.

6    A.   It means that DEA never took custody of this item.  There

7    was no actual seizure.  This is a mechanism that DEA uses to

8    simply report an event that happened by another law enforcement

9    agency, in this case the seizure of cocaine by the Croatian

10   police.

11   Q.   Why create such a form?  What's the purpose?

12   A.   It's a requirement just to keep track and records of

13   statistics, amounts of drugs seized, amounts of drugs that were

14   obtained relative to a given investigation.

15   Q.   Did you have an understanding that the drugs seized as

16   memorialized in that Form 7 would eventually be used in

17   connection with a United States prosecution?

18   A.   I imagine that it would.

19   Q.   Is that part of why the form is created?

20   A.   Yes.  Although whenever we do any sort of bilateral or

21   multilateral investigation, if foreign counterparts do a

22   seizure, we would prepare this form in any case, even if the

23   drugs weren't coming to the U.S.

24   Q.   Did you prepare a separate form when you actually received

25   drug evidence in this case?

Ladnlan3                        Kohut - Redirect

1    A.  I did.  I believe that was Exhibit BBB.

2    Q.  BBB that you viewed previously?

3    A.  Yes.  Either that or the CCC.  I think it was BBB.

4    Q.  That is the form this memorializes your actual receipt of

5    the property?

6    A.  That is correct, sir.

7              MR. HELLMAN:  I have no other questions.

8              Unless there is any reason not to, I would ask Special

9    Agent Kohut to seal Government Exhibit 103.

10             THE COURT:  All right.  Please seal it, Mr. Kohut.

11             THE WITNESS:  Yes, your Honor.

12             MR. HELLMAN:  Sorry, if I could, just one other

13   question.

14             THE COURT:  Go ahead, Mr. Hellman.

15   BY MR. HELLMAN:

16   Q.  Mr. Kohut, with respect to Defense Exhibit AAA, if there

17   are dates in that form which you say are in error, what are

18   those dates and what should they be?

19   A.  Well, under my signature it lists the 2nd of October, 2018.

20   That should have been on or immediately after shortly after

21   10/30/2018.

22             The supervisor signature is 9/13/2019.  Again, that

23   should have been sometime shortly after the end of October of

24   2018.

25             MS. CISTARO:  Objection.  Speculation.

Ladnlan3                    Kohut - Redirect

1              THE COURT:  Sustained.

2     BY MR. HELLMAN:

3     Q.  With respect only to dates that you personally entered on

4     that form, which date would that be?

5     A.  There were two.  Actually, I entered the date on three

6     different occasions.  On the top, in item 7, 10/30/2018.  In

7     Section 23 the narrative section, I wrote 10/30/2019.  That

8     should have been 10/30/2018.  And then below my signature is

9     listed 10/2/2018.  That should have been on or after

10    10/30/2018.

11    Q.  So the correct date is the first one that you had marked on

12    the form?

13    A.  Yes, correct.

14    Q.  May I approach the witness with tape and a marker?

15              THE COURT:  Yes.

16              MR. HELLMAN:  Thank you.  No other questions.

17              MS. RENZLER:  Your Honor, I just have one clarifying

18    question.

19              THE COURT:  He has not finished yet.

20              (Continued on next page)

21

22

23

24

25

LADHLan4                          Kohut - Cross

1          THE COURT:  Anything else, Mr. Hellman?

2     BY MR. HELLMAN:

3     Q.  Mr. Kohut, did you place tape and your signature over

4     closures of bags which are marked Government Exhibit 102 and

5     103 just now?

6     A.  Yes, sir, I did.

7          MR. HELLMAN:  That's all.

8          THE COURT:  All right.  Ms. Renzler, did you have

9     something?

10         MS. RENZLER:  Yes, just one question, your Honor.

11         THE COURT:  All right.

12    CROSS-EXAMINATION

13    BY MS. RENZLER:

14    Q.  Good afternoon.

15    A.  Good afternoon, ma'am.

16    Q.  I just want to make sure the record is clear on one point.

17    Just to confirm, you received the packaging in Government

18    Exhibit 102 separately from the alleged cocaine, correct?

19    A.  At the same time I received them, yes.

20    Q.  But they were separated from each other?

21    A.  I believe, as I recall, Inspector Sestak opened the

22    packaging to show me the actual exhibit at that time when I

23    received them.

24         MS. RENZLER:  Thank you.

25         THE COURT:  All right.  Anything else?

LADHLan4                    Kohut - Recross

1              MS. CISTARO:  Yes, your Honor, just a few questions.

2   RECROSS EXAMINATION

3   BY MS. CISTARO:

4   Q.  Agent Kohut, it's your testimony is that the multiple

5   errors in Defense Exhibit AAA are just typos?

6   A.  Yes, those are administrative errors.

7   Q.  And it's your testimony that your signature that predates

8   the arrival of the aircraft in Croatia is just a typo?

9   A.  The date is not auto-populated when an electronic signature

10  is done in our signature.

11  Q.  So you signed the document attesting to your signature and

12  the contents of that document, and you're saying it was

13  auto-generated?

14  A.  No, I'm not saying -- I'm saying the opposite.  That date

15  is not auto-generated.

16  Q.  OK.

17  A.  It is manually input.

18  Q.  So that's a typo, correct?

19  A.  Correct.

20  Q.  And that typo is 28 days prior to the arrival of the

21  aircraft in Croatia, true?

22  A.  That is correct, yes, ma'am.

23  Q.  So it's fair to say that you've made multiple mistakes,

24  correct?

25  A.  I made some administrative errors on this form, yes, ma'am.

1          MS. CISTARO:  Thank you.  No further questions.

2          THE COURT:  All right.  Anything else?

3          MR. HELLMAN:  No, thank you.

4          THE COURT:  All right.  You may step down, sir.

5          THE WITNESS:  Thank you, your Honor.

6          (Witness excused)

7          THE COURT:  All right.  The government can call its

8   next witness.

9          MR. HELLMAN:  The government calls David

10  Cardona-Cardona.  Your Honor, if I may, I'll remove the

11  exhibits from the witness stand.

12         THE COURT:  Yes, please do.  Thank you.

13  DAVID CARDONA-CARDONA,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16         THE COURT:  Please proceed.

17         MS. TARLOW:  Thank you, your Honor.

18  DIRECT EXAMINATION

19  BY MS. TARLOW:

20  Q.  Good afternoon.  What is your full name?

21  A.  My name is David Cardona-Cardona.

22  Q.  Do you have any nicknames?

23  A.  Yes.  Ramon, Carlos, them.

24  Q.  How old are you?

25  A.  I'm 57 years old.

LADHLan4                          Cardona-Cardona - Direct

1    Q.  And where were you born?

2    A.  I was born in the city of Pereira, Colombia.

3    Q.  Where do you live?

4          THE COURT:  Can you spell that, the name of the place.

5          THE WITNESS:  P-e-r-e-i-r-a, Pereira.

6          THE COURT:  Go ahead.

7    Q.  And where do you live now?

8    A.  Right now I live in Newark, in prison.

9    Q.  What crimes are you currently in prison for?

10   A.  I'm in for conspiracy to transport and distribute cocaine,

11   conspiracy to transport and distribute weapons, and conspiracy

12   of narco-terrorism.

13   Q.  Did you plead guilty to those crimes?

14   A.  Yes.

15   Q.  And did you make that plea with a cooperation agreement?

16   A.  Yes.

17   Q.  As you sit here today, do you face a mandatory minimum

18   sentence?

19   A.  Yes.

20   Q.  What is that mandatory minimum sentence?

21   A.  Twenty years.

22   Q.  Approximately when did you commit the crimes that you have

23   pled guilty to?

24   A.  Between October of 2017 and October of 2018.

25   Q.  What kinds of drugs did you plead guilty to conspiring to

1   distribute?

2   A.   Cocaine.

3   Q.   Did you distribute cocaine by yourself or with others?

4   A.   With others.

5   Q.   So now I'd like you to look around the courtroom.  Do you

6   recognize anyone with whom you distributed drugs?

7   A.   Yes, I actually do.  So to my right at a diagonal is Jibril

8   Adamu, and Jean-Claude is right behind him.

9   Q.   Can you please first identify Mr. Adamu by an article of

10  clothing that he is wearing.

11  A.   Yes.  He's wearing a light gray jacket, suit jacket, and a

12  light blue shirt under his jacket, and he is to the right of an

13  older gentleman with salt-and-pepper hair.

14           MS. TARLOW:  Your Honor, let the record reflect that

15  the witness has identified Mr. Adamu.

16           THE COURT:  Yes, the record will so reflect.

17  Q.   Mr. Cardona, can you please now identify Mr. Landji by an

18  article of clothing that he is wearing.

19  A.   Yes.  He's wearing a darker suit jacket, and he's right

20  behind Jibril.

21           MS. TARLOW:  Your Honor, let the record reflect that

22  the witness has identified Mr. Landji.

23           THE COURT:  The record will so reflect.

24           MS. TARLOW:  Mr. Minikel, can you please pull up what

25  is marked for identification as Government Exhibit 201 for the

1    Court, the witness, and the parties.

2    Q.  Do you recognize who this is?

3    A.  Yes.  This is Jean-Claude.

4        MS. TARLOW:  And now, Mr. Minikel, if you can please

5    show the witness, the Court, and the parties, Government

6    Exhibit 202.

7    Q.  Do you recognize who this is?

8    A.  This is Jibril Adamu.

9        MS. TARLOW:  And now, Mr. Minikel, if you can please

10   pull up what is marked for identification as Government

11   Exhibit 205 for the Court, witness, and parties.

12   Q.  Do you recognize who that is?

13   A.  Yes, that's me.

14       MS. TARLOW:  Your Honor, the government offers

15   Government Exhibits 201, 202, and 205 into evidence.

16       THE COURT:  Any objection?

17       MR. BIALE:  No objection.

18       MR. DUNN:  No, your Honor.

19       THE COURT:  Government Exhibits 201, 202, and 205 are

20   received.

21       (Government's Exhibits 201, 202, and 205 received in

22   evidence)

23       MS. TARLOW:  Your Honor, permission to publish

24   Government Exhibit 201?

25       THE COURT:  Yes.

LADHLan4                    Cardona-Cardona - Direct

1  BY MS. TARLOW:

2  Q.  Mr. Cardona, you testified that this is a photograph of

3  Mr. Landji?

4  A.  Yes, correct.

5  Q.  Do you know Mr. Landji by any other names?

6  A.  Yes.  I know him as JC, Mr. Dishonest.  There are others.

7  Those are the ones I remember now.  We also called him 419.

8  Q.  And what does "419" refer to?

9  A.  419 is used in Africa to refer to people who are kind of

10  casual.  They don't behave the right way in their commitments.

11  And it's a reference to an article in the Nigerian criminal

12  code.  No. 419 is the code that has to do with fraud.  So it's

13  like a play on words.

14       MS. TARLOW:  Mr. Minikel, please publish for the jury

15  Government Exhibit 202.

16  Q.  Mr. Cardona, you testified that this photograph depicts

17  Mr. Adamu?

18  A.  Yes, that's correct.

19  Q.  Do you know him by any other names?

20  A.  Jibril, always Jibril.

21  Q.  I'm going to refer to Mr. Landji and Mr. Adamu moving

22  forward as the defendants.  Do you understand?

23  A.  Yes.

24  Q.  You testified a moment ago that there came a time when you

25  began to distribute cocaine with the defendants, is that right?

1    A.  Yes, that's correct.

2    Q.  When did you first start selling drugs?

3    A.  In '90 in Italy.

4    Q.  What kind of drugs?

5    A.  Cocaine.

6    Q.  Have you ever sold any other types of drugs?

7    A.  None at all.

8    Q.  Approximately when did you first agree to distribute

9    cocaine with the defendants?

10   A.  In approximately 2009.

11   Q.  Did you ever work with the defendants on any dealings that

12   were not drug related?

13   A.  No.

14   Q.  I'd like you to turn your attention to approximately 2017.

15   A.  Okay.

16   Q.  What did you agree to do with the defendants at that time?

17   A.  So in '17, in 2017, we agreed to use Jean-Claude's plane to

18   traffic cocaine between South America, Africa, and Europe.

19   Q.  And how much cocaine did you agree to distribute with the

20   defendants?

21   A.  The plane's capacity is two tons, slightly more than that.

22   Q.  And you agreed to transport using that plane approximately

23   two tons of cocaine?

24   A.  Yes, that's correct.

25   Q.  How often did you agree to distribute that quantity?

1    A.  The plan was to use it every two weeks.  Maybe have a trip

2    go out every two weeks, every month.

3    Q.  Who else other than the defendants were you going to

4    distribute the cocaine with?

5    A.  With Rambo, Domingo, Paco, Pacero, Richard, and Gordo.

6    Q.  So I would like to discuss each of those individuals in

7    turn.

8    A.  Very well.

9    Q.  Starting with Rambo, what was Rambo's role in this scheme?

10   A.  Rambo was the liaison between a group of people in Europe

11   who sold cocaine.  Domingo was his associate.

12   Q.  What else were Rambo and Domingo going to invest in?

13   A.  They were going to invest in the building up of

14   Jean-Claude's company to be able to buy new planes, have more

15   operational abilities, and then be able to expand in different

16   scenarios.

17   Q.  What were those new planes going to be used for?

18   A.  They were going to be used to transport cocaine, to have

19   further range, and -- further range and more operational

20   capacity.

21   Q.  What do you mean by "further range"?

22   A.  We would be able to do this at a longer range, so we would

23   be able to travel longer distances.

24   Q.  What do you mean by additional operational capacity?

25   A.  So what I'm referring to, as far as cocaine trafficking

LADHLan4                        Cardona-Cardona - Direct

1    goes, is that what usually happens is that many different

2    scenarios present themselves.  For example, you operate on

3    landing strips that are makeshift, that are just made on the

4    fly, and when you operate from an airport, you do -- you use

5    different kinds of planes.  So there is a different scenario.

6    Q.  So was part of the plan to purchase different types of

7    planes for those different scenarios you just described?

8    A.  Yes, that's correct.

9    Q.  You also testified that someone named Richard was involved

10   in this scheme to distribute cocaine, is that right?

11   A.  That's correct.

12   Q.  What was Richard's role?

13   A.  Richard's role was to provide logistical support for

14   landing in the Western Sahara and also to provide the cocaine

15   in Suriname, for it to be transported.

16   Q.  What do you mean by providing logistical support for

17   landing in the Western Sahara?

18   A.  Yes.  So landing in the Western Sahara takes place on

19   makeshift landing strips, and so on land you always need to

20   have fuel, communication, lights, transportation, all of these

21   things with respect to logistics, in order to be able to carry

22   out your operation.

23   Q.  What kind of operation are you referring to?

24   A.  The operation would be to land planes that are carrying

25   cocaine.  The transportation of cocaine, that's what it was, of

LADHLan4                    Cardona-Cardona – Direct

1    course.

2    Q.  Why would you use a makeshift landing strip for that type

3    of operation?

4    A.  Because these were completely clandestine.  They were

5    always clandestine, and as such, being clandestine, you always

6    operated in that way.

7            MR. BIALE:  Objection.  Sorry, your Honor.  I don't

8    know if you heard me.  Objection.

9            THE COURT:  You object to what?

10           MR. BIALE:  The discussion of always -- can we get

11   specific about what he's --

12           THE COURT:  Overruled.

13           What do you mean by clandestine?

14           THE WITNESS:  By clandestine I mean that it is done

15   completely in far away places, hidden far away from other

16   people's eyes, curious people's eyes, far away from the

17   authorities.

18   BY MS. TARLOW:

19   Q.  You testified earlier that someone named Gordo was also

20   involved in this scheme to distribute cocaine.  Who is Gordo?

21   A.  Gordo was Richard's associate, and he was one of the

22   investors in the operation.  And, of course, that would be the

23   transportation of cocaine operation.

24   Q.  Was there also someone named Youssouf Fofana who was

25   involved in this agreement to distribute cocaine?

LADHLan4                          Cardona-Cardona - Direct

1   A.  Yes, Youssouf Fofana also, yes.

2   Q.  So I'm now showing you, the Court, and the parties what has

3   been marked for identification as Government Exhibit 203.

4           Do you recognize this photograph?

5   A.  Yes.

6   Q.  Who does it depict?

7   A.  This is Youssouf Fofana.

8           MS. TARLOW:  Your Honor, the government offers

9   Government Exhibit 203.

10          THE COURT:  Any objection?

11          MR. BIALE:  No objection.

12          MR. DUNN:  No, your Honor.

13          THE COURT:  Government Exhibit 203 is received.

14          (Government's Exhibit 203 received in evidence)

15          MS. TARLOW:  Mr. Minikel, please publish Government

16  Exhibit 203.

17  BY MS. TARLOW:

18  Q.  How did you know Fofana?

19  A.  I met Fofana since -- in 2009 when I trafficked cocaine in

20  Western Africa.  He was one of my customers, my buyers.

21  Q.  Buyer of what?

22  A.  Buyers of cocaine.

23  Q.  And what role did Fofana play in this particular scheme

24  with the defendants to distribute cocaine?

25  A.  Fofana always was the bridge, the link of communications

1    between myself and Jean-Claude and Jibril.

2    Q.  And why did he serve in that role?

3    A.  Because I was traveling a lot, and I didn't want to have

4    communications from Colombia to Mali for fear of being

5    intercepted.  So I assigned him to be always in charge, to be

6    in contact with them, with Jibril and Jean-Claude, and also to

7    keep me informed.  And also, he was a person that acted in a

8    way so that there was also always a good report within the

9    group.

10   Q.  What kinds of things would he report to you?  What kind of

11   information would he relay?

12   A.  For instance, he would keep me up to date about how the

13   repairs of the airplanes were going.  If there was a need to

14   find something in Africa or to get in contact with somebody in

15   Africa, he was the person in charge of that.

16   Q.  What do you mean by "a need to find something in Africa"?

17   A.  Say, for instance, if there was a need to find drugs or

18   cocaine, he always knew where they were in Africa, or if you

19   need to find a good contact in one of the countries of Western

20   Africa, he always knew the appropriate people.  He always knew

21   how to move about over there.

22   Q.  What were the defendants' roles in this scheme to

23   distribute the cocaine?

24   A.  To take the plane, for transportation.

25   Q.  And where were they going to distribute the cocaine to?

LADHLan4                         Cardona-Cardona – Direct

1   A.   The cocaine was going to be distributed in West Africa and

2   in Europe.

3   Q.   And where was the cocaine going to come from?

4   A.   The cocaine had three possible ways:  One was Venezuela,

5   the another one was British Guyana, and the other was Suriname.

6   Q.   And it was going to be transported on planes flown by the

7   defendants?

8            MR. BIALE:  Objection.

9            THE COURT:  Sustained.

10  Q.   Who was going to fly the planes from the points just

11  identified to the locations in Africa and Europe with drugs on

12  board?

13  A.   Jean-Claude and Jibril.

14  Q.   I am now showing you, the Court, and the parties what is

15  marked for identification as Government Exhibit 236.

16           Do you recognize this?

17  A.   Yes.

18  Q.   What is it?

19  A.   Those are the departure and destination routes of the

20  cocaine.

21  Q.   For the operation that you've just described involving the

22  defendants?

23  A.   Correct.

24           MS. TARLOW:  Your Honor, the government offers

25  Government Exhibit 236.

LADHLan4                         Cardona-Cardona - Direct

1          MR. BIALE:  Can I do brief voir dire, your Honor?

2          THE COURT:  Yes.

3     VOIR DIRE EXAMINATION

4     BY MR. BIALE:

5     Q.  Sir, did you prepare this document?

6     A.  Which document?

7     Q.  Document that you're looking at which is marked for

8     identification as Government Exhibit 236, did you prepare this

9     document?

10    A.  I gave the points of departure and the destination

11    location.

12    Q.  My question is did you prepare this document?  Did you

13    create this document that's marked for identification as

14    Government Exhibit 236?

15    A.  OK.  I did not do it physically with my own hands.  I

16    provided the information in order for it to be done.

17    Q.  Do you know who prepared this document?

18    A.  No.

19    Q.  You weren't present when the document was prepared?

20    A.  No.

21         MR. BIALE:  Your Honor, we object to the admission of

22    Government Exhibit 236.

23         THE COURT:  The objection's overruled.

24         MR. DUNN:  Your Honor, for the record, I join in that

25    too.

1          THE COURT:  Government Exhibit 236 is received.

2          (Government's Exhibit 236 received in evidence)

3          MS. TARLOW:  Thank you, your Honor.  May we publish

4    Government Exhibit 236?

5          THE COURT:  You may.

6    DIRECT EXAMINATION CONTINUED

7    BY MS. TARLOW:

8    Q.  So now using Government Exhibit 236, can you please explain

9    what locations in South America are approximately identified on

10   this map.

11   A.  Yes.  The points of departure for loading the cocaine are

12   Venezuela.  You can see is identified with the first line.

13   Then British Guyana and then Suriname.  And the destinations,

14   they're clearly visible in West Africa, the Western Sahara,

15   Guinea Conakry, and Sierra Leone.

16   Q.  And you testified that these were origin points in South

17   America where some of the drugs would originate from for this

18   operation for the defendants?

19   A.  That is correct.

20   Q.  And how were the locations, the three locations you just

21   identified, in Western Africa significant in this case?

22   A.  Because they're important because that's where the planes

23   were going to land with the drugs, and West Africa is used as a

24   middle point in order to secure the drugs before they go to a

25   different destination.

LADHLan4                          Cardona-Cardona – Direct

1    Q.  I'm now showing you, the Court, and the parties what is

2    marked for identification as Government Exhibit 239.

3            Do you recognize this?

4    A.  Yes, correct.

5    Q.  What is it?

6    A.  Those are the continuation of places from Africa to Europe.

7    Q.  Again, are these points identified in the map locations

8    where drugs were going to be distributed in your operation with

9    the defendants?

10   A.  That is correct.

11           MS. TARLOW:  Your Honor, the government offers

12   Government Exhibit 239.

13           MR. BIALE:  Same objection, your Honor.

14           MR. DUNN:  And I join in, your Honor.

15           THE COURT:  The objection's overruled.  239's

16   received.

17           (Government's Exhibit 239 received in evidence)

18           MS. TARLOW:  Your Honor, may we publish Government

19   Exhibit 239?

20           THE COURT:  Yes.

21   BY MS. TARLOW:

22   Q.  So now using Government Exhibit 239, can you please explain

23   what the three destination locations were for the drugs in your

24   operation with the defendants.

25           MR. BIALE:  Objection.

LADHLan4                        Cardona—Cardona – Direct

1              THE COURT:  Ground?

2              MR. BIALE:  Leading.

3              THE COURT:  Overruled.

4   A.  Yes, the three locations of origin for the drugs are,

5   again, the desert in the Western Sahara, Guinea Conakry, and

6   Sierra Leone.  The destinations are Albania, Montenegro, and

7   Odessa.

8   Q.  What kind of airplane did you initially discuss using with

9   the defendants for this operation?

10  A.  Gulfstream II-B.

11  Q.  And generally, what kind of a plane is that?

12  A.  It's a long-range airplane of large capacity with a

13  capacity to transport approximately between 2,000 and

14  2,500 tons of cocaine, kilos of cocaine.

15  Q.  What is your understanding of what that type of plane is

16  generally used to transport for purposes not related to drug

17  trafficking?

18  A.  It's mostly used to do charter flights, such as VIP,

19  businessmen, public figures.

20  Q.  What do you mean by "VIP"?

21  A.  I'm referring to people that can afford paying for a

22  private flight, so it's usually wealthy people.

23  Q.  I'm going to refer to that particular airplane as the G-II

24  moving forward.  Do you understand that?

25  A.  Very well.

LADHLan4                          Cardona-Cardona – Direct

1    Q.  I'm now showing you, the Court, and the parties what have

2    been marked for identification as Government Exhibits 214 and

3    now 503-V, as in Victor.

4              Do you recognize these photographs?

5    A.  Yes.

6    Q.  What do they both depict?

7    A.  This picture describes the plane that we were preparing,

8    that we were retrofitting to fly with Jean-Claude, with cocaine

9    for this scheme that we were plotting.

10   Q.  Are these fair and accurate depictions of that plane, the

11   G-II?

12   A.  Yes.

13             MS. TARLOW:  Your Honor, the government offers

14   Government Exhibits 214 and 503-V.

15             MR. BIALE:  No objection.

16             MR. DUNN:  No objection, your Honor.

17             THE COURT:  Government Exhibit 214 and 503-V are

18   received.

19             (Government's Exhibits 214 and 503-V  received in

20   evidence)

21             MS. TARLOW:  Mr. Minikel, please publish Government

22   Exhibit 214.

23   BY MS. TARLOW:

24   Q.  Who owned the G-II airplane depicted in Government

25   Exhibit 214?

LADHLan4                          Cardona-Cardona - Direct

 1              MR. BIALE:  Objection.

 2              THE COURT:  Ground?

 3              MR. BIALE:  Foundation.

 4              THE COURT:  Sustained.

 5    BY MS. TARLOW:

 6    Q.  Did there come a time when you learned who owned this

 7    particular airplane?

 8    A.  Yes.

 9    Q.  Approximately when was that?

10    A.  That was sometime or so in the summer of 2016.

11    Q.  And what did you learn then?

12    A.  So I was in Spain, and Youssouf, the friend whose

13    photograph we just saw, who was always in contact with him,

14    called me.  He said:  Hey, do you remember our friend --

15              THE COURT:  Wait, wait, wait.  What's the name of the

16    person who called you?

17              THE WITNESS:  Youssouf Fofana.

18              THE COURT:  All right.  Go ahead.

19    A.  And he said:  Hey, look, do you remember our friend

20    Jean-Claude?  And I said:  Sure, I do.  He said:  You know,

21    he's in Portugal right now.  He bought a plane that you're

22    going to be interested in.  Jean-Claude sent me a photograph

23    through Youssouf, and he sent me his telephone number, and I

24    called him in Portugal to say that I would see him sometime

25    soon because I wasn't able to right then.

LADHLan4                    Cardona-Cardona – Direct

1    Q.  You just described a telephone conversation.  Who was that

2    telephone conversation with?

3    A.  I was talking to Youssouf Fofana.

4    Q.  Did you later have a telephone conversation with

5    Jean-Claude Landji?

6    A.  Yes, Youssouf actually gave me his phone number in

7    Portugal, and I called him.

8    Q.  And what did you discuss?

9    A.  What I said to him -- well, he wanted me to go to Portugal

10   to meet with him, and I said, no, we should set a new date for

11   us to meet.  And we set a date to see each other soon after.

12   Q.  Why did Mr. Landji want you to go to Portugal to meet with

13   him?

14          MR. BIALE:  Objection.

15          THE COURT:  Sustained.

16   Q.  What was your understanding of why Mr. Landji wanted you to

17   go to Portugal?  What did he tell you about why he wanted you

18   to go there?

19   A.  He wanted to show me the plane.

20   Q.  Which plane?

21   A.  The plane I just identified in the photograph, the G-II-B.

22   Q.  And so what is your understanding of who owned the plane

23   that you identified in Government Exhibit 214, which we have

24   been referring to as the G-II?

25   A.  Jean-Claude.

LADHLan4                           Cardona-Cardona - Direct

1    Q.  I'd like to direct your attention to October 2018.  Where

2    was the G-II located at that time?

3    A.  It was in Bamako, Mali.

4              THE COURT:  How do you spell the first place?

5              THE WITNESS:  B-o-m-o -- sorry, it's B-a-m-o-k-o, K at

6    the end.

7    Q.  What did you plan to do with the G-II plane in October 2018

8    with the defendants?

9    A.  We made a plan to send a test flight to Europe with a

10   sample of cocaine on it.

11   Q.  How much cocaine?

12   A.  One kilo.

13   Q.  And where was the plane going to come from?

14   A.  The plane was going to leave Bamako.

15   Q.  And where in Europe did you ultimately decide that the

16   plane was going to go to with the test shipment of cocaine?

17   A.  To Zagreb, Croatia.

18   Q.  I am now showing you, the Court, and the parties what is

19   marked for identification as Government Exhibit 240.  Do you

20   recognize this?

21   A.  Yes.  That's the route from Bamako to Zagreb, Croatia.

22             MS. TARLOW:  Your Honor, the government offers

23   Government Exhibit 240.

24             MR. BIALE:  Objection.  Same objection.

25             MR. DUNN:  Same objection, your Honor.

LADHLan4                    Cardona-Cardona - Direct

1          THE COURT:  I don't understand the basis for the

2    objection.

3          MR. BIALE:  Your Honor, can we come and discuss?

4          THE COURT:  Do you want to approach on it, or --

5    because I don't understand the basis for the objection.  So

6    maybe you better approach and tell me what your basis is.

7          MR. BIALE:  Very briefly, your Honor.

8          THE COURT:  I'm sorry?

9          MR. BIALE:  We will do it very briefly.

10          THE COURT:  OK.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LADHLan4                        Cardona-Cardona - Direct

1          (At sidebar)

2          THE COURT:  So he's testified that there was a plan to

3   transport a one kilogram sample of cocaine, to fly it from a

4   city in Mali to Zagreb, Croatia.  I suspect there are people on

5   the jury who don't have a clear understanding of where Mali is.

6   There may be people on the jury that don't have a clear

7   understanding of where Zagreb, Croatia is.  So we have a map

8   that shows those places.  So I don't understand why that's

9   objectionable.

10          MR. BIALE:  Couple of issues, your Honor.  First of

11  all, the question was put to the witness:  Is this the route

12  from Mali to Croatia?  I don't think that that exhibit which

13  simply shows a straight line from Mali to Croatia that looks

14  like it was drawn up on Google Maps necessarily reflects the

15  route that the plane took.  I also don't know that the witness

16  has any personal knowledge about the route that the plane took,

17  and then in addition to that, there is my prior objection that

18  I don't believe the witness prepared these maps.

19          THE COURT:  That doesn't matter.  That matters not one

20  whit whether he prepared the map.  If this was a photograph, it

21  matters not whether the witness took the photograph.  Totally

22  irrelevant.  So to the extent your objection is premised on the

23  fact that he didn't prepare the maps, there's no basis for that

24  objection at all.

25          Now, the objection about the suggestion that the plane

LADHLan4                    Cardona-Cardona – Direct

1    took this route, that's different.  So, for the record, I'll

2    say there's a straight line from the city in Mali to Zagreb,

3    and I am concerned that that could suggest to the jury that

4    that's the way the plane flew or that there was an agreement

5    that the plane would fly in a straight line from Mali, the city

6    in Mali, to Zagreb, and so I think that could be potentially

7    misleading.

8            So did he have any understanding of the route by which

9    the plane was going to fly from Mali to Zagreb?

10           MS. TARLOW:  Your Honor, I don't think he knows the

11   particular route, and I can clarify that point.  I was asking

12   him what he believed it depicted, and I believe he was -- he

13   was going to answer just that it was the destination point and

14   the arrival for the test shipment.

15           THE COURT:  OK.

16           MS. TARLOW:  And I can clarify that he doesn't know

17   that that was a straight line necessarily from point A to point

18   B.

19           MR. BIALE:  That's fine.  Thank you, Judge.

20           THE COURT:  OK.

21           MR. TREMONTE:  Judge, Judge.

22           THE COURT:  Yes.

23           MR. TREMONTE:  Inasmuch as the objective of the

24   Plexiglas witness booth is to allow the unmasked witness to be

25   fully visible, his facial features to the jury, I would suggest

1    that the witness be asked to remove his mask.

2            THE COURT:  Well, that is the purpose of the Plexiglas

3    booth.  Of course, the Plexiglas booth is not completely

4    enclosed, but I do agree that the purpose of the booth was so

5    that the jury can make a determination of the witness'

6    demeanor.

7            Do you have a view?

8            MS. TARLOW:  There's no objection from the government

9    if that is defense's preference.

10           MR. TREMONTE:  Maybe we can revisit it on the next

11   break so it's not distracting to the jury.

12           THE COURT:  Right.  So I think that's a fair point.

13   Maybe you could instruct the witness, for purposes of tomorrow,

14   that he can take the mask off in the witness -- when he's

15   within the witness booth, and then when he leaves, he's got to

16   put the mask back on.

17           MS. TARLOW:  Yes, your Honor.  Will do.

18           MR. TREMONTE:  OK.

19           THE COURT:  OK.  Thank you.

20           (Continued on next page)

21

22

23

24

25

1          (In open court; jurors present)

2               MS. TARLOW:  May I proceed, your Honor?

3               THE COURT:  Yes, go right ahead.

4     BY MS. TARLOW:

5     Q.  Turning your attention again to Government Exhibit 240.

6     What is the location in Africa that is identified on this map?

7     A.  The -- at the end of the -- at the --

8               THE INTERPRETER:  The interpreter correction.

9     A.  At the upper end of the red line is Zagreb, Croatia, and at

10    the very lower end of the red line is Bamako.

11    Q.  Do you know if the test shipment was going to be flown on a

12    path in this direct route that is shown on Government

13    Exhibit 240 from Bamako to Croatia?

14    A.  Just like we see it here.

15    Q.  Do you have personal knowledge of the exact route that was

16    taken?

17    A.  Yes.

18    Q.  Was your understanding that the test shipment was going to

19    originate from Bamako?

20    A.  Yes.

21    Q.  And arrive in Zagreb, Croatia?

22    A.  Yes.

23              MS. TARLOW:  Your Honor, the government offers

24    Government Exhibit 240.

25              MR. BIALE:  I would ask that a further foundation be

1   laid for what the witness just testified to.

2          THE COURT:  All right.  Could you further explore his

3   knowledge of the route that would be taken.

4          MS. TARLOW:  Yes, your Honor.

5   Q.  How do you know that that was the route that was going to

6   be taken with the test shipment of cocaine?

7   A.  Because I was personally involved in planning the shipment.

8   Q.  Did you have discussions about the route that the shipment

9   would take?

10  A.  Yes, of course.

11  Q.  Were you on the plane at the time of the test shipment from

12  Mali to Croatia?

13  A.  No, I was at the destination waiting for the plane.

14  Q.  So do you have personal knowledge of the route that the

15  plane, in fact, took?

16  A.  Yes.

17  Q.  Again, how is that?

18  A.  I was personally involved in creating the plan to send the

19  cocaine there.  I was the one who gave the order that the

20  cocaine should be sent to Zagreb.

21          THE COURT:  I want to make sure that the jury

22  understands the purpose that the government is offering the

23  three maps, Government Exhibit 236, Government Exhibit 239, and

24  now we're looking at Government Exhibit 240.  The purpose of

25  the maps is to show you the relationship between departure and

LADHLan4                    Cardona–Cardona – Direct

1  destination, the various countries, and so forth.

2          That's really the purpose of the maps, is that fair to

3  say?

4          MS. TARLOW:  Yes, your Honor.

5          THE COURT:  So that's why the maps are being offered

6  to you, so that you have in mind where Mali is, where Croatia

7  is, and then with respect to the earlier maps, the countries in

8  South America, the countries in Africa, and then the

9  destinations in Europe.  That's the purpose of the maps,

10  because not everybody knows off the top of their head where

11  Mali is or where a British Guyana is or where Suriname is, etc.

12  That's why the government has laid the maps before you, just so

13  you can orient yourself geographically.  OK.

14          MS. TARLOW:  Your Honor, the government offers

15  Government Exhibit 240 for that purpose.

16          THE COURT:  All right.

17          MR. BIALE:  No objection.

18          MR. DUNN:  No objection, your Honor.

19          THE COURT:  Government Exhibit 240 is received.

20          (Government's Exhibit 240 received in evidence)

21  BY MS. TARLOW:

22  Q.  What is your understanding of whether that test shipment

23  occurred?

24  A.  Yes, it did actually occur.

25  Q.  Approximately when?

1    A.  That was October 29-30, 2018.

2    Q.  Did you and the defendants continue to ship drugs on the

3    G-II airplane after October 2018?

4    A.  No, because we were arrested.

5    Q.  Approximately when were you arrested?

6    A.  October 29, 2018.

7    Q.  I'd like to take a step back for a moment and focus on your

8    relationship with Mr. Adamu.

9    A.  Yes.

10   Q.  Approximately when did you first meet him?

11   A.  At the end or beginning of 2010, sometime around then.

12   Q.  And where were you at that time when you met him?

13   A.  I was in Guinea Conakry when I first met him, and I met

14   with him in Lomé with a friend of his.

15   Q.  So focusing on the first time that you were introduced to

16   him, who introduced the two of you?

17   A.  It was one of my cocaine customers in Conakry, who was his

18   friend and my friend.  They were friends in common.  His name

19   was Jimmie.

20   Q.  When you were first introduced to Mr. Adamu, what did you

21   discuss with him?

22   A.  We discussed purchasing a plane that had been seized by the

23   authorities in Sierra Leone, the plane was in Sierra Leone, to

24   traffic cocaine with.

25   Q.  What was Adamu's role going to be?

LADHLan4                    Cardona–Cardona – Direct

1   A.  He was going to be the plane's pilot.

2   Q.  And where were you going to traffic those drugs from?

3   A.  Back then, Venezuela.

4   Q.  And where were you going to traffic those drugs to?

5   A.  They would go to West Africa, Guinea Conakry.

6          THE COURT:  All right.  So Conakry, is that a city in

7   Guinea?

8          THE WITNESS:  Yes, the name of the country is Guinea

9   Conakry, and then the city is Conakry.

10          THE COURT:  OK.  And that's in West Africa, right?

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  OK.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LADNLAN5                              Cardona - Direct

1    Q.   You testified that you discussed purchasing a plane for the
2    distribution of drugs, is that correct, with Mr. Adamu?
3    A.   Yes, the purpose of the meeting was to buy the plane that
4    had been seized by the narcotics enforcement unit of the Sierra
5    Leone police.  They were selling it quite cheaply, and so the
6    purpose of buying the plane was to continue trafficking with
7    him.
8    Q.   And what type of plane was that?
9    A.   It was a Cessna Conquest II.
10   Q.   I am now showing you, the Court, and the parties what is
11   marked for identification as Government Exhibit 235.  Do you
12   recognize this?
13   A.   Yes, that's that type of plane, yes.
14   Q.   And what type of plane is that.
15   A.   That is a Cessna Conquest II.
16          MS. TARLOW:  Your Honor, the government offers
17   Government Exhibit 235.
18          MR. BIALE:  No objection.
19          MR. DUNN:  No objection, your Honor.
20          THE COURT:  Government Exhibit 235 is received.
21          (Government Exhibit 235 received in evidence)
22   Q.   Did you later discuss purchasing another plane with Adamu
23   to traffic drugs?
24   A.   With Adamu, we met later on in Senegal for him to pilot a
25   plane for us, a 727.

LADNLAN5                          Cardona - Direct

1    Q.  Before we discuss the 727 plane, had you also discussed

2    purchasing with Adamu another type of plane to traffic drugs?

3    A.  Yes, a King 350, yes.

4    Q.  And why that kind of plane?

5    A.  Because that plane has similar features to the Conquest II.

6    It's a type of plane that can land in makeshift landing strips,

7    and it's the appropriate one for cocaine trafficking from South

8    America and West Africa.

9    Q.  What about that plane makes it ideal for landing on

10   makeshift landing strips?

11   A.  It can take off very quickly during a very short period of

12   time, and it can also land on short landing strips, on

13   makeshift landing strips, even on highways.

14            MS. TARLOW:  I am now showing you the Court and the

15   parties what is marked for identification as Government Exhibit

16   209.

17   BY MS. TARLOW:

18   Q.  Do you recognize this?

19   A.  Yes.

20   Q.  What is it?

21   A.  It is a King 350.

22            MS. TARLOW:  The government offers Government Exhibit

23   209.

24            MR. BIALE:  No objection, Judge.

25            MR. DUNN:  No objection.

LADNLAN5                          Cardona - Direct

1           THE COURT:  209 is received.

2           (Government Exhibit 209 received in evidence)

3           MS. TARLOW:  Your Honor, if we can now publish first

4    Government Exhibit 235.

5           THE COURT:  Yes.

6           MS. TARLOW:  And now 209.

7    BY MS. TARLOW:

8    Q.  What did you discuss with Adamu that you would transport on

9    these two planes?

10   A.  We talked about the quantities that could be transported,

11   quantities of drugs that these planes could hold -- the Cessna

12   about 800 kilos and the King about one ton -- between South

13   America and the coast of West Africa.

14   Q.  Why did you discuss the specific quantities of cocaine with

15   Adamu that would be transported on these planes?

16   A.  It's important to know the quantity of cocaine to be

17   transported because that's proportionate to the type of fuel

18   that the plane uses, burns.  In order to do calculations from

19   origin and destination, you measure the distance, and based on

20   the distance, then the quantity of cocaine is determined.

21   Q.  What, if anything, did you discuss with Adamu about how you

22   would avoid being caught transporting those drugs with these

23   planes?

24   A.  Yes.  We discussed about the need to fly an undeclared

25   flight.  We referred to it as black flight.  It's a completely

LADNLAN5                      Cardona - Direct

1    clandestine flight.

2              All location systems of the plane are turned off, the

3    location systems, they are turned off.  Yes, we discussed about

4    that matter.  All those details are necessary to be discussed.

5    Q.  Why would you turn off your location systems on the plane

6    for this type of scheme?

7    A.  In order not to be detected.

8    Q.  By whom?

9    A.  Not to be detected by the authorities who are monitoring

10   these kind of flights.

11   Q.  Is there a term used for those types of flights?

12   A.  Yes.  A black flight, an undeclared flight.

13             THE COURT:  You referred to location systems.

14             Are they known as transponders?

15             THE WITNESS:  Yes.  Correct.  The transponders and the

16   GPS.

17   BY MS. TARLOW:

18   Q.  What, if anything, did you discuss about what would happen

19   at any airports to evade detection?

20   A.  Yes.  The equipment that your Honor mentioned is what is

21   visible on the screens at the airport.  By turning them off,

22   then you avoid being seen.

23   Q.  What did you discuss doing with respect to certain airport

24   officials?

25   A.  Especially on the African side, and also from South America

LADNLAN5                        Cardona - Direct

1   as well, you normally bribe the authorities in order to arrive

2   securely with the cocaine, the crew, and the airplane.  But I

3   would like to remind that this plane can be operated from any

4   landing strip, not necessarily the airport.

5   Q.  What do you mean by that?

6   A.  For instance, I'm referring to the fact that you can land

7   even on a road, or even taking off.  In the case of Africa,

8   when we got there, very few times you land on an airport with

9   this type of plane.  You land on makeshift landing strips,

10  where the army provided us protection.

11  Q.  Did you discuss using makeshift landing strips with Adamu

12  with respect to using these planes?

13  A.  Yes, both options.  We considered both options.

14  Q.  Did you end up buying the Cessna Conquest II in Sierra

15  Leone?

16  A.  No.  Because when we initiated the clearance process from

17  the authorities in Sierra Leone, the clearance process for the

18  airplane in Sierra Leone would take over a year.

19  Q.  Did you end up buying the King Air 350?

20  A.  Yes.  We were looking into it, but then there was another

21  traffic operation and we changed our minds.

22  Q.  Approximately when did you first start talking about this

23  other trafficking operation?

24  A.  That was in 2010.

25  Q.  And who were you having discussions with about this other

LADNLAN5                      Cardona - Direct

1   trafficking operation?

2   A.  This operation was being planned as well by Juan Carlos, a

3   friend that I met in Africa.

4   Q.  How did you know Juan Carlos?

5   A.  I met him in Guinea trafficking with cocaine.  He would

6   sell to me, and I would buy from him.

7   Q.  What did you discuss with Mr. Adamu about this operation?

8   A.  I contacted him in order for him to come to Senegal -- I

9   was in Senegal -- to fly a 727 with cocaine that we were going

10  to send to South America.

11  Q.  What is a 727?

12  A.  It's a large-capacity cargo plane.  It's a heavy plane.

13  It's a large plane.

14  Q.  After you had those conversations with Mr. Adamu about the

15  operation, what did he then do?

16  A.  We came to an agreement with him.  My friend discussed with

17  him money issues, and we proceeded to send the plane to Panama.

18  Q.  Who was onboard the plane at that time?  Who did you

19  understand was onboard?

20  A.  Jibril and his crew and an engineer who the name escapes me

21  and also another person whom I don't remember the name either.

22  Q.  And what is --

23  A.  Another pilot.

24  Q.  What is your understanding of what happened after he flew

25  to Panama on the 727?

LADNLAN5                     Cardona - Direct

1    A.  We flew the plane there, and there the Colombians were the

2    owners of the drugs decided to switch pilots.  So Jibril went

3    back to his country.

4    Q.  Did you speak with him after he returned from Panama?

5    A.  Yes.

6    Q.  And what did you discuss?

7    A.  The friend who introduced him to me and him, they were

8    complaining to me that they owed him money as compensation for

9    the 727.  He was like trying to collect it from me.

10   Q.  Who owed him money?

11   A.  Juan Carlos did.

12   Q.  And Juan Carlos owed who money?

13   A.  To Jibril.

14   Q.  And how much did Jibril say Juan Carlos owed him?

15   A.  $20,000.

16   Q.  What did Jibril Adamu say that he was owed the money for?

17   A.  For compensation for have not chosen him as pilot of the

18   727.

19   Q.  What did you discuss with Mr. Adamu about what happened

20   with the plane after it left from Panama?

21   A.  I told him what happened in Mali, that the plane had a

22   crash in the desert.

23   Q.  Which plane?

24   A.  The Boeing 727 that we are discussing right now.

25   Q.  What did you describe happened when the plane crashed in

LADNLAN5                    Cardona - Direct

1    Mali?

2    A.  I told him that there had been a sandstorm at landing,

3    which caused the main turbine to blow up.  We proceeded to burn

4    the plane, and when they found the plane that made

5    international news.

6    Q.  What did you discuss was on the plane at the time that it

7    crashed in Mali?

8    A.  Yes.  There were 5,000 kilos of cocaine.

9    Q.  And then this was the plane that Adamu had initially flown

10   to Panama?

11   A.  Yes, correct.

12   Q.  And that plane was subsequently flown by other individuals

13   to Mali?

14   A.  Yes, correct.

15   Q.  Where did you go after that 727 plane crashed in Mali?

16   A.  I went to Bamako.

17   Q.  Again, where is Bamako located?

18   A.  Bamako is the capital of Mali, the one we were just viewing

19   earlier.

20   Q.  Why did you go to Bamako then?

21   A.  I went because I was going to buy part of the drugs that

22   were on that plane.

23   Q.  What did you then do?

24   A.  I did go there and they started selling me some of those

25   drugs, and then I started selling it.  I sold it.

LADNLAN5                    Cardona - Direct

1    Q.  What quantity of drugs were you responsible for selling?

2    A.  Two tons.

3    Q.  And where did you sell them?

4    A.  I sold them there in Bamako.

5    Q.  Did there come a time when you were arrested after that

6    drug shipment?

7    A.  Yes, correct.

8    Q.  Approximately when was that?

9    A.  That was sort of towards the end of 2010, sometime around

10   then.

11   Q.  What were you arrested for?

12   A.  Because of the death of Juan Carlos.

13   Q.  Again, how was Juan Carlos related to this 727 shipment of

14   drugs?

15   A.  Well, Juan Carlors and his associate, Miguel, were

16   responsible for security regarding the plane's arrival and also

17   the logistical support in Mali when it arrived.

18   Q.  What do you mean by security?

19   A.  So by security I mean that nothing would happen to the

20   plane, its crew, or the cocaine when it arrived there.  They

21   bribed the authorities.

22   Q.  Why did you kill Juan Carlos?

23   A.  Because we had gotten information from Miguel that he was

24   going to kill us.  He was very close to the chief of the

25   intelligence services in that country, so this was a serious

LADNLAN5                        Cardona - Direct

1    threat.

2    Q.  Who was close to the chief of intelligence services?

3    A.  Miguel.

4    Q.  And what was the information that Miguel received?

5    A.  Well, this chief of intelligence had told Miguel that we

6    had to be very careful, be on high alert, because he had found

7    out that there were some Nigerian hitmen there, and Juan Carlos

8    wanted to kill us.

9    Q.  What was your understanding of who had hired those hitmen?

10   A.  Juan Carlos.  So Juan Carlos felt he was being cut out of

11   the business.  He had not complied payment-wise with the

12   Colombians he was dealing with.  And he reacted in that manner.

13   Things were going very well for me businesswise.  They were

14   also for Miguel.  He was envious.

15   Q.  Who was envious?

16   A.  Juan Carlos.

17   Q.  Was there anyone else who helped you kill Juan Carlos?

18   A.  Yes, Miguel, and there was a third guy, Gustavo.  He was

19   Colombian, too.  Miguel was the one who set, you know, the trap

20   so we could take him down.

21   Q.  And where did that happen?

22   A.  That happened in Bamako, in the industrial area of Bamako.

23   Q.  What do you mean by Miguel set a trap?

24   A.  Yes.  Well, Miguel asked him to come to that industrial

25   area saying to him that he was going to give him another chance

LADNLAN5                          Cardona - Direct

1    to sort of build himself back up in the business, be able to

2    pay what he owed, and that is how he showed up for the

3    appointment that Miguel had made with him.

4    Q.  And when he showed up at this warehouse in Mali, how did

5    you kill him?

6    A.  It happened very fast.  He drove to the warehouse.  He

7    parked the car that he had drove there in.  Miguel had warned

8    me that he would be armed and, therefore, we had to react

9    really fast.  So after he parked his car I shot him.

10   Q.  Who?

11   A.  I shot Juan Carlos.

12   Q.  And what did you do after shooting Juan Carlos?

13   A.  Well, our plan was to make the body disappear.  So,

14   immediately after, we started making the body disappear.  I

15   started to cut him up.  I had started dismembering him, but the

16   police showed up.  There were police, police, police all over

17   the place.

18            So we ran off with the guy who was in there with us to

19   hide the body.  We put it under some sacks of cement.  It all

20   happened very fast, because the police, well, it took them

21   about ten or fifteen minutes to come in.

22   Q.  What happened after the police came into the warehouse?

23   A.  The police looked around for the body, and once they found

24   it we were arrested immediately.

25   Q.  And what happened after you were arrested?  What did you

LADNLAN5                        Cardona - Direct

```
 1   do?
 2   A.  We immediately set off to hire the best lawyers possible in
 3   Mali, and together with them we all cooked up a scheme to get
 4   out of prison quickly.
 5   Q.  What was that scheme?
 6   A.  To pay off the authorities who had to be paid off so we
 7   could be released.
 8   Q.  Did you end up going to trial?
 9   A.  Yes.
10   Q.  And what did you say about your defense at trial?
11   A.  That it was an act of personal defense.  It was personal
12   defense.
13   Q.  Was that a lie?
14   A.  Yes.
15   Q.  Were you convicted?
16   A.  Yes.  But, well, for that self-defense.  Miguel and Gustavo
17   were released.  I got five years.
18   Q.  And what happened after you were sentenced to five years?
19   A.  Well, a few months later, well after Miguel and Gustavo
20   were released, which was around 18 months after the arrests, a
21   few months after that, maybe two or three months, I was given a
22   presidential pardon.
23   Q.  And what is your understanding of how that presidential
24   pardon was obtained?
25   A.  Miguel was able to obtain that by an act of corruption.
```

LADNLAN5                    Cardona - Direct

1    There are presidential pardons every year in Mali, and in order
2    to be put on that list you must pay money.
3    Q.  Is it your understanding that is what Miguel did for you?
4    A.  Yes, yes.
5    Q.  Had you ever been arrested before that time?
6    A.  Yes.  In Italy.
7    Q.  And approximately when was that?
8    A.  In '90, 1990.
9    Q.  And for what?
10   A.  Cocaine trafficking.
11   Q.  Were there others involved in that arrest?
12   A.  Yes.
13   Q.  Did you also go to trial for that crime?
14   A.  Yes.
15   Q.  And did you testify?
16   A.  Yes.
17   Q.  What did you say?
18   A.  Well, I said that the act that had been committed, I had
19   committed it with one of the other people because everybody
20   else had been released.
21   Q.  And why did you say that?
22   A.  I said that so there would be fewer people in the case and
23   the law provided for lower penalties, much lower penalties.
24   Q.  But that was a lie?
25   A.  Yes.

LADNLAN5                          Cardona - Direct

1    Q.  So you lied in order to get a lower sentence?

2    A.  Yes, correct.

3    Q.  Did you serve a jail sentence?

4    A.  Yes.

5    Q.  For how long?

6    A.  Four years and a few months, maybe three or four additional

7    months.

8    Q.  Okay.  I'd like to take a step back now and discuss your

9    relationship with Mr. Landji.

10   A.  Very well.

11   Q.  Approximately when did you first meet him?

12   A.  In 2009.

13   Q.  Where?

14   A.  In Conakry, Guinea Conakry.

15   Q.  Who introduced you to Mr. Landji?

16   A.  A friend of his by the name of Cassius introduced him to

17   one of my associate Loco Lucho.

18   Q.  How did you know Loco Lucho?

19   A.  I knew him from a long time ago because Lucho is a friend

20   of my cousin who is also involved if the cocaine base in

21   Conakry.

22   Q.  Had you ever trafficked drugs with Loco Lucho?

23   A.  Yes.

24   Q.  And that's one person, Loco Lucho?

25   A.  Yes.

LADNLAN5                        Cardona – Direct

1    Q.  You also mentioned someone named Cassius?

2    A.  Yes.

3    Q.  Who introduced you to Cassius?

4    A.  Lucho's wife knew him.  She was Ghanaian, so she knew

5    Cassius.

6    Q.  Had you ever trafficked drugs with Cassius?

7    A.  Yes.

8             THE INTERPRETER:  Counselor, could the interpreter

9    just clarify something.  Interpreter's correction, Lucho's wife

10   was Guinean, from Guinea.  She was one of the locals.

11   Q.  When you were introduced to Landji, who was present?

12   A.  Cassius was there, I was there, Juan Carlos was there, and

13   Lucho.

14   Q.  And what did you discuss with Landji at that time when you

15   were first introduced to him?

16   A.  We discussed a flight to transport cocaine from Venezuela.

17   Q.  What did you discuss that Landji's role would be?

18   A.  The transportation.

19   Q.  And what kind of drugs?

20   A.  Cocaine.

21   Q.  Did you discuss with Landji the quantity of cocaine?

22   A.  Yes.

23   Q.  How much did you discuss that he would be transporting?

24   A.  Two tons.

25   Q.  Did you discuss what kind of plane Landji would use?

LADNLAN5                          Cardona - Direct

1    A.  Yes, it was a Gulfstream III.

2    Q.  What is your understanding of what type of plane a

3    Gulfstream III is?

4    A.  The Gulfstream III is a plane that has very similar

5    characteristics, like a G2B.  It has a flying range of 3500

6    nautical miles, and a cargo capacity of between 2 and 2.5 tons.

7    Q.  When it is not being used for drug trafficking, what is

8    your understanding of what that plane is generally used for?

9    A.  It's used for charter flights and business flights.

10   Q.  Where did Mr. Landji say that the Gulfstream III plane was

11   going to come from?

12   A.  He was going to fly the plane from here, from the United

13   States.

14   Q.  I'm now showing you, the Court, and the parties what has

15   been marked as Government Exhibit 501BB.

16          MS. TARLOW:  If you can, Mr. Minikel, zoom in on the

17   photograph.

18   BY MS. TARLOW:

19   Q.  Do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  It's a Gulfstream III.

23          MS. TARLOW:  Your Honor, the government offers

24   Government Exhibit 501BB.

25          THE COURT:  Any objection?

LADNLAN5                          Cardona - Direct

1              MR. BIALE:  No objection.

2              MR. DUNN:  No objection, your Honor.

3              THE COURT:  Government Exhibit 501BB is received.

4              (Government Exhibit 501BB received in evidence)

5              MS. TARLOW:  Your Honor, may we publish Government

6    Exhibit 501BB?

7              THE COURT:  Yes.

8    BY MS. TARLOW:

9    Q.  What was your understanding of how Landji was going to get

10   access to this plane?

11   A.  Yes.  We gave him the money so he could lease it, do the

12   leasing, to him and to Cassius to both of them.

13   Q.  Was he going to lease it through his aviation company?

14   A.  Yes.  That type of leasing is usually done through aviation

15   companies.

16   Q.  What was the name of Mr. Landji's aviation company?

17   A.  Okland Aviation.

18   Q.  What did you discuss with Mr. Landji about where the flight

19   using the Gulfstream III was going to depart from?

20   A.  Guinea Conakry.  The plane would come from the United

21   States land at the Guinea Conakry International Airport.  And

22   then after that it would go to Venezuela to pick up the drugs,

23   so Conakry to Venezuela.

24   Q.  And what did you discuss with Landji about the path that

25   the plane would take from Conakry to Venezuela?

LADNLAN5                     Cardona - Direct

A.   Yes.  The plan was for him to fly the plane to an island
near Venezuela.  And once he was, had left the island on his
way back to Conakry, he was going to make a detour off the
route and land on an airstrip in Venezuela that we were going
to give him the indications of.  It would land there, load the
cocaine very quickly, refuel quickly, take off again heading to
Guinea Conakry, where we would be waiting for him.

            THE COURT:  All right.  Well, let's leave it there.

            Ladies and gentlemen, it's 2:30, so we're going to
break for the day.  As always, don't discuss the case, keep an
open mind, because there's more evidence.  We will resume
tomorrow at 9:30 tomorrow morning.

            Thank you all very much.

            (Continued on next page)

1           (Jury not present)

2           THE COURT:  The witness can step down.

3           (Witness not present)

4           THE COURT:  Please be seated.

5           All right.  So I will be expecting a letter from the

6    defendants in response to the government's letter that came in

7    this morning at about 1 a.m.

8           Are there matters the lawyers want to raise before we

9    break?

10          MS. TARLOW:  Not from the government, your Honor.

11          MR. BIALE:  Nothing on behalf of Mr. Landji, your

12   Honor.

13          MR. DUNN:  Nothing, your Honor.

14          THE COURT:  All right.

15          Why don't we meet tomorrow morning at 9:00, okay?  So

16   that we have time.  If I am in a position to issue a ruling at

17   that time, I will.

18          Mr. Hellman, something you wanted to say?

19          MR. HELLMAN:  Yes, sorry.  The white tape that the

20   witness has used to try to reclose Exhibits 102 and 103 is not

21   holding its seal.  Additional evidence tape has been brought.

22   I just wanted to make a record that Special Agent Maher is

23   going to add the tape and his initials to it, unless there's

24   any objection.

25          THE COURT:  What exhibit is that you're referring to?

LADNLAN5                          Cardona – Direct

1            MR. HELLMAN:  Both 102 and 103.  They are in the

2       government's trial cart here in the courtroom and the tape has

3       come undone.

4            THE COURT:  All right.  That will be done.  If there's

5       nothing else, we are adjourned until 9:00 tomorrow.

6            MR. HELLMAN:  Thank you, your Honor.

7            (Adjourned to Thursday, October 14, 2021, at 9:00

8       a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination  of:                                    Page

 TOMISLAV MILUNIC

Direct By Mr. Hellman . . . . . . . . . . . . 177

Cross By Ms. Renzler . . . . . . . . . . . . 188

Cross By Mr. Dunn . . . . . . . . . . . . . 194

Redirect By Mr. Hellman . . . . . . . . . . 201

Recross By Mr. Dunn . . . . . . . . . . . . 203

ANTON KOHUT

Direct By Mr. Hellman . . . . . . . . . . . 204

Cross By Ms. Cistaro . . . . . . . . . . . . 228

Redirect By Mr. Hellman . . . . . . . . . . 238

Cross By Ms. Renzler . . . . . . . . . . . . 242

Recross By Ms. Cistaro . . . . . . . . . . . 243

DAVID CARDONA-CARDONA

Direct By Ms. Tarlow . . . . . . . . . . . . 244

                GOVERNMENT EXHIBITS

Exhibit No.                                   Received

 102   . . . . . . . . . . . . . . . . . . 176

 241   . . . . . . . . . . . . . . . . . . 179

 103   . . . . . . . . . . . . . . . . . . 227

 201, 202, and 205  . . . . . . . . . . . 247

 203   . . . . . . . . . . . . . . . . . . 253

 236   . . . . . . . . . . . . . . . . . . 257

 239   . . . . . . . . . . . . . . . . . . 258

214 and 503-V  . . . . . . . . . . . . . . 260

240  . . . . . . . . . . . . . . . . . . 270

235  . . . . . . . . . . . . . . . . . . 273

209  . . . . . . . . . . . . . . . . . . 275

501BB  . . . . . . . . . . . . . . . . . 289

DEFENDANT EXHIBITS

Exhibit No.                                Received

AAA  . . . . . . . . . . . . . . . . . . 231

BBB  . . . . . . . . . . . . . . . . . . 233